**No. 25-1674**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

PEOPLE OF THE STATE OF CALIFORNIA, *EX REL.* ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA,

*Plaintiff-Appellee*,

v.

EXXON MOBIL CORPORATION,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of California,
No. 3:24-cv-07594-RS

_____

## BRIEF FOR APPELLANT EXXON MOBIL CORPORATION

_____

DAWN SESTITO
MATTHEW COWAN
O'MELVENY & MYERS, LLP
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071
dsestito@omm.com

DAVID J. LENDER
WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, NY 10153
david.lender@weil.com

PAUL D. CLEMENT
C. HARKER RHODES IV
NICCOLO A. BELTRAMO
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellant Exxon Mobil Corporation*

June 23, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1-1, Appellant Exxon Mobil Corporation certifies that it is a publicly traded corporation (NYSE stock symbol: XOM) and has no corporate parent, and that no publicly held corporation owns 10% or more of Exxon Mobil Corporation's stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ......................................................................... 1

STATEMENT OF JURISDICTION .......................................................... 3

STATEMENT OF THE ISSUES ............................................................ 4

RELEVANT STATUTORY PROVISIONS ...................................................... 4

STATEMENT OF THE CASE .............................................................. 4

    A.    Factual Background ........................................................ 4

    B.    Procedural History ........................................................ 7

SUMMARY OF ARGUMENT ................................................................ 13

STANDARD OF REVIEW ................................................................. 15

ARGUMENT ........................................................................... 16

I.    The District Court Had Admiralty Jurisdiction Over This Case ................. 16

    A.    California's Claims Allege Injury on Navigable Waters ..................... 16

    B.    California's Claims Involve a Potentially Disruptive Impact on Maritime Commerce ........................................................ 19

    C.    California's Claims Involve a Substantial Relationship to Traditional Maritime Activity ......................................................... 20

    D.    California Cannot Defeat Admiralty Jurisdiction by Relying on the Saving-to-Suitors Clause ............................................... 23

II.    The District Court Had Federal-Enclave Jurisdiction Over This Case ........... 36

III.    The District Court Had Federal-Officer Removal Jurisdiction Over This Case ... 45

A.     ExxonMobil's Actions Under Federal Direction Have a Causal Nexus With California's Claims ............................................... 47

B.     ExxonMobil Has Colorable Federal Defenses .................................. 56

CONCLUSION ....................................................................................... 59

STATEMENT OF RELATED CASES ................................................... 61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM

## TABLE OF AUTHORITIES

**Cases**

*Ali v. Rogers*,
    780 F.3d 1229 (9th Cir. 2015) .............................................................. 16, 19, 20

*Allison v. Boeing Laser Tech. Servs.*,
    689 F.3d 1234 (10th Cir. 2012) ...................................................................39

*Alvares v. Erickson*,
    514 F.2d 156 (9th Cir. 1975) ......................................................................37

*ARCO Env't Remediation, L.L.C.*
    *v. Dep't of Health & Env't Quality of Mont.*,
    213 F.3d 1108 (9th Cir. 2000) ....................................................................43

*Arizona v. Manypenny*,
    451 U.S. 232 (1981) .............................................................................. 45, 57

*Arpin v. Santa Clara Valley Transp. Agency*,
    261 F.3d 912 (9th Cir. 2001) ..................................................................... 26, 27

*Baker v. Atl. Richfield Co.*,
    962 F.3d 937 (7th Cir. 2020) ......................................................................58

*Bell v. Arvin Meritor, Inc.*,
    2012 WL 1110001 (N.D. Cal. Apr. 2, 2012) .........................................................40

*Betzner v. Boeing Co.*,
    910 F.3d 1010 (7th Cir. 2018) ....................................................................54

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) .............................................................................. 57, 58

*BP P.L.C. v. Mayor of Balt.*,
    593 U.S. 230 (2021) ..................................................................................3

*Bradford v. Harding*,
    284 F.2d 307 (2d Cir. 1960) .......................................................................46

*Christensen v. Ga.-Pac. Corp.*,
    279 F.3d 807 (9th Cir. 2002) ......................................................................19

*City & Cnty. of Honolulu v. Sunoco LP*,
  39 F.4th 1101 (9th Cir. 2022)........................................................ *passim*

*Cnty. of San Mateo v. Chevron Corp.*,
  32 F.4th 733 (9th Cir. 2022)......................................................... *passim*

*Colorado v. Symes*,
  286 U.S. 510 (1932)............................................................................45

*Conner v. Aerovox, Inc.*,
  730 F.2d 835 (1st Cir. 1984) ...........................................................21

*DeFiore v. SOC LLC*,
  85 F.4th 546 (9th Cir. 2023)......................................................... *passim*

*Durham v. Lockheed Martin Corp.*,
  445 F.3d 1247 (9th Cir. 2006)....................................................... *passim*

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005).................................................................... 18, 39

*ExxonMobil Corp. v. United States*,
  108 F.Supp.3d 486 (S.D. Tex. 2015)................................................50

*Fung v. Abex Corp.*,
  816 F.Supp. 569 (N.D. Cal. 1992) ...................................................44

*Ghotra ex rel. Ghotra v. Bandila Shipping, Inc.*,
  113 F.3d 1050 (9th Cir. 1997)................................................ 29, 30, 32

*Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. S.D.*,
  865 F.3d 1237 (9th Cir. 2017)....................................................... *passim*

*Gruver v. Lesman Fisheries Inc.*,
  489 F.3d 978 (9th Cir. 2007)................................................. 20, 21, 22

*Guidry v. Durkin*,
  834 F.2d 1465 (9th Cir. 1987)..........................................................18

*Hansen v. Grp. Health Coop.*,
  902 F.3d 1051 (9th Cir. 2018).........................................................46

*Hawaii ex rel. Louie v. HSBC Bank Nev., N.A.*,
  761 F.3d 1027 (9th Cir. 2014)................................................................43

*Hukkanen v. Air & Liquid Sys. Corp.*,
  2017 WL 1217075 (C.D. Cal. Mar. 31, 2017).......................................43

*Hunter v. Philip Morris USA*,
  582 F.3d 1039 (9th Cir. 2009)...............................................................54

*In re Blue Water Boating, Inc.*,
  786 F.App'x 703 (9th Cir. 2019).............................................................17

*In re Garrett*,
  981 F.3d 739 (9th Cir. 2020)..................................................................17

*In re Mission Bay Jet Sports, LLC*,
  570 F.3d 1124 (9th Cir. 2009)................................................................17

*Isaacson v. Dow Chem. Co.*,
  517 F.3d 129 (2d Cir. 2008)...................................................................51

*Jamil v. Workforce Res., LLC*,
  2018 WL 2298119 (S.D. Cal. May 21, 2018).........................................39

*Jefferson Cnty. v. Acker*,
  527 U.S. 423 (1999)...............................................................................51

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
  513 U.S. 527 (1995)........................................................................ *passim*

*Johanns v. Livestock Mktg. Ass'n*,
  544 U.S. 550 (2005)...............................................................................31

*Kakarala v. Wells Fargo Bank, NA*,
  615 F.App'x 424 (9th Cir. 2015).............................................................24

*Kohlasch v. N.Y. State Thruway Auth.*,
  460 F.Supp. 956 (S.D.N.Y. 1978) ..........................................................22

*Latiolais v. Huntington Ingalls, Inc.*,
  951 F.3d 286 (5th Cir. 2020)..................................................................47

vi

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) ................................................................. 51, 55, 59

*Lewis v. Lewis & Clark Marine, Inc.*,
531 U.S. 438 (2001).................................................................. *passim*

*Lu Junhong v. Boeing Co.*,
792 F.3d 805 (7th Cir. 2015)..................................................... 33, 35

*Madruga v. Super. Ct. of Cal.*,
346 U.S. 556 (1954)...................................................................29

*Maryland v. 3M Co.*,
130 F.4th 380 (4th Cir. 2025)....................................................44

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)...................................................................47

*Moreno v. Ross Island Sand & Gravel Co.*,
2015 WL 5604443 (E.D. Cal. Sept. 23, 2015)...........................17

*Morris v. Princess Cruises, Inc.*,
236 F.3d 1061 (9th Cir. 2001)....................................... 25, 26, 27, 30

*N. Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*,
69 F.3d 1034 (9th Cir. 1995)...................................................... 24, 25

*N.J. Steam Navigation Co. v. Merchs.' Bank of Bos.*,
47 U.S. (6 How.) 344 (1848) .....................................................28

*Nat'l Sea Clammers Ass'n v. City of N.Y.*,
616 F.2d 1222 (3d Cir. 1980)....................................................22

*Ochoa-Salgado v. Garland*,
5 F.4th 615 (5th Cir. 2021).......................................................31

*Plakas v. Middlesex Cnty.*,
803 F.2d 714, 1986 WL 17843 (4th Cir. 1986)........................21

*Red Cross Line v. Atl. Fruit Co.*,
264 U.S. 109 (1924)................................................................ 29, 32

*Riggs v. Airbus Helicopters, Inc.*,
  939 F.3d 981 (9th Cir. 2019) ................................................................46

*Romero v. Int'l Terminal Operating Co.*,
  358 U.S. 354 (1959) ................................................................. 30, 33

*Sinotes-Cruz v. Gonzales*,
  468 F.3d 1190 (9th Cir. 2006) ..............................................................31

*Solano v. Beilby*,
  761 F.2d 1369 (9th Cir. 1985) ..............................................................18

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004) ..............................................................................38

*Sullivan v. First Affiliated Secs., Inc.*,
  813 F.2d 1368 (9th Cir. 1987) ..............................................................44

*Taghadomi v. United States*,
  401 F.3d 1080 (9th Cir. 2005) ................................................. 17, 18, 19

*Tobar v. United States*,
  639 F.3d 1191 (9th Cir. 2011) ................................................. 17, 18, 20

*Totah v. Bies*,
  2011 WL 1324471 (N.D. Cal. Apr. 6, 2011) .........................................39

*United States v. Cox*,
  7 F.3d 1458 (9th Cir. 1993) ..................................................................26

*United States v. Redwood City*,
  640 F.2d 963 (9th Cir. 1981) ................................................................22

*Walton v. Channel Star Excursions, Inc.*,
  2007 WL 763299 (E.D. Cal. Mar. 9, 2007) ..........................................17

*Watson v. Philip Morris Cos.*,
  551 U.S. 142 (2007) ................................................................. 45, 48, 50

**Constitutional Provisions**

U.S. Const. art.I, §8, cl.17 ....................................................................37

U.S. Const. art.IV, §3, cl.2 ....................................................................37

**Statutes**

28 U.S.C. §1332(d) ...............................................................................11

28 U.S.C. §1333 ............................................................................... 18, 28

28 U.S.C. §1333(1) ........................................................................ *passim*

28 U.S.C. §1367 ...................................................................................18

28 U.S.C. §1441 ................................................................................... 30

28 U.S.C. §1441(a) ....................................................................... *passim*

28 U.S.C. §1441(a) (2006)...................................................................34

28 U.S.C. §1441(b) (2006) ..................................................................34

28 U.S.C. §1441(b)(2)..........................................................................35

28 U.S.C. §1442(a)(1) ................................................................... *passim*

28 U.S.C. §1447(c) ........................................................................ 24, 25

Cal. Pub. Res. Code §14500 *et seq.* .....................................................5

Cal. Pub. Res. Code §14547 ..................................................................6

Cal. Pub. Res. Code §18000 ..................................................................6

Cal. Pub. Res. Code §18015 ..................................................................6

Cal. Pub. Res. Code §18017 ..................................................................6

Cal. Pub. Res. Code §40000 *et seq.* .....................................................5

Cal. Pub. Res. Code §41780.01 .............................................................6

Cal. Pub. Res. Code §42300 *et seq.* .....................................................6

Cal. Pub. Res. Code §42649 ..................................................................6

Cal. Pub. Res. Code §42649.2 ...............................................................6

Cal. Pub. Res. Code §42924.5 ............................................................................6

Judiciary Act of 1789, Ch. 20, 1 Stat. 73 ............................................... 28

Federal Courts Jurisdiction and Venue Clarification Act of 2011,
    Pub. L. No. 112-63, 125 Stat. 758 .......................................................34

Removal Clarification Act of 2011,
    Pub. L. No. 112-51, 125 Stat. 545 .......................................................47

**Other Authorities**

Amended Notice of Removal, *Sierra Club, Inc. v. Exxon Mobil Corp.*,
    No. 3:24-cv-7288 (N.D. Cal. filed Nov. 8, 2024)................................11

CalRecycle, *Plastics Programs and Resources*,
    https://perma.cc/G5RJ-NYR2 (last visited June 23, 2025) ...............7

Letter from Rob Bonta, Att'y Gen. of Cal., to Carolyn Hoskinson,
    Dir. of Off. of Res. Conserv. & Recovery, EPA, July 31, 2024,
    https://perma.cc/VX9T-8GB6................................................................52

Merriam-Webster Dictionary, https://perma.cc/ZU23-Y257
    (last visited June 23, 2025) ..................................................................52

Motion to Dismiss, *Sierra Club, Inc. v. Exxon Mobil Corp.*,
    No. 3:24-cv-7288 (N.D. Cal. filed Mar. 27, 2025)..............................11

Motion to Strike, *Sierra Club, Inc. v. Exxon Mobil Corp.*,
    No. 3:24-cv-7288 (N.D. Cal. filed Mar. 27, 2025)..............................11

Notice of Removal, *Sierra Club, Inc. v. Exxon Mobil Corp.*,
    No. 3:24-cv-7288 (N.D. Cal. filed Oct. 18, 2024)................................9

*Synthetic Rubber—Bet You Didn't Know It Was a Plastic!*, Plastics
    Industry, https://perma.cc/3LGK-E38Y (last visited June 23, 2025) ................ 52

C. Wright et al., *Federal Practice & Procedure* (2d ed. 1985) .............................. 44

Rosanna Xia, *The Biggest Likely Source of Microplastics in California
    Coastal Waters? Our car tires*, L.A. Times (Oct. 2, 2019),
    https://perma.cc/9TAR-RU3J ...............................................................53

**INTRODUCTION**

For nearly half a century, California has actively promoted recycling as a means of reducing plastic waste and plastic pollution. It has repeatedly told the public that recycling will help mitigate plastic waste, calling it "the most promising method of controlling the increasing amounts of plastics in the waste stream" because "most plastics are technically recyclable." 2-ER-100. And it has put that view into effect through legislation, passing numerous laws encouraging or mandating recycling of all manner of plastic products. California has also recognized the vast benefits that plastic provides, recognizing that plastics are "integral to our lifestyle and economy" and "contribute to our health, safety, and peace of mind in endless beneficial ways." 2-ER-151, 154.

Despite all that, California has decided to sue Exxon Mobil Corporation (ExxonMobil) for saying the exact same things, claiming that ExxonMobil's own efforts to promote recycling are responsible for "the plastic waste and pollution crisis." 6-ER-956. According to California, a handful of public statements over the past few decades (mostly made by entities other than ExxonMobil) about the benefits and recyclability of plastics somehow led California consumers to improperly *discard* more plastic litter, rather than recycling it or otherwise properly disposing of it, and thereby "harm[ed] California's iconic coastlines, waterways, wildlife, and

residents." 6-ER-956. And according to California, ExxonMobil is therefore on the hook for the entire cost of cleaning up all plastic pollution across the entire state.

That theory is deeply flawed on the merits. But for present purposes, the question is simply where the flaws with that theory should be explored: in California's own state courts, or in federal court via removal (where a parallel suit brought by several environmental groups is currently pending). For at least three independent reasons, the sweeping nature of this suit gives rise to federal-court jurisdiction, and the district court erred by ordering remand.

First, the district court had admiralty jurisdiction over this suit. As California's complaint makes clear, its sweeping claims seek relief for pollution-related injury occurring across the state, including in large part on navigable waters. And as numerous cases demonstrate, pollution of navigable waters is a maritime tort with a substantial relationship to traditional maritime activity. The district court accordingly erred by refusing to exercise admiralty jurisdiction over this case.

Second, the district court also had federal-enclave jurisdiction. Again, California's allegations make clear that its expansive asserted injury arises across the entire state, including on numerous federal enclaves located along the California coastline. The state's attempt to avoid federal jurisdiction by artificially carving those federal enclaves out of its claims cannot be reconciled with the indivisible injury that California asserts and the relief that it seeks.

Finally, the district court also had federal-officer removal jurisdiction. The pollution-related injury for which California seeks relief is caused in part by improperly discarded synthetic rubber products, at least some of which were made from synthetic rubber that ExxonMobil manufactured as a contractor for the federal government during World War II ("WWII"). Because California's claims are related to actions that ExxonMobil took under federal direction, ExxonMobil is entitled to remove this case and have its federal-contractor defense heard in federal court.

In short, the district court had jurisdiction over this case three times over: under admiralty jurisdiction, federal-enclave jurisdiction, and federal-officer removal jurisdiction. Any one of those three grounds is independently sufficient to provide federal jurisdiction, and all three are present here. On any and all of those grounds, this Court should reverse the decision below and order this case heard in federal court.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §§1331 (federal-enclave jurisdiction), 1333 (admiralty jurisdiction), and 1442 (federal-officer removal). *See infra* pp.16-59. The district court nevertheless entered a final order remanding this case to state court, 1-ER-2, which this Court has jurisdiction to review under 28 U.S.C. §§1291 and 1447(d). *See BP P.L.C. v. Mayor of Balt.*, 593 U.S. 230 (2021) (all grounds for removal are reviewable on appeal in a case removed

3

on federal-officer grounds). The district court entered its remand order on February 24, 2025, 1-ER-2, and ExxonMobil filed its notice of appeal on March 11, 2025, 6-ER-1120, which was timely under Federal Rule of Appellate Procedure 4(a)(1)(A). The parties have agreed to a partial stay of the litigation pending this appeal. *See infra* p.13.

## STATEMENT OF THE ISSUES

1. Whether the district court had admiralty jurisdiction over California's claims alleging injury in the form of pollution of navigable waters.

2. Whether the district court had federal-enclave jurisdiction over California's claims alleging injury to waterways and shorelines that include dozens of national parks, military bases, and other federal enclaves.

3. Whether the district court had federal-officer removal jurisdiction over California's claims alleging injury arising in part from ExxonMobil's wartime production of synthetic rubber under federal direction.

## RELEVANT STATUTORY PROVISIONS

Relevant statutory provisions are set out in an addendum to this brief.

## STATEMENT OF THE CASE

### A.    Factual Background.

ExxonMobil is a New Jersey corporation that is one of the world's largest energy companies. *See* 6-ER-958. Among many other things, ExxonMobil sells plastic resin pellets to other companies, which then use those plastic resin pellets to

4

make plastic products for other businesses or for consumers. *See* 6-ER-957. ExxonMobil does not sell its plastic resin pellets to any consumers or other end users.

Plastic recycling and plastic pollution have long been topics of widespread debate nationwide. California's complaint alleges that ExxonMobil and other industry members exercised their First Amendment rights to participate in this public dialogue and to petition for reasonable regulations by sharing their perspectives on these issues with policymakers and the public. *See, e.g.*, 6-ER-992, 1027-28, 1036. ExxonMobil has explained, for example, how plastic products help grow and preserve food, deliver clean drinking water, protect against disease, and play a critical role in computers, mobile phones, and vehicles—often with a lower carbon footprint than alternatives like paper, aluminum, and glass. California has likewise publicly acknowledged these comparative benefits of plastic over the years, such as by explaining that the use of "light and strong" plastics "allow[s] for vehicles with increased fuel efficiency" and that plastics "play a significant role in reducing the amount of waste ultimately sent to landfills." 2-ER-156.

Unsurprisingly, California itself has been an active participant in the debate over plastic recycling and plastic pollution. It has been legislating on these topics for decades, passing numerous laws encouraging or mandating recycling.[1]

---

[1] *See, e.g.*, Cal. Pub. Res. Code §14500 *et seq.* (California Beverage Container Recycling and Litter Reduction Act of 1986); *id.* §40000 *et seq.* (California

California has also extensively advocated recycling as an important strategy to address plastic-related pollution, including a years-long educational campaign telling Californians that "recycling eliminates the need to build landfills, saves energy, reduces greenhouse gas emissions, reduces air pollution and water pollution, conserves forests, and has twice the economic impact of disposal while generating $10 billion worth of taxable economic activity each year." 2-ER-247; *see, e.g.*, 3-ER-298 (describing state program to "develop public interest for recycling plastics"); 3-ER-382 ("It is important that we ALL recycle in order to save the Earth's natural resources."); 3-ER-407 ("Of course with recycling, there's no such thing as too much of a good thing."); 3-ER-412 ("Plainly, recycling is more important than ever.").

Since the 1990s, "[r]ecycling and composting programs" have "formed the core of California's waste diversion efforts." 3-ER-280; *see also* 2-ER-102 (recommending "avoiding legislation that ban[s] plastics" and instead "developing

---

Integrated Waste Management Act of 1989); *id.* §42300 *et seq*. (Rigid Plastic Packaging Container Act of 1991); *id.* §18000 (1988 law requiring resin identification label); *id.* §41780.01 (2011 law setting goal that "75 percent of solid waste generated be source reduced, recycled, or composted by the year 2020, and annually thereafter"); *id.* §42649 (2011 law mandating commercial recycling); *id.* §42924.5 (2016 law requiring state agencies and facilities to facilitate recycling onsite); *id.* §42649.2 (2011 law requiring businesses to provide customer access to recycling); *id.* §§14547, 18017 (2020 law establishing plastic recycling content standards); *id.* §18015 (2022 law requiring certain labeling and coding of rigid plastic bottles and containers).

a healthy and growing market for postconsumer plastics" by "encourag[ing] the existing plastics processing industry … to use recycled plastics"). California has promoted not only traditional "mechanical" plastic recycling, but also "chemical recycling" (or "advanced recycling," *see* 6-ER-1024, 1026), describing it as a "cutting-edge" technology with "significant long-term potential." 2-ER-231.[2] Today, California's cities and counties are responsible for waste management under the oversight of a state agency called "CalRecycle," which continues to advocate "bring[ing] together the state's recycling and waste management programs" to work toward a society "that uses less, recycles more, and takes resource conservation to higher and higher levels." 3-ER-414. Even today, CalRecycle says it is "addressing plastic waste" with efforts to "[i]nvest and expand domestic recycling." CalRecycle, *Plastics Programs and Resources*, https://perma.cc/G5RJ-NYR2 (last visited June 23, 2025).

### B.    Procedural History.

Despite its own long history of encouraging plastic recycling, California now seeks to impose liability on ExxonMobil for its speech and advocacy on the very same topic. On September 23, 2024, California filed the present suit against

---

[2] Mechanical recycling involves "recovering plastic waste by mechanical processes such as … grinding, heating, re-granulating and compounding." 6-ER-993. In advanced recycling, by contrast, plastic waste is broken down through heating or chemical treatment into its constituent polymers, which can then be used to produce plastic precursors or other products. 6-ER-1024.

ExxonMobil in California state court, alleging that ExxonMobil engaged in "deceptive public messaging" and a "decades-long campaign of deception" to influence public opinion by promoting plastic recycling, and that ExxonMobil's purported "deceptive statements" promoting recycling are somehow responsible for statewide plastic pollution, including on California's "iconic coastlines, waterways," and "oceans." 6-ER-956-57; *see* 6-ER-1065 (alleging pollution of California's "rivers, lakes, bays, and ocean waters"). Based on these allegations, California's complaint asserts six causes of action: (1) public nuisance, including by "contamination of groundwater, beaches, and waterways," 6-ER-1085-88; (2) "pollution, impairment, and destruction of natural resources" under Cal. Gov. Code §12607, including "surface water in bays, lakes, streams, and rivers," 6-ER-1088-90; (3) "[w]ater [p]ollution" under Cal. Fish & Game Code §§5650-5650.1, on the theory that ExxonMobil "permitted" plastic pollution "to pass into the waters of the State," 6-ER-1090; (4) untrue or misleading advertising under Cal. Bus. & Prof. Code §17500, 6-ER-1091-92; (5) misleading environmental marketing under Cal. Bus. & Prof. Code §17580.5, 6-ER-1092-93; and (6) unfair competition under Cal. Bus. & Prof. Code §17200, 6-ER-1093-94.

California filed its complaint in coordination with a consortium of non-governmental organizations, which filed their own parallel suit against ExxonMobil in California state court on the same day. After service, ExxonMobil timely removed

8

both suits to federal district court. *See* 5-ER-923; Notice of Removal, *Sierra Club, Inc. v. Exxon Mobil Corp.*, No. 3:24-cv-7288 (N.D. Cal. filed Oct. 18, 2024), Dkt.1.

As to California's suit, ExxonMobil explained that the breadth of California's complaint made removal proper on three independent grounds. First, the district court had admiralty jurisdiction over California's suit under 28 U.S.C. §1333, because California's claims include alleged injuries that occurred on navigable waters (in the form of plastic pollution in "rivers, lakes, bays, and ocean waters," 6-ER-1065), and that had the potential to disrupt maritime commerce and a substantial relationship to traditional maritime activity, 5-ER-926-30. *See* 28 U.S.C. §1441(a) (authorizing removal of "any civil action brought in a State court of which the district courts of the United States have original jurisdiction").

Second, the district court had federal-question jurisdiction under 28 U.S.C. §1331 and the federal-enclave doctrine, which affords jurisdiction over "tort claims that arise on federal enclaves." 5-ER-931 (quoting *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006)). Because California's complaint alleges injury in the form of plastic pollution on its coastlines and waterways—which include numerous federal enclaves, such as the Presidio in San Francisco, the Golden Gate National Recreational Area, Naval Air Station North Island, and many other federal facilities and national park areas—its claims arise under federal law and are

9

subject to federal-enclave jurisdiction, making the case removable. 5-ER-931-32; 28 U.S.C. §1441(a).

Third, the district court had jurisdiction under the federal-officer removal statute, which authorizes removal of suits against "any officer (or any person acting under that officer) of the United States or of any agency thereof … for or relating to any act under color of such office." 28 U.S.C. §1442(a)(1). As ExxonMobil explained in its notice of removal, it acted under federal officials as a government contractor that produced synthetic rubber as part of the war effort during WWII, which was used to manufacture synthetic-rubber tires and other products that are now contributing to the pollution affecting California's coastlines and waterways. 5-ER-933-45.[3] ExxonMobil also asserts colorable federal defenses to California's claims, including a federal-contractor defense to the extent California's claims are based on products that ExxonMobil manufactured under federal direction. 5-ER-945-46. As a result, ExxonMobil explained, it was entitled to remove California's suit under the federal-officer removal statute.

As to the non-governmental organizations' suit, ExxonMobil asserted that removal was proper for all the foregoing reasons and two more: because the district court had diversity jurisdiction under 28 U.S.C. §1332(a), and because it had

---

[3] For simplicity, this brief also uses "ExxonMobil" for ExxonMobil's predecessors.

jurisdiction under the Class Action Fairness Act of 2005, *id.* §1332(d). *See* Amended Notice of Removal, *Sierra Club, Inc. v. Exxon Mobil Corp.*, No. 3:24-cv-7288 (N.D. Cal. filed Nov. 8, 2024), Dkt.13.

California and the non-governmental organizations each filed motions to remand their cases to state court, which the district court resolved in a single order. The district court denied the non-governmental organizations' motion to remand, holding that ExxonMobil properly removed that suit on diversity grounds. 1-ER-3, 14, 16. That suit accordingly remains before the district court, where the parties have now completed briefing on ExxonMobil's motion to dismiss and motion to strike the plaintiffs' claims insofar as they challenge speech and advocacy protected by the First Amendment. *See* Motion to Dismiss, *Sierra Club, Inc. v. Exxon Mobil Corp.*, No. 3:24-cv-7288 (N.D. Cal. filed Mar. 27, 2025), Dkt.32; Motion to Strike, *Sierra Club, Inc. v. Exxon Mobil Corp.*, No. 3:24-cv-7288 (N.D. Cal. filed Mar. 27, 2025), Dkt.33.

As to California's suit, however, the district court reached the opposite conclusion, rejecting each of the three independent bases that ExxonMobil advanced for removal. Despite acknowledging that California "pleads torts related to navigable water," the district court found admiralty jurisdiction unavailable because ExxonMobil's alleged "deception" did not occur on navigable water, and because (according to the court) that alleged deception "does not bear a substantial

11

relationship to traditional maritime activity." 1-ER-12-13. Alternatively, the district court held that admiralty jurisdiction could not provide an independent basis for removal in light of the saving-to-suitors clause of §1333, which "sav[es] to suitors in all cases all other remedies to which they are otherwise entitled," 28 U.S.C. §1333(1)—an argument that did not occur to California until its reply brief below. 1-ER-12.

The district court also declined to find federal-enclave jurisdiction, relying on California's disclaimer of any injury arising on federal land. 1-ER-9. In the alternative, the district court held federal-enclave jurisdiction was lacking because ExxonMobil's "cultural messaging and corporate decision-making" did not occur on any federal enclaves. 1-ER-9-10. The district court recognized that ExxonMobil was asserting "injury-based enclave jurisdiction" rather than "conduct-based enclave jurisdiction," and that the plastic pollution that California had alleged did indeed "touch[] on federal enclaves," but nevertheless held those facts insufficient to support federal jurisdiction. 1-ER-10.

Finally, the district court found federal-officer removal unavailable. 1-ER-10-11. The district court did not dispute that ExxonMobil acted under federal direction in fulfilling its federal contracts to produce synthetic rubber during WWII, but held that California's claims were not sufficiently related to those acts to permit federal-officer removal, on the theory that synthetic rubber is a "completely different

substance" from plastic and that the federal government did not instruct ExxonMobil to engage in the alleged "deceptive conduct." 1-ER-10-11. The district court also concluded that ExxonMobil had not raised a colorable federal defense, finding ExxonMobil's federal-contractor defense inapplicable to California's claims regarding alleged "deception about plastic." 1-ER-11.

The district court entered an administrative stay of its remand order to permit ExxonMobil to seek a stay pending appeal if necessary. 1-ER-16. The parties subsequently stipulated to a partial stay pending appeal that limits the proceedings that will take place in state court while this appeal is pending. *See* 2-ER-20, 27. That stipulated stay will expire on March 31, 2026, without prejudice to the parties' ability to agree to or seek a further stay. 2-ER-23. In accordance with that agreement, the district court remanded the case to state court on April 9, 2025, where the case is now pending.

## SUMMARY OF ARGUMENT

The sprawling nature of California's suit means that the district court had jurisdiction over this case on three independent grounds: admiralty jurisdiction, federal-enclave jurisdiction, and federal-officer removal jurisdiction. On any and all of these independent bases, this Court should reverse the district court's remand order.

13

First, the district court had admiralty jurisdiction under 28 U.S.C. §1333(1). California's claims explicitly assert injury occurring on navigable waters (in the form of pollution affecting those waters) and a disruptive impact on maritime commerce, and pollution of navigable waters bears a substantial relationship to traditional maritime activity, as numerous cases make clear. The district court erred in focusing on the location of the challenged *conduct* rather than the alleged *injury*, and in misapplying the substantial-relationship test by broadly describing the basis for California's claims as "deceptive conduct" while ignoring its maritime impacts. And the district court erred again in relying on the saving-to-suitors clause as a basis for denying removal—an argument that California failed to timely assert within 30 days after removal, that California forfeited below by failing to raise it in its opening brief, and is mistaken in any event.

Second, the district court independently had federal-enclave jurisdiction over this case. California's sweeping claims allege injury from pollution on lands and waters throughout the entire state, including numerous federal military installations and parks and other federal enclaves. The district court nevertheless refused to permit removal on federal-enclave grounds, on the theory that the allegedly deceptive speech at issue did not emanate from federal enclaves. But as this Court's precedent makes clear, federal-enclave jurisdiction is proper if the asserted *injury* occurs on a federal enclave, no matter where the injury-causing conduct is alleged

14

to occur. In the alternative, the district court relied on the state's attempt to avoid federal jurisdiction by artificially disclaiming any injury arising on federal land. But that artful pleading device does not alter the basic nature of California's claims, which assert an injury that does not stop neatly at federal-enclave boundaries and which seek injunctive relief that will necessarily implicate federal enclaves as well.

Finally, the district court had federal-officer removal jurisdiction over this case as well. California's sweeping claims assert aesthetic and economic injury from pollution that is caused in part by synthetic rubber, at least some of which was manufactured by ExxonMobil for the federal government as a federal contractor during the WWII era. California's claims are therefore related to acts taken by ExxonMobil under federal direction, and ExxonMobil is entitled to have its federal defenses to those claims heard in federal court. The district court reached the opposite conclusion only by applying the wrong legal standard, construing the federal-officer removal statute narrowly rather than broadly and ignoring the necessary contribution of synthetic-rubber pollution to the injury California alleges. For any and all of these reasons, this Court should reverse.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's decision to remand a case." *DeFiore v. SOC LLC*, 85 F.4th 546, 552 (9th Cir. 2023). The Court "accept[s] the

15

… factual allegations [in the notice of removal] as true and draw[s] all reasonable inferences in favor of the remover." *Id*.

## ARGUMENT

The district court erred in rejecting each of ExxonMobil's three independent grounds for federal jurisdiction: admiralty jurisdiction, federal-enclave jurisdiction, and federal-officer removal. On each of these independent grounds, the district court had subject-matter jurisdiction over this case and removal was proper.

## I. The District Court Had Admiralty Jurisdiction Over This Case.

First, the district court had admiralty jurisdiction over this case. Under the federal admiralty jurisdiction statute, federal courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. §1333(1). That jurisdiction extends to tort claims where the alleged tort has "(1) taken place on navigable water (or a vessel on navigable water having caused an injury on land), (2) 'a potentially disruptive impact on maritime commerce,' and (3) a 'substantial relationship to traditional maritime activity.'" *Ali v. Rogers*, 780 F.3d 1229, 1235 (9th Cir. 2015) (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995)). All three elements of that test are met here.

### A. California's Claims Allege Injury on Navigable Waters.

In evaluating the first element—whether the alleged tort has "taken place on navigable water," *Ali*, 780 F.3d at 1235—the "situs of a tort for the purpose of determining admiralty jurisdiction is the place where the injury occurs." *Taghadomi*

16

*v. United States*, 401 F.3d 1080, 1084 (9th Cir. 2005).  That rule "holds even when some of the negligent activity occurs on land," and indeed even when that activity "took place entirely on land."  *Id.*; *see id.* at 1085 ("[T]he tort is deemed to occur, not where the wrongful act or omission has its inception, but where the impact of the act or omission produces such injury as to give rise to a cause of action."); *Tobar v. United States*, 639 F.3d 1191, 1197 (9th Cir. 2011).

Under that rule, the alleged injury here occurred at least in part on navigable water.  California alleges that ExxonMobil contributed to large scale plastic pollution on its "waterways," including its "rivers, lakes, bays, and ocean waters."  6-ER-956, 1065; *see, e.g.*, 6-ER-973 ("oceans, seas, rivers and lakes"); 6-ER-974-75 (Pacific Ocean); 6-ER-975 ("rivers, waterways and marine environments").  Many of those waterways are unquestionably navigable.  *See, e.g.*, *In re Mission Bay Jet Sports, LLC*, 570 F.3d 1124, 1127 (9th Cir. 2009) (coastal waters "open to the Pacific Ocean and subject to the ebb and flow of tides," including Mission Bay in San Diego); *In re Blue Water Boating, Inc.*, 786 F.App'x 703, 704 n.2 (9th Cir. 2019) (Santa Barbara Harbor); *Walton v. Channel Star Excursions, Inc.*, 2007 WL 763299, at *2 (E.D. Cal. Mar. 9, 2007) (Sacramento River); *Moreno v. Ross Island Sand & Gravel Co.*, 2015 WL 5604443, at *16 (E.D. Cal. Sept. 23, 2015) (San Joaquin River); *cf. In re Garrett*, 981 F.3d 739, 741 (9th Cir. 2020) (waters are navigable when they form "a continued highway over which commerce is or may be carried on with other States or foreign

17

countries"). California's claims therefore satisfy the first element of the admiralty jurisdiction test.[4]

The district court gave no persuasive reason for reaching a different conclusion. It recognized that California "pleads torts related to navigable water, including, *inter alia*, a state law water pollution claim." 1-ER-12. But it nevertheless asserted that the location test was not met because on "a close reading" of the state's claims, "the alleged tort is 'deception,' not the actual depositing of plastic into navigable water," and the alleged deception "did not occur in navigable water." 1-ER-13. That reasoning simply "ignores the clear law of [this] circuit that the situs of a tort for the purpose of determining admiralty jurisdiction is the place where the injury occurs," not where the alleged tortious conduct took place. *Taghadomi*, 401 F.3d at 1084; *see, e.g.*, *Tobar*, 639 F.3d at 1197; *Guidry v. Durkin*, 834 F.2d 1465, 1470 (9th Cir. 1987); *Solano v. Beilby*, 761 F.2d 1369, 1371 (9th Cir. 1985). Because the state's alleged injury here—plastic pollution—occurred at least in part on navigable waters, the first element of the admiralty jurisdiction test is met,

---

[4] Because California's claims are premised at least in part on injuries that occurred on navigable waters, the district court had admiralty jurisdiction over the entire case, including supplemental jurisdiction under 28 U.S.C. §1367 over any claims for injuries that did not occur on navigable waters. 28 U.S.C. §§1333, 1367; *see Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 563 (2005); *see also Guidry v. Durkin*, 834 F.2d 1465, 1469-70 (9th Cir. 1987) (finding location test met for libel published both at sea and on land).

regardless of where the alleged "wrongful act or omission ha[d] its inception." *Taghadomi*, 401 F.3d at 1085.

## B. California's Claims Involve a Potentially Disruptive Impact on Maritime Commerce.

California's claims also involve a "potentially disruptive impact on maritime commerce." *Ali*, 780 F.3d at 1235. That element "considers whether the general features of the incident could hypothetically have an effect on maritime commerce," without "requir[ing] that any impact actually occurred." *Christensen v. Ga.-Pac. Corp.*, 279 F.3d 807, 815 n.31 (9th Cir. 2002); *see Grubart*, 513 U.S. at 538 (explaining that this element looks to "potential effects, not to the particular facts of the incident").

Here, California's complaint alleges that plastic pollution has had actual and direct effects on maritime commerce, including by disrupting commercial fishing operations. *See, e.g.*, 6-ER-1070-71 (plastic pollution "affects a substantial number of people who use California waterways for commercial and recreational purposes"); 6-ER-1074 (plastic pollution "interfere[s] with California's commercial and recreational fishing and boat navigation"); 6-ER-1074 ("[P]lastic waste and pollution negatively impacts fish populations that California's fishing economy depends upon."). Those alleged impacts are more than sufficient to present the "potentially disruptive impact on maritime commerce" that admiralty jurisdiction requires, *Ali*, 780 F.3d at 1235—which is presumably why the district court did not

19

Case: 25-1674, 06/23/2025, DktEntry: 24.1, Page 31 of 84

dispute that this element of the admiralty jurisdiction test is met here, *see* 1-ER-12-13. The second element of the test for admiralty jurisdiction is accordingly satisfied.

### C. California's Claims Involve a Substantial Relationship to Traditional Maritime Activity.

Finally, California's claims involve "a substantial relationship to traditional maritime activity." *Ali*, 780 F.3d at 1235. In evaluating that element, courts look at a claim's "general features, rather than at its minute particulars, to assess whether there is the requisite connection," *id.*, and the necessary connection is "interpreted broadly," *Tobar*, 639 F.3d at 1198. The analysis proceeds in two steps: First, the court must "define what constitutes the activity giving rise to the incident." *Gruver v. Lesman Fisheries Inc.*, 489 F.3d 978, 983 (9th Cir. 2007). Then, it must determine whether that activity has "a substantial relationship to traditional maritime activity," *id.* at 986; that is, whether the activity "is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand," *Grubart*, 513 U.S. at 539-40. In making that determination, "the Supreme Court has recognized that the fundamental purpose of admiralty law is the protection of maritime commerce," and has indicated "apparent approval of the notion that virtually every activity involving a vessel on navigable waters would be a traditional maritime activity sufficient to invoke maritime jurisdiction." *Gruver*, 489 F.3d at 986.

20

That substantial-relationship element is satisfied here. As to the "activity giving rise to the incident," *id.* at 983, California alleges that ExxonMobil's conduct permitted "plastic waste" to "pass into the waters of the State," which was "deleterious to fish, plant life, mammals, or bird life." 6-ER-1090. It also alleges that ExxonMobil "created, caused, contributed to, and assisted in creating harmful plastic pollution throughout California," including in navigable waters. 6-ER-1086. That is, California's claims broadly assert that ExxonMobil caused or contributed to increased pollution of California's navigable waterways through its production of plastic resin and its alleged "deception." *See, e.g.*, 6-ER-1074.

Those allegations of maritime pollution bear a substantial relationship to traditional maritime activity, and indeed are a paradigmatic example of the kind of maritime tort for which "special admiralty rules" exist. *Grubart*, 513 U.S. at 539. Courts across the country have thus routinely held that pollution in navigable waters constitutes a maritime tort that falls within admiralty jurisdiction, regardless of whether that pollution originates on land. *See, e.g.*, *Plakas v. Middlesex Cnty.*, 803 F.2d 714, 1986 WL 17843, at *1-3 (4th Cir. 1986) (table) (considering "private nuisance claims in admiralty" for "disposal of trash and shells into Broad Creek"); *Conner v. Aerovox, Inc.*, 730 F.2d 835, 836 (1st Cir. 1984) (admiralty jurisdiction over "maritime tort claims for damages resulting from water pollution" based on discharges of pollutants from land into navigable waters); *Nat'l Sea Clammers Ass'n*

21

*v. City of N.Y.*, 616 F.2d 1222, 1235 (3d Cir. 1980) (admiralty jurisdiction for claims of sewage discharge into navigable waters), *vacated in part on other grounds sub nom. Middlesex Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981); *Kohlasch v. N.Y. State Thruway Auth.*, 460 F.Supp. 956, 962 (S.D.N.Y. 1978) (admiralty jurisdiction for claim that a drain caused polluting discharge into navigable water); *see also United States v. Redwood City*, 640 F.2d 963, 969-70 (9th Cir. 1981) ("[o]il pollution in navigable waters" constitutes a "maritime tort").  Put simply, pollution of navigable waters—whether by oil, plastic, or any other polluting agent—bears a substantial relationship to traditional maritime activity and constitutes the kind of "activity traditionally subject to admiralty law" for which "the reasons for applying special admiralty rules would apply."  *Gruver*, 489 F.3d at 983. The third element of the admiralty jurisdiction test is therefore satisfied as well, and the district court had admiralty jurisdiction over this case.

The district court reached the opposite conclusion only by misapplying the substantial-relationship test.  The district court defined the activity at issue here as "Exxon's allegedly deceptive conduct," and then simply asserted without further analysis that this alleged deception "does not bear a substantial relationship to traditional maritime activity."  1-ER-13.  In adopting that approach, the district court made precisely the error that the Supreme Court warned against in *Grubart*, defining the relevant activity in a way that is "too general to differentiate cases" and setting

22

the frame "at a sufficiently high level of generality to eliminate any hint of maritime connection." 513 U.S. at 538, 541-42. That kind of "hypergeneralization"—such as describing repair and maintenance work on a navigable waterway performed from a vessel as merely "repair and maintenance," or a fire on a vessel docked at a marina as just "fire"—would turn the substantial-relationship test "into a vehicle for eliminating admiralty jurisdiction." *Id.* So too here: By broadly describing the relevant activity as nothing more than "deceptive conduct," 1-ER-13, the district court "eliminat[ed] the maritime aspect" of California's claims and thus "frustrated" the purpose of the substantial-relationship test, *Grubart*, 513 U.S. at 542. When California's claims are instead properly described "at an intermediate level of possible generality," as alleging deceptive conduct leading to pollution of navigable waters, there should be "no question that the activity is substantially related to traditional maritime activity" and so the district court had admiralty jurisdiction. *Id.* at 538, 540.

D. **California Cannot Defeat Admiralty Jurisdiction by Relying on the Saving-to-Suitors Clause.**

In the alternative, the district court held that even if it had admiralty jurisdiction over this case, ExxonMobil still could not remove the case to federal court on that basis unless ExxonMobil could also establish *another* independent basis for federal jurisdiction as well. 1-ER-12. The district court reached that conclusion by relying on the saving-to-suitors clause of 28 U.S.C. §1333, which

23

affords the district courts original and exclusive jurisdiction over admiralty cases, "saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. §1333(1). According to the district court, that clause not only preserves for plaintiffs "all other remedies" to which they might be entitled in admiralty cases, *id.*, but prohibits defendants from removing those cases to federal court unless they can show some other non-admiralty basis for federal jurisdiction, 1-ER-12. That argument—which California raised for the first time in its reply brief below, and ExxonMobil accordingly had no opportunity to brief before the district court—is both forfeited and incorrect.

1. To begin with, the district court erred by relying on a basis for remand that California failed to raise within 30 days after removal and that does not affect subject-matter jurisdiction. By statute, "[a] motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal." 28 U.S.C. §1447(c). That provision "requires that a defect in removal procedure be raised within 30 days after the filing of the [notice of] removal." *N. Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034, 1037 (9th Cir. 1995). Any defects in removal procedure not raised within that 30-day period are forfeited. *Id.* at 1038; *see, e.g., Kakarala v. Wells Fargo Bank, NA*, 615 F.App'x 424, 425 (9th Cir. 2015) (mem.)

24

("To avoid waiver, the party seeking remand must raise the alleged defect in a motion filed within the 30-day window created by §1447(c)[.]").

That statutory requirement precludes California from relying on the saving-to-suitors clause as a basis for remand here. California did not mention the saving-to-suitors clause anywhere in its motion to remand (which it filed more than 30 days after the case was removed in any event). *See* 5-ER-894 (motion to remand filed Dec. 9, 2024); *see also* 5-ER-923 (notice of removal filed Nov. 1, 2024). Instead, California raised that clause for the first time in its reply brief below, which it filed fully 90 days after ExxonMobil's notice of removal. *See* 2-ER-40 (reply in support of remand filed Jan. 30, 2025). Because the saving-to-suitors clause is procedural and does not affect the district court's subject-matter jurisdiction, California lost any right to remand based on that clause by failing to raise it within 30 days after removal. 28 U.S.C. §1447(c); *N. Cal. Dist. Council*, 69 F.3d at 1038; *see Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1069 (9th Cir. 2001) (any defect in the "removal of … saving clause claims" does not affect the district court's "original jurisdiction over the claim in the first instance"). As a result, under §1447(c), the district court erred in relying on the saving-to-suitors clause as a basis for remand here.[5]

---

[5] Because California raised the saving-to-suitors clause for the first time in its reply brief below, ExxonMobil had no opportunity to brief the application of

2. Even setting aside the statutory bar imposed by §1447(c), basic principles of forfeiture confirm that the district court erred by relying on the saving-to-suitors clause as support for its remand order. Again, California presented no argument whatsoever regarding the saving-to-suitors clause in its opening brief below. *See* 5-ER-894. It accordingly forfeited any argument that the saving-to-suitors clause made ExxonMobil's removal of this case improper. *See, e.g.*, *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) ("[I]ssues which are not specifically and distinctly argued and raised in a party's opening brief are waived."); *see also Morris*, 236 F.3d at 1069 ("[A] state plaintiff may waive the improper removal of a savings clause claim."). California's subsequent attempt to raise the saving-to-suitors clause in its reply brief below did not cure that forfeiture, especially as it left ExxonMobil with no opportunity to brief the issue. *See, e.g.*, *United States v. Cox*, 7 F.3d 1458, 1463 (9th Cir. 1993) ("[A] party may not make new arguments in the reply brief."). The district court erred in relieving California from the consequences of its forfeiture by relying on the saving-to-suitors clause.

---

§1447(c) to the district court. ExxonMobil did, however, inform the district court at oral argument that the saving-to-suitors clause was waived as a "procedural defect" that "was not raised within 30 days of removal," and suggested that the court request briefing on the issue. 2-ER-36-39. The district court nevertheless neither requested further briefing nor addressed §1447(c) in its opinion. *See* 1-ER-12.

26

The district court suggested that California had not entirely forfeited its saving-to-suitors clause argument, because California's opening brief below did cite *County of San Mateo v. Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022), which (among many other things) found an admiralty case non-removable based on the saving-to-suitors clause. 1-ER-12. But California's opening brief below never cited *San Mateo* for anything remotely related to the saving-to-suitors clause; indeed, it did not cite *San Mateo* in its discussion of admiralty jurisdiction *at all*. *See* 5-ER-903-08. Instead, it cited *San Mateo* only in its discussion of federal-enclave jurisdiction and federal-officer removal. *See* 5-ER-909-20. Citing *San Mateo* for those completely different holdings did not and could not preserve a saving-to-suitors-clause argument that California never mentioned in its opening brief below, let alone "put[] Exxon on notice" that it should "address the saving to suitors discussion" in a case that California cited for entirely distinct propositions. *Contra* 1-ER-12.[6]

3. Even if California had preserved its saving-to-suitors-clause argument, that argument would still be unavailing. Under the general federal removal statute, "any

---

[6] The district court also suggested that *Morris* was distinguishable because the state plaintiff there "failed to seek remand of claims falling within the court's admiralty jurisdiction," 1-ER-12 (brackets and ellipsis omitted) (quoting *Morris*, 236 F.3d at 1069), whereas California did seek remand here. 1-ER-12. That is incorrect as, the plaintiff in *Morris* likewise sought remand on other grounds. *See* 236 F.3d at 1066. Regardless, the fact that California sought remand on *certain* grounds in its opening brief below does not somehow preserve *other* grounds that California did *not* raise there. *See, e.g., Arpin*, 261 F.3d at 919.

civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant" to federal district court "[e]xcept as otherwise expressly provided by Act of Congress." 28 U.S.C. §1441(a). The admiralty jurisdiction statute unquestionably gives the federal district courts original jurisdiction over all admiralty cases. 28 U.S.C. §1333. That makes admiralty cases removable under §1441(a), and the saving-to-suitors clause— "saving to suitors in all cases all other remedies to which they are otherwise entitled," 28 U.S.C. §1333(1)—comes nowhere near "expressly provid[ing]" otherwise, *id.* §1441(a).

The saving-to-suitors clause dates back to the Judiciary Act of 1789, which granted federal courts exclusive jurisdiction over maritime and admiralty claims, "saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it." Ch. 20, §9, 1 Stat. 73, 77 (1789). That clause serves a modest goal: It "preserves remedies and the concurrent jurisdiction of state courts over some admiralty and maritime claims." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 445 (2001); *see N.J. Steam Navigation Co. v. Merchs.' Bank of Bos.*, 47 U.S. (6 How.) 344, 390 (1848) (saving-to-suitors clause "leaves the concurrent power where it stood at common law"). Consistent with that understanding and the clause's text, the Supreme Court has applied the saving-to-suitors clause to preserve *concurrent* state-court jurisdiction over certain maritime claims—those carried on in

28

personam (where "the defendant is a person, not a ship or some other instrument of navigation"), rather than in rem (where "a vessel or thing is itself treated as the offender and made the defendant"). *Madruga v. Super. Ct. of Cal.*, 346 U.S. 556, 560-61 (1954). The saving-to-suitors clause also ensures that plaintiffs who have non-maritime causes of action can continue to pursue those remedies—in federal or state court—along with their associated procedural rights (such as trial by jury), rather than being limited to admiralty remedies in cases that fall within admiralty jurisdiction. *See, e.g.*, *Red Cross Line v. Atl. Fruit Co.*, 264 U.S. 109, 124 (1924) (saving-to-suitors clause preserves "all means other than proceedings in admiralty which may be employed to enforce the right or to redress the injury involved"); *see also Lewis*, 531 U.S. at 454-55; *Ghotra ex rel. Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1054 (9th Cir. 1997) (saving-to-suitors clause "permits the plaintiff to bring an action 'at law' in the federal district court" rather than invoking admiralty jurisdiction).

In *San Mateo*, this Court read the saving-to-suitors clause more broadly—as not just preserving *concurrent* state-court jurisdiction over in personam maritime claims and any non-maritime remedies that a plaintiff may have, but affirmatively *prohibiting* removal of admiralty cases from state court to federal court based on admiralty jurisdiction alone. 32 F.4th at 763. That is, *San Mateo* read the saving-to-suitors clause to mean that "maritime claims brought in state court are not

29

removable to federal court absent an independent jurisdictional basis," and "in order to remove such a claim to federal court, the defendant must assert some other basis of jurisdiction, such as diversity jurisdiction." *Id.* In making that statement, however, *San Mateo* did not address the plain text of §1441 providing that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction" is removable, or explain how the saving-to-suitors clause could be read to "expressly provide[]" otherwise for cases of admiralty jurisdiction. 28 U.S.C. §1441(a).[7]

More to the point, *San Mateo* specifically noted that the removing defendants in that case had forfeited two potentially relevant arguments: namely, that (1) "the 'saving to suitors' clause only preserved the right to pursue non-maritime remedies," and (2) "the Federal Courts Jurisdiction and Venue Clarification Act of 2011 amended the removal statute, 28 U.S.C. §1441, so as to allow removal based on admiralty jurisdiction alone." 32 F.4th at 764 n.25. Each of those arguments

_____

[7] *San Mateo* also cited *Morris* and *Ghotra*, but neither holds that a defendant cannot remove an admiralty case without invoking some other basis for jurisdiction. *Morris* stated that "[c]ourts have held that saving clause claims brought in state court are not removable … absent some other jurisdictional basis," but it did not adopt that holding itself, and the Supreme Court case that it cites addressed the issue only in dicta. 236 F.3d at 1069 (citing *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 371 (1959)). *Ghotra*, for its part, says nothing about removal at all. *See* 113 F.3d at 1054-55. In any event, both *Morris* and *Ghotra* were decided before Congress amended the removal statute in 2011. *See infra* pp.33-36.

demonstrates that the saving-to-suitors clause does not preclude removal based on admiralty jurisdiction here. And because *San Mateo* expressly did not consider those arguments, its statement that "maritime claims brought in state court are not removable to federal court absent an independent jurisdictional basis" is not controlling here. *Id.* at 763; *see, e.g.*, *Sinotes-Cruz v. Gonzales*, 468 F.3d 1190, 1203 (9th Cir. 2006) (issue that "was not presented for review" and "was not given reasoned consideration" is "not binding precedent"); *see also Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 558-59 (2005) (relying on a government-speech argument that the Court expressly deemed forfeited in a prior case, and distinguishing prior precedent on that ground); *Ochoa-Salgado v. Garland*, 5 F.4th 615, 619 (5th Cir. 2021) ("[A] panel's assumption is not binding if the adverse party did not challenge and we did not consider that issue.").[8]

First, as already explained, the saving-to-suitors clause "only preserved the right to pursue non-maritime remedies" and the concurrent jurisdiction of state courts over those remedies; it does not prevent federal courts from exercising their

---

[8] Again, because California raised the saving-to-suitors clause for the first time in its reply brief below, ExxonMobil did not have the opportunity to brief these two arguments in the district court. *See supra* p.25 & n.5. ExxonMobil did, however, inform the district court at oral argument of these "two issues that were reserved in the *San Mateo* case," and suggested that the court request briefing if it was considering relying on the saving-to-suitors clause. 2-ER-37-38. The district court nevertheless neither requested further briefing nor addressed these issues in its opinion. *See* 1-ER-12.

31

own concurrent removal jurisdiction on admiralty grounds. *San Mateo*, 32 F.4th at 764 n.25; *see supra* pp.28-29. That is clear from the text of the clause, which by its terms simply preserves for plaintiffs "all other remedies to which they are otherwise entitled" in addition to their admiralty remedies, such as non-maritime claims (and any associated jury-trial rights) arising from the same events. 28 U.S.C. §1333(1); *see Lewis*, 531 U.S. at 454-55 (citing "[t]rial by jury" as "an obvious, but not exclusive, example of the remedies available to suitors"); *Red Cross Line*, 264 U.S. at 124 (saving-to-suitors clause preserves "remedies in pais, as well as proceedings in court; judicial remedies conferred by statute, as well as those existing at the common law; remedies in equity, as well as those enforceable in a court of law"); *Ghotra*, 113 F.3d at 1054 (saving-to-suitors clause "permits the plaintiff to bring an action 'at law'"). That text says nothing whatsoever about barring defendants from invoking federal removal jurisdiction based on original admiralty jurisdiction, and certainly nowhere "expressly provide[s]" that such removal is unavailable. 28 U.S.C. §1441(a).

To be sure, the Supreme Court has occasionally suggested in dicta that Congress did not historically intend for all admiralty jurisdiction cases filed in state court to be removable. *See Lewis*, 531 U.S. at 455 (noting that the Court had "previously refused to hold that admiralty claims, such as a limitation claim, fall within the scope of federal question jurisdiction out of concern that saving to suitors

32

actions … would be removed to federal court and undermine the claimant's choice of forum"); *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 371-72 (1959) (explaining that if admiralty actions were treated as arising under federal law for federal-question jurisdiction purposes, it would take away "the historic option of a maritime suitor pursuing a common-law remedy to select his forum, state or federal … since saving-clause actions would then be freely removable").  But at the same time, the Court has explicitly recognized that "[t]he prospect that a vessel owner may remove a state court action to federal court … does not limit a claimant's forum choice under the saving to suitors clause any more than other litigants' forum choices may be limited," undermining any argument that the saving-to-suitors clause has any implications for removal jurisdiction.  *Lewis*, 531 U.S. at 455.  More to the point, the Supreme Court has never relied on its prior dicta to hold that the saving-to-suitors clause independently bars removal to federal court based on federal admiralty jurisdiction alone, and for good reason: because the text of the saving-to-suitors clause says nothing of the sort.  Needless to say, the Court today is more attendant to the controlling nature of the statutory text than when these dicta originated.

Second, and in any event, Congress in 2011 "amended the removal statute, 28 U.S.C. §1441, so as to allow removal based on admiralty jurisdiction alone." *San Mateo*, 32 F.4th at 764 n.25 (reserving this issue); *see, e.g.*, *Lu Junhong v. Boeing Co.*, 792 F.3d 805, 817-18 (7th Cir. 2015) (Easterbrook, J.).  Before 2011, the federal

33

removal statute generally permitted removal of "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. §1441(a) (2006). But that right of removal was available to all defendants only in federal-question cases; in all other cases, it was limited to out-of-state defendants:

> Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

28 U.S.C. §1441(b) (2006). That is, before 2011, a defendant in a federal-question case could always remove that case to federal court, but a defendant in any other case could not do so if he was a citizen of the state in which the suit was brought.

In 2011, however, Congress enacted the Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, 125 Stat. 758, which fundamentally altered that rule. That Act struck the previous version of §1441(b) quoted above, replacing it (as relevant here) with the following:

> A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title [diversity jurisdiction] may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

34

28 U.S.C. §1441(b)(2). That is, Congress amended §1441 to prevent removal by home-state defendants only in *diversity jurisdiction* cases. In all other cases—including admiralty jurisdiction cases—removal is permitted in "any civil action brought in a State court of which the district courts of the United States have original jurisdiction," regardless of the citizenship of the defendant, "[e]xcept as otherwise expressly provided by Act of Congress." *Id.* §1441(a).

That change eliminates the basis for the dicta in *Lewis* and *Romero*—both decided well before 2011. *See Lu Junhong*, 792 F.3d at 817 (explaining that *Romero* "no longer provide[s] assistance" in light of the 2011 amendment to §1441). As the Seventh Circuit explained in *Lu Junhong*, the Court in *Romero* "held that an admiralty claim under §1333 is not a federal-question claim under §1331," and so was not removable under the pre-2011 version of §1441 based on admiralty jurisdiction alone "when the defendant is a citizen of the forum state." *Id.*; *see Lewis*, 531 U.S. at 455 (describing *Romero*'s refusal to hold that admiralty claims "fall within the scope of federal question jurisdiction"). But Congress' 2011 amendment to §1441 sweeps away that concern, making clear that any cases that fall within a federal district court's original jurisdiction—except for cases removable solely on diversity grounds—are removable to federal court *regardless* of the citizenship of the parties. That change leaves no basis for inferring that despite the clear (and

35

clearly expansive) language of §1441, Congress somehow tacitly intended for admiralty cases to be uniquely nonremovable.

In short, under the plain language of §1441 as amended in 2011, removal is permitted in "any civil action brought in a State court of which the district courts of the United States have original jurisdiction," regardless of the citizenship of the defendant, "[e]xcept as otherwise expressly provided by Act of Congress." 28 U.S.C. §1441(a). Because the district court had original admiralty jurisdiction over this case, *see supra* pp.16-23, and because nothing in the saving-to-suitors clause "expressly provide[s]" that a defendant may not remove based on admiralty jurisdiction, 28 U.S.C. §1441(a), the district court erred in remanding this case to state court.

## II.    The District Court Had Federal-Enclave Jurisdiction Over This Case.

The district court also had federal-enclave jurisdiction over this case, because the sweeping injury that California has alleged inescapably includes injury that occurred on federal enclaves. That provides a second, independent basis for federal jurisdiction over this case, and confirms that the district court erred by ordering it remanded.

1. "Federal enclave jurisdiction refers to the principle that federal law applies in federal enclaves." *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1111 (9th Cir. 2022). Under the Constitution, Congress holds the power "[t]o exercise

36

exclusive Legislation in all Cases whatsoever … over all Places purchased" by the federal government "by the Consent of the Legislature of the State in which the Same shall be." U.S. Const. art.I, §8, cl.17; *see also id*. art.IV, §3, cl.2 ("The Congress shall have Power to … make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."). As a result, "when the federal government purchases state land with the consent of the state legislature, any law existing on that land must derive its authority and force from the United States and is for that reason federal law." *San Mateo*, 32 F.4th at 749 (brackets omitted). Because "federal law applies to a legal controversy arising on federal enclaves," any such controversy "necessarily arises under the laws of the United States," and so the federal courts have jurisdiction over such controversies under the general grant of federal-question jurisdiction in 28 U.S.C. §1331. *Id.*; *see Honolulu*, 39 F.4th at 1111; *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on federal enclaves.").

In federal-enclave cases, federal jurisdiction depends on "the locus in which the claim arose." *San Mateo*, 32 F.4th at 749 (quoting *Alvares v. Erickson*, 514 F.2d 156, 160 (9th Cir. 1975)). Federal-enclave jurisdiction is accordingly proper if either (1) "an injury occurred on a federal enclave," or (2) "an injury stemmed from conduct on a federal enclave" and "the connection between injuries and conduct" is

not "too attenuated and remote." *Honolulu*, 39 F.4th at 1111; *see San Mateo*, 32 F.4th at 749 (employee who "was injured while working at a federal naval center" could invoke federal-enclave jurisdiction "if the employee's accident occurred on property that qualified as a federal enclave"); *cf. Sosa v. Alvarez-Machain*, 542 U.S. 692, 705 (2004) ("[A] cause of action sounding in tort arises in the jurisdiction where the last act necessary to establish liability occurred; *i.e.*, the jurisdiction in which injury was received."). The district court therefore had federal-enclave jurisdiction over this case if California's claims allege any injury "on a federal enclave." *Honolulu*, 39 F.4th at 1111.

They plainly do. California's sweeping complaint seeks to hold ExxonMobil liable for plastic pollution across the entire state, including all of its "coastlines" and "waterways." 6-ER-956 (alleging "ever-increasing plastic pollution of the environment, harming California's iconic coastlines [and] waterways"); *see also, e.g.*, 6-ER-973 (alleging plastic pollution "in oceans, seas, rivers and lakes … and along riverbanks and shorelines"); 6-ER-975 ("beaches, rivers, waterways and marine environments"); 6-ER-1064 ("beaches and inland waterways"); 6-ER-1070 ("beaches, coastlines, … lakes, rivers, and other waterways"). Those areas include numerous marine and land-based federal enclaves, such as the Presidio in San Francisco, the Golden Gate National Recreational Area, Monterey Bay National Marine Sanctuary, Camp Pendleton, Naval Air Station North Island, Point Mugu

38

Naval Air Weapons Station, Vandenberg Space Force Base, and countless other federal facilities and national park areas. *See, e.g.*, *Totah v. Bies*, 2011 WL 1324471, at *2 (N.D. Cal. Apr. 6, 2011) (recognizing that the Presidio is a federal enclave); *Jamil v. Workforce Res., LLC*, 2018 WL 2298119, at *4 (S.D. Cal. May 21, 2018) (same for Camp Pendleton); *see also Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1235 (10th Cir. 2012) (federal enclaves include "military bases, federal facilities, and even some national forests and parks"); 6-ER-1065 (explicitly alleging plastic pollution in "protected coastal areas, such as the Monterey Bay National Marine Sanctuary"). Because California's expansive claims allege injury occurring on numerous federal enclaves throughout the state, they fall within the scope of federal-enclave jurisdiction. *Honolulu*, 39 F.4th at 1111.[9]

2. None of the district court's reasons for denying federal-enclave jurisdiction is persuasive. The district court acknowledged that "plastic pollution touches on federal enclaves," but believed that "does not mean California's claims have their loci there" because "the claims concern the cultural messaging and corporate decision-making that Exxon allegedly engaged in." 1-ER-10. But while the *conduct*

---

[9] Again, because California's claims are premised at least in part on injuries that occurred on federal enclaves, the district court had jurisdiction over the entire case, including supplemental jurisdiction under 28 U.S.C. §1367 over any claims for injuries that occurred elsewhere. *Allapattah*, 545 U.S. at 563; *see Durham*, 445 F.3d at 1250 (recognizing that a defendant could seek removal when "some of [the plaintiff's] claims arose on federal enclaves"); *see also supra* n.4.

that California challenges—including First Amendment-protected "cultural messaging," *id.*—may not have occurred on federal enclaves, the *injury* that California alleges (plastic pollution) plainly did. *See, e.g.*, 6-ER-956, 973, 975, 1064-65, 1070; *supra* pp.37-39. Under this Court's precedent, that gives rise to federal-enclave jurisdiction. *See Honolulu*, 39 F.4th at 1111 (federal-enclave jurisdiction requires "that an injury occurred on a federal enclave *or* that an injury stemmed from conduct on a federal enclave" (emphasis added)).[10]

The district court invoked this Court's decisions in *Honolulu* and *San Mateo*, describing them as cases where this Court "roundly rejected fossil fuel defendants' arguments for federal enclave jurisdiction in similar pollution-related claims" and "rebuffed the broad reading of federal enclave jurisdiction that Exxon nevertheless asserts." 1-ER-10. That is incorrect. In both *Honolulu* and *San Mateo*, plaintiffs brought suit against an array of oil and gas companies, claiming that they had

---

[10] In a footnote, the district court claimed that ExxonMobil "misstate[d] the law" by asserting that "the locus test is satisfied as long as at least some of the locations where the tortious harm occurred are federal enclaves." 1-ER-9 n.5 (brackets omitted). On the contrary, that is precisely what this Court's precedent shows. *See Honolulu*, 39 F.4th at 1111 (federal-enclave jurisdiction is available where "an injury occurred on a federal enclave"); *Durham*, 445 F.3d at 1250 (defendant could seek removal when "some of [the plaintiff's] claims arose on federal enclaves"). The decision in *Bell v. Arvin Meritor, Inc.*, 2012 WL 1110001 (N.D. Cal. Apr. 2, 2012), properly followed that precedent in finding federal-enclave jurisdiction where "at least some of the[] locations" where the plaintiff was exposed to asbestos "are federal enclaves," *id.* at *2, and the district court's attempts to distinguish *Bell* are entirely unpersuasive. *Contra* 1-ER-9 n.5.

40

contributed to and failed to warn the public about the risks of global climate change. *Honolulu*, 39 F.4th at 1106; *San Mateo*, 32 F.4th at 744. In both cases, the defendants sought to remove based on federal-enclave jurisdiction (among other grounds), asserting that some of the *conduct* that may have contributed to the plaintiffs' alleged injury took place on federal enclaves. *Honolulu*, 39 F.4th at 1111-12; *San Mateo*, 32 F.4th at 750 (explaining that the removing defendants "allege[d] only that some of the defendants engaged in some conduct on federal enclaves that may have contributed to global warming"). And in both cases, this Court found those allegations insufficient, explaining that the defendants' oil and gas operations on federal enclaves were "too remote and attenuated" from the plaintiffs' alleged injuries to support federal-enclave jurisdiction. *Honolulu*, 39 F.4th at 1111-12; *San Mateo*, 32 F.4th at 750 (finding the "connection between conduct on federal enclaves and the Counties' alleged injuries … too attenuated and remote").

That is nothing like this case. ExxonMobil does not assert that the district court had federal-enclave jurisdiction here based on any *conduct* that occurred on federal enclaves; instead, the district court had federal-enclave jurisdiction here because the *injury* that California alleges occurred in part on federal enclaves. *See* 6-ER-956, 973, 975, 1064-65, 1070; *supra* pp.37-39; *see also Honolulu*, 39 F.4th at 1111 (federal-enclave jurisdiction arises when "an injury occurred on a federal enclave"). *Honolulu*'s and *San Mateo*'s holdings that the *conduct* that occurred on

41

federal enclaves in those cases was "too remote and attenuated" from the plaintiffs' alleged injury to support federal-enclave jurisdiction, *Honolulu*, 39 F.4th at 1111-12; *see San Mateo*, 32 F.4th at 750, does not alter the settled rule that federal-enclave jurisdiction is available when the *injury* occurs at least in part on a federal-enclave, *see Honolulu*, 39 F.4th at 1111; *Durham*, 445 F.3d at 1250.

The district court claimed that the distinction between the conduct-based theories of federal-enclave jurisdiction addressed in *Honolulu* and *San Mateo* and the injury-based theory asserted here "makes no difference." 1-ER-10. But it never explained *why* that fundamental difference in the theories being asserted should be irrelevant to the analysis; instead, it appears to have simply taken *Honolulu* and *San Mateo* as a sign that "fossil fuel defendants[]" should be reflexively denied federal-enclave jurisdiction on all "pollution-related claims." 1-ER-10. Needless to say, that is not the rule that *Honolulu* and *San Mateo* adopt. The fact that this Court "rebuffed" the conduct-based theories of federal-enclave jurisdiction presented in those climate-change cases says nothing whatsoever about the distinct injury-based theory presented here. *Contra* 1-ER-10.

3. In the alternative, the district court held that federal-enclave jurisdiction was not available because California's complaint "expressly disclaims injuries arising on federal lands, which would include federal enclaves, and … does not seek any relief relating to such injuries." 1-ER-9; *see* 6-ER-956 n.1. In the district court's

42

view, that disclaimer was "sufficient to eviscerate [any] grounds for removal" based on federal-enclave jurisdiction. 1-ER-9 (quoting *Hukkanen v. Air & Liquid Sys. Corp.*, 2017 WL 1217075, at *2 (C.D. Cal. Mar. 31, 2017)).

Not so. While California may be the "master of [its] complaint," *see Hawaii ex rel. Louie v. HSBC Bank Nev., N.A.*, 761 F.3d 1027, 1040 (9th Cir. 2014); *cf.* 1-ER-9, it cannot avoid the jurisdictional consequences of its allegations by artificially disclaiming injury that is inseparable from the basis of its claims. California's complaint extensively alleges widespread plastic pollution across the lands and waters of the entire state, and seeks to hold ExxonMobil uniquely responsible for that statewide problem, including by paying the costs of cleaning up plastic pollution statewide. *See, e.g.*, 6-ER-956, 973, 975, 1064-65, 1070, 1094-95. That alleged injury caused by statewide plastic pollution does not stop neatly at federal enclave borders, nor can California plausibly seek injunctive relief to clean up only non-federal land while leaving federal enclaves in the state untouched (as any remaining plastic pollution on federal enclaves would inevitably spread to its non-federal surroundings). The "artful pleading rule" precludes a plaintiff from "defeat[ing] removal by omitting to plead necessary federal questions in a complaint," *ARCO Env't Remediation, L.L.C. v. Dep't of Health & Env't Quality of Mont.*, 213 F.3d 1108, 1114 (9th Cir. 2000), and the same principle precludes a plaintiff from alleging claims based on an indivisible injury that arose in part on federal enclaves but then

43

attempting to escape federal jurisdiction by artificially disclaiming that indivisible injury to the extent its federal nature permits removal. *See, e.g.*, *Sullivan v. First Affiliated Secs., Inc.*, 813 F.2d 1368, 1372 (9th Cir. 1987) ("removal court" must sometimes "seek to determine whether the real nature of the claim is federal, regardless of plaintiff's characterization" (quoting 14A C. Wright et al., *Federal Practice & Procedure* §3722, at 268-75 (2d ed. 1985))); *Fung v. Abex Corp.*, 816 F.Supp. 569, 571 (N.D. Cal. 1992) ("Failure to indicate the federal enclave status and location of the [injury] will not shield plaintiffs from the consequences of this federal enclave status."); *see also Maryland v. 3M Co.*, 130 F.4th 380, 389-90 (4th Cir. 2025) ("declin[ing] to give dispositive effect to the [plaintiffs'] disclaimers" in evaluating federal-officer removal).

Put simply, California cannot allege claims that necessarily rest in part on injury occurring on federal enclaves, and then attempt to avoid federal jurisdiction by disclaiming that same injury to the extent it would allow ExxonMobil to defend itself in federal court. Because California's claims are based in part on injury occurring on federal enclaves, and because it cannot evade the jurisdictional consequences of its sweeping claims through an artificial disclaimer, the district court's order remanding this case to state court should be reversed.

## III. The District Court Had Federal-Officer Removal Jurisdiction Over This Case.

Finally, the district court erred in ordering this case remanded because it also had federal-officer removal jurisdiction. That doctrine likewise provides an independent basis for federal jurisdiction here, and an independent ground for reversing the decision below.

The federal-officer removal statute authorizes removal of any action against "any officer (or any person acting under that officer) of the United States or of any agency thereof … for or relating to any act under color of such office." 28 U.S.C. §1442(a)(1). As both the Supreme Court and this Court have often emphasized, that statute must be "liberally construed to give full effect to the purposes for which [it was] enacted." *Colorado v. Symes*, 286 U.S. 510, 517 (1932); *see, e.g.*, *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) ("[T]he right of removal is absolute for conduct performed under color of federal office, and … the policy favoring removal should not be frustrated by a narrow, grudging interpretation of §1442(a)(1)."); *DeFiore v. SOC LLC*, 85 F.4th 546, 553 (9th Cir. 2023) ("[C]ourts afford §1442 a 'generous' and 'liberal' construction, interpreting the statute 'broadly in favor of removal.'" (quoting *Durham*, 445 F.3d at 1252-53)); *San Mateo*, 32 F.4th at 756 ("The federal officer removal statute should be 'liberally construed' to fulfill its purpose[.]"); *Durham*, 445 F.3d at 1252 ("We take from this history a clear command from both Congress

45

and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal.").[11] That is for good reason: "because the statute 'vindicates the interests of government itself' in 'preserving its own existence.'" *DeFiore*, 85 F.4th at 553 (ellipsis omitted) (quoting *Bradford v. Harding*, 284 F.2d 307, 310 (2d Cir. 1960) (Friendly, J.)).

Under this Court's precedent, a private person may invoke federal-officer removal by showing that "(a) it is a person within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and the plaintiff's claims; and (c) it can assert a colorable federal defense." *San Mateo*, 32 F.4th at 755 (brackets omitted) (quoting *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981, 986-87 (9th Cir. 2019)). It is undisputed that ExxonMobil, as a corporation, is a "person" within the meaning of the statute. *See DeFiore*, 85 F.4th at 553; *Honolulu*, 39 F.4th at 1107. Because both of the other requirements for federal-officer removal jurisdiction are met as well, the district court erred in ordering this case remanded.

---

[11] In *Honolulu*, this Court stated that it "strictly construe[s] the removal statute against removal jurisdiction." 39 F.4th at 1106-07 (quoting *Hansen v. Grp. Health Coop.*, 902 F.3d 1051, 1056-57 (9th Cir. 2018)). That is true with respect to removal under §1441, *see Hansen*, 902 F.3d at 1056-57; but as Supreme Court precedent and this Court's cases before and after *Honolulu* confirm, it is *not* correct with respect to federal-officer removal under §1442. *See, e.g.*, *DeFiore*, 85 F.4th at 553; *Durham*, 445 F.3d at 1252.

**A.     ExxonMobil's Actions Under Federal Direction Have a Causal Nexus With California's Claims.**

To demonstrate the causal nexus that this Court's precedent requires for federal-officer removal, a private person "must show: (1) that the person was 'acting under' a federal officer in performing some 'act under color of federal office,' and (2) that such action is causally connected with the plaintiff's claims against it." *San Mateo*, 32 F.4th at 755. Although the second part of that test once required a direct causal nexus between the acts taken under federal direction and the plaintiff's claims, Congress amended §1442(a)(1) in 2011 to allow removal of suits "for *or relating to*" any act under federal direction. Removal Clarification Act of 2011, Pub. L. No. 112-51, §2(b)(1)(A), 125 Stat. 545 (emphasis added); *see DeFiore*, 85 F.4th at 557 n.6; *Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. S.D.*, 865 F.3d 1237, 1250 (9th Cir. 2017). In so doing, "Congress broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected or associated*, with acts under color of federal office," even absent a direct causal relationship. *DeFiore*, 85 F.4th at 557 n.6 (quoting *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc)); *see Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (explaining that the "ordinary meaning" of "relating to" is "a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with'"). This Court accordingly interprets its "causal nexus" requirement "as incorporating the 'connected or associated with' standard

47

reflected in Congress's 2011 amendment and the Supreme Court's decisions." *DeFiore*, 85 F.4th at 557 n.6.

ExxonMobil meets both parts of that test here. As a federal contractor, ExxonMobil was indisputably "'acting under' a federal officer" in producing synthetic rubber for the federal government's use during WWII in accordance with federal specifications. *San Mateo*, 32 F.4th at 755. Those actions under federal direction are also "connected or associated with" California's claims, *DeFiore*, 85 F.4th at 557 n.6, which allege injury in the form of pollution that is exacerbated by improperly discarded synthetic-rubber products. ExxonMobil was accordingly entitled to invoke federal-officer removal under §1442(a)(1).

1. First, ExxonMobil plainly acted under federal direction in producing synthetic rubber as a contractor for the federal government during the WWII era. "For a private entity to be 'acting under' a federal officer, the private entity must be involved in 'an effort to assist, or to help carry out, the duties or tasks of the federal superior'" under federal "subjection, guidance, or control." *Goncalves*, 865 F.3d at 1245 (emphasis omitted) (quoting *Watson*, 551 U.S. at 152). Thus, for example, "a private party acts under the government when the party is a contractor given detailed specifications and ongoing supervision to help fight a war." *Honolulu*, 39 F.4th at 1107; *see, e.g.*, *Watson*, 551 U.S. at 153 (recognizing that federal contractors "fall within the terms of the federal officer removal statute" when the government

provides "detailed regulation, monitoring, or supervision" and the contractor "is helping the Government to produce an item that it needs").

ExxonMobil's production of synthetic rubber as a federal contractor in WWII falls squarely into that category. WWII created massive demand for synthetic rubber, which was used for tires and other essential military products. 6-ER-1101. The federal government accordingly sought, "under the stress of a war emergency," to transform the "fledgling" synthetic-rubber industry into "an industrial mechanism capable of producing more than a million long tons of rubber annually"—a goal it achieved through "the joint efforts of Government and private industry." 6-ER-1101. In particular, the government contracted with ExxonMobil to construct two government-owned butyl plants—the only butyl plants in the United States during WWII—at refineries owned by ExxonMobil in Baton Rouge, Louisiana and Baytown, Texas, and purchased the entirety of the output from these plants. 6-ER-1111; *see* 5-ER-939-42. The government also constructed butadiene and other chemical plants at Baton Rouge and Baytown that were operated by ExxonMobil. 6-ER-1111; *see* 5-ER-939. Those plants were used to create synthetic rubber for the government for vehicle tires and other military necessities. 5-ER-939; *see* 5-ER-939-42.

The government also exercised "detailed regulation, monitoring, [and] supervision" over ExxonMobil's operation of the plants under its federal contracts.

*Watson*, 551 U.S. at 153; *see* 5-ER-939-42 (describing the government's "day-to-day involvement in operational decisions"). As another district court has noted, ExxonMobil had to "obtain government approval for, among other things, any plant-related expenditure exceeding $1,000; the disposal of waste, scrap, byproducts, and surplus materials and equipment; additions or alterations to the plants; and increasing employee salaries and benefits." *ExxonMobil Corp. v. United States*, 108 F.Supp.3d 486, 531 (S.D. Tex. 2015). A federal official was also permanently stationed at each facility, to oversee operations and ensure compliance with federal specifications, and would "play[] a substantial role in overseeing day-to-day operation" of the facilities. *Id.* More to the point, ExxonMobil produced its synthetic rubber for the federal government under exacting federal specifications; it was not free to produce any varieties and quantities of synthetic rubber it chose, but was instead required to comply with precise technical specifications set by its federal contracts, to produce synthetic rubber in the manner, type, and amount that the government dictated. *See generally* 4-ER-564-778, 5-ER-781-841 (federal contracts). Those facts are more than sufficient to establish that Exxon Mobil was "acting under" federal direction for federal-officer removal purposes. 28 U.S.C. §1442(a)(1); *see, e.g.*, *Honolulu*, 39 F.4th at 1107 ("a contractor given detailed specifications and ongoing supervision" is "act[ing] under the government").

2. ExxonMobil's actions under federal direction are also "connected or associated with" California's claims, *DeFiore*, 85 F.4th at 557 n.6. As this Court has recognized, the "hurdle erected by [that] requirement is quite low." *Goncalves*, 865 F.3d at 1244 (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)). After Congress' amendment of the statute in 2011, it requires only that the plaintiff's claims "relat[e] to" the defendant's acts under federal direction, without necessarily requiring that they be "*causally* connected." *DeFiore*, 85 F.4th at 557 n.6. And in assessing that relationship, a court must "credit the defendant's theory of the case." *Leite v. Crane Co.*, 749 F.3d 1117, 1124 (9th Cir. 2014); *see, e.g.*, *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999); *Isaacson*, 517 F.3d at 137.

Applying those principles, this case "meets the low bar that the causal-connection prong requires." *Goncalves*, 865 F.3d at 1245. During WWII, ExxonMobil helped produce millions of tons of synthetic rubber for the federal government, much of which became tires for military vehicles and other essential wartime supplies. 5-ER-937-38, 943. Many of those military vehicles were stationed at the dozens of military installations that are located in California, including along its coastlines and waterways. 5-ER-943-44. As a result, waste tires and other synthetic rubber debris from military vehicles and military supplies would have made its way into California's natural environment and waterways, contributing to the state's pollution problems. 5-ER-944-45. Indeed, because the

51

butyl plants operated by ExxonMobil were the *only* butyl plants operating in the United States during this period, any domestic synthetic-rubber products from that era made with butyl are necessarily related to ExxonMobil's acts under federal direction in operating those plants. 5-ER-943-44.

On the other side of the equation, California's extraordinarily sweeping claims allege aesthetic and economic injury from all kinds of plastic pollution found all across the state. *See, e.g.*, 6-ER-1070, 1074. California does not define the term "plastic" in its complaint, and so it is not clear from the face of the complaint whether California's claims intend to include pollution from discarded synthetic-rubber products such as those manufactured by ExxonMobil under federal direction. *See plastic*, Merriam-Webster Dictionary, https://perma.cc/ZU23-Y257 (last visited June 23, 2025) (defining "plastic" as "any of numerous organic synthetic or processed materials that are mostly thermoplastic or thermosetting polymers of high molecular weight and that can be made into objects, films, or filaments"); *see also Synthetic Rubber—Bet You Didn't Know It Was a Plastic!*, Plastics Industry, https://perma.cc/3LGK-E38Y (last visited June 23, 2025) (synthetic rubber "is a variation of plastic"). Notably, studies have identified car tires as a source of microplastics, as California itself has acknowledged. *See* Letter from Rob Bonta, Att'y Gen. of Cal., to Carolyn Hoskinson, Dir. of Off. of Res. Conserv. & Recovery, EPA, July 31, 2024, at 36, https://perma.cc/VX9T-8GB6 ("One study estimates that

tire wear particles are one of the top two sources of primary microplastics in the ocean."); *see also* Rosanna Xia, *The Biggest Likely Source of Microplastics in California Coastal Waters? Our car tires*, L.A. Times (Oct. 2, 2019), https://perma.cc/9TAR-RU3J.  That also helps explain why California alleges that "waste tires" form part of the feedstock for advanced recycling.  *See* 1-ER-10 (citing 6-ER-1032-33 n.125).

But even assuming that California's definition of "plastic" excludes synthetic rubber, the aesthetic and economic impact on California's coastlines and waterways is not caused solely by plastic pollution, but by all improperly discarded waste that finds its way to those areas, including synthetic-rubber products.  That is, the underlying aesthetic and economic injury that California asserts is inextricably intertwined with pollution caused by improperly discarded synthetic-rubber products, including at least some products traceable to ExxonMobil's WWII-era operations under federal direction, and any attempt to remedy that injury would have to contend with the effects of synthetic-rubber pollution as well.  *See* 5-ER-944.  In short, the millions of tons of synthetic rubber that ExxonMobil helped produce at the federal government's behest during WWII have contributed to, and thus "relat[e] to," the injury underlying California's claims.  28 U.S.C. §1442(a)(1).  That is enough to meet the "low bar" posed by the federal-officer removal nexus requirement.  *Goncalves*, 865 F.3d at 1245.

3. The district court did not dispute that ExxonMobil acted under federal direction in producing synthetic rubber for the federal government's use during WWII. *See* 1-ER-10 (recognizing that "the United States government contracted with Exxon's predecessors to produce rubber for World War II-era military use"). It nevertheless concluded that federal-officer removal jurisdiction was unavailable, because (it said) California's complaint is "about *plastic*," not synthetic rubber, and so ExxonMobil's acts under federal direction were not sufficiently connected to California's claims to permit removal. 1-ER-10-11. That conclusion was incorrect.

As an initial matter, the district court applied the wrong legal standard in reviewing ExxonMobil's federal-officer removal arguments. In describing the legal standard, the district court asserted that it would apply a "strong presumption against removal jurisdiction," and would "resolve[] all ambiguity in favor of remand to state court." 1-ER-5 (quoting *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1042 (9th Cir. 2009)). That was wrong as a matter of law; while there is a presumption against removal in cases removed under §1441, no such presumption applies to federal-officer removal under §1442, given the strong federal interest in ensuring a federal forum for federal officers and those acting under their direction. *Durham*, 445 F.3d at 1252; *see supra* pp.45-46; *see also, e.g.*, *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018) ("The presumption against removal in ordinary diversity jurisdiction cases does not extend to the federal officer removal statute.").

54

The district court not only applied the wrong standard, but also reached the wrong result. In the district court's view, ExxonMobil's actions in producing synthetic rubber under federal direction could not be related to California's claims because "[r]ubber is not the product at issue in the complaint—plastic is." 1-ER-10. Of course, as already noted, it is not clear from the face of the complaint that California's allegations regarding plastic pollution are intended to exclude synthetic-rubber pollution. *See supra* pp.52-53. But even if California did intend to limit its claims in that way, those claims would still be sufficiently "connected or associated with" ExxonMobil's WWII-era production of synthetic rubber under federal direction to permit federal-officer removal. *DeFiore*, 85 F.4th at 557 n.6.

As the district court noted, California's claims "are not about pollution in the abstract"; instead, they focus specifically on ExxonMobil's First Amendment-protected "promotion of plastics recycling programs." 1-ER-11. But the *injury* that California asserts from that allegedly unlawful conduct—increased pollution of its coastlines and waterways—is a harm that is caused by *both* plastic and synthetic-rubber waste, and no remedy can address the former without also addressing the latter. Because the underlying injury for which California seeks a remedy is caused in part—at least on ExxonMobil's theory of the case, which is all that matters in applying the federal-officer removal test, *see Leite*, 749 F.3d at 1124—by synthetic-rubber pollution, including synthetic rubber that ExxonMobil manufactured for the

55

federal government, California's claims are "connected or associated with" ExxonMobil's actions under federal direction. *DeFiore*, 85 F.4th at 557 n.6.

The district court also suggested that the nexus that federal-officer removal requires was absent because "nothing suggests that the challenged acts occurred *because of* what Exxon was asked to do by the government." 1-ER-11 (emphasis added) (brackets omitted). But ever since Congress amended §1442 in 2011 to permit removal of suits "relating to" acts taken under federal direction, that kind of strict causal relationship has not been required. 28 U.S.C. §1442(a)(1); *see DeFiore*, 85 F.4th at 557 n.6 (removal is not limited to suits "*causally* connected" to acts under federal direction, and instead reaches all suits "*connected* or *associated*" with such acts). Put simply, federal-officer removal is not limited to suits brought "because of" acts taken under federal direction, *contra* 1-ER-11; it extends to all suits "relating to" such acts, 28 U.S.C. §1442(a)(1). That broader standard encompasses California's suit here.

## B. ExxonMobil Has Colorable Federal Defenses.

Finally, ExxonMobil has colorable federal defenses to California's claims. In evaluating that element, "the scope of the court's inquiry is only whether the defendant advanced a *colorable* federal defense, not whether the defense will be successful," as defendants "need not win their case before removal." *DeFiore*, 85 F.4th at 558 (emphasis added) (brackets omitted). A federal defense qualifies as

56

colorable unless it is "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous." *Id.* at 560. Any federal defense that clears that "low bar" is enough to satisfy this element of the federal-officer removal test. *Id.*

ExxonMobil's federal defenses here readily meet that standard. As the district court repeatedly stressed in its remand order, California's complaint centers on ExxonMobil's First Amendment activities. Thus, ExxonMobil has more than colorable federal defenses in the form of the First Amendment objections that it has already begun to brief in the ongoing federal case involving the environmental groups. ExxonMobil also has preemption defenses that are more than colorable. Those federal defenses alone suffice to support federal-officer removal. *See, e.g.*, *Goncalves*, 865 F.3d at 1249 (finding colorable federal defense based on preemption).

In addition, ExxonMobil has a colorable federal-contractor defense "arising out of [its] official duties" in producing synthetic rubber for the federal government. *Manypenny*, 451 U.S. at 241. The federal-contractor defense, which precludes "civil liabilities arising out of the performance of federal procurement contracts," *Boyle v. United Techs. Corp.*, 487 U.S. 500, 506 (1988), protects against liability arising from "any product supplied for government use so long as it conformed to the government's reasonably precise specifications," *Baker v. Atl. Richfield Co.*, 962

F.3d 937, 946 (7th Cir. 2020). In particular, the federal-contractor defense is available when (1) the government "approved reasonably precise specifications"; (2) the contractor "conformed to those specifications"; and (3) "the supplier warned the United States about the dangers in the [product] that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

ExxonMobil's federal-contractor defense is more than colorable (and indeed, meritorious) here. As detailed above, ExxonMobil produced synthetic rubber for the United States under "reasonably precise specifications," including day-to-day government control and supervision, at its Baton Rouge and Baytown plants, and the synthetic rubber that ExxonMobil provided "conformed to those specifications." *Id.*; *see supra* pp.48-50. To the extent the synthetic rubber that ExxonMobil produced posed any danger of future pollution-related injury, that danger was "known … to the United States" at least as well as to ExxonMobil. *Boyle*, 487 U.S. at 512. ExxonMobil is therefore entitled to a federal-contractor defense to any claim of injury arising from pollution created in part by the synthetic rubber it manufactured for the federal government. *See Baker*, 962 F.3d at 940 (defendant that manufactured "materials [that] were critical wartime commodities" for the federal government had a colorable federal contractor defense to soil pollution claims relating to those operations).

58

The district court believed ExxonMobil's federal-contractor defense was not colorable because California's claims "involve deception about plastic, not the production of rubber." 1-ER-11. That is wrong for all the reasons already explained: Even assuming that California's definition of "plastic" does not include synthetic rubber, *see supra* pp.52-53, and even accepting that the *conduct* that California challenges in its claims is ExxonMobil's allegedly deceptive speech about plastic, the ultimate *injury* that California asserts is pollution of its landscapes, coastlines, and waterways—and that injury inescapably arises from plastic *and* synthetic rubber waste, which both contribute to the state's alleged "pollution crisis" and which would both be addressed in any potential remedy. 6-ER-956; *see supra* pp.51-52. In short, accepting ExxonMobil's theory of the case—as the federal-officer removal analysis requires, *see Leite*, 749 F.3d at 1124—the injury that California asserts arises at least in part from ExxonMobil's production of synthetic rubber for the federal government, and ExxonMobil has a colorable (in fact, meritorious) federal-contractor defense to any liability for that injury. The district court erred in denying ExxonMobil its right to have that defense heard in federal court.

## CONCLUSION

This Court should reverse the district court's remand order.

Respectfully submitted,

s/Paul D. Clement

DAWN SESTITO

MATTHEW COWAN

O'MELVENY & MYERS, LLP

400 S. Hope Street, 18th Floor

Los Angeles, CA 90071

dsestito@omm.com

PAUL D. CLEMENT

C. HARKER RHODES IV

NICCOLO A. BELTRAMO

CLEMENT & MURPHY, PLLC

706 Duke Street

Alexandria, VA 22314

(202) 742-8900

paul.clement@clementmurphy.com

DAVID J. LENDER

WEIL, GOTSHAL & MANGES, LLP

767 Fifth Avenue

New York, NY 10153

david.lender@weil.com

*Counsel for Appellant Exxon Mobil Corporation*

June 23, 2025

60

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, ExxonMobil states that it is not aware of any other cases pending in this Court that are related to the present case.

June 23, 2025

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Circuit Rule 32-1(a) because this brief contains 13,986 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

June 23, 2025

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in this case are registered ACMS users and that service will be accomplished by the ACMS system.

<u>s/Paul D. Clement</u>
Paul D. Clement

**ADDENDUM**

## TABLE OF CONTENTS

28 U.S.C. §1331 ....................................................................................1a

28 U.S.C. §1333 ....................................................................................2a

28 U.S.C. §1441 ....................................................................................3a

28 U.S.C. §1442 ....................................................................................6a

28 U.S.C. §1447 ....................................................................................8a

i

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 85. District Courts; Jurisdiction (Refs & Annos)

28 U.S.C.A. § 1331

§ 1331. Federal question

Currentness

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 930; Pub.L. 85-554, § 1, July 25, 1958, 72 Stat. 415; Pub.L. 94-574, § 2, Oct. 21, 1976, 90 Stat. 2721; Pub.L. 96-486, § 2(a), Dec. 1, 1980, 94 Stat. 2369.)

28 U.S.C.A. § 1331, 28 USCA § 1331
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

End of Document                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

1a

United States Code Annotated
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
      Part IV. Jurisdiction and Venue (Refs & Annos)
         Chapter 85. District Courts; Jurisdiction (Refs & Annos)

28 U.S.C.A. § 1333

§ 1333. Admiralty, maritime and prize cases

Currentness

The district courts shall have original jurisdiction, exclusive of the courts of the States, of:

**(1)** Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

**(2)** Any prize brought into the United States and all proceedings for the condemnation of property taken as prize.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 931; May 24, 1949, c. 139, § 79, 63 Stat. 101.)

28 U.S.C.A. § 1333, 28 USCA § 1333
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. **2a**

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 89. District Courts; Removal of Cases from State Courts (Refs & Annos)

28 U.S.C.A. § 1441

§ 1441. Removal of civil actions

Currentness

**(a) Generally.**--Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

**(b) Removal based on diversity of citizenship.--(1)** In determining whether a civil action is removable on the basis of the jurisdiction under section 1332(a) of this title, the citizenship of defendants sued under fictitious names shall be disregarded.

**(2)** A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

**(c) Joinder of Federal law claims and State law claims.--(1)** If a civil action includes--

(A) a claim arising under the Constitution, laws, or treaties of the United States (within the meaning of section 1331 of this title), and

(B) a claim not within the original or supplemental jurisdiction of the district court or a claim that has been made nonremovable by statute,

the entire action may be removed if the action would be removable without the inclusion of the claim described in subparagraph (B).

**(2)** Upon removal of an action described in paragraph (1), the district court shall sever from the action all claims described in paragraph (1)(B) and shall remand the severed claims to the State court from which the action was removed. Only defendants against whom a claim described in paragraph (1)(A) has been asserted are required to join in or consent to the removal under paragraph (1).

**(d) Actions against foreign States.**--Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury. Where removal is based upon this subsection, the time limitations of section 1446(b) of this chapter may be enlarged at any time for cause shown.

**(e) Multiparty, multiforum jurisdiction.**--**(1)** Notwithstanding the provisions of subsection (b) of this section, a defendant in a civil action in a State court may remove the action to the district court of the United States for the district and division embracing the place where the action is pending if--

**(A)** the action could have been brought in a United States district court under section 1369 of this title; or

**(B)** the defendant is a party to an action which is or could have been brought, in whole or in part, under section 1369 in a United States district court and arises from the same accident as the action in State court, even if the action to be removed could not have been brought in a district court as an original matter.

The removal of an action under this subsection shall be made in accordance with section 1446 of this title, except that a notice of removal may also be filed before trial of the action in State court within 30 days after the date on which the defendant first becomes a party to an action under section 1369 in a United States district court that arises from the same accident as the action in State court, or at a later time with leave of the district court.

**(2)** Whenever an action is removed under this subsection and the district court to which it is removed or transferred under section 1407(j) [1] has made a liability determination requiring further proceedings as to damages, the district court shall remand the action to the State court from which it had been removed for the determination of damages, unless the court finds that, for the convenience of parties and witnesses and in the interest of justice, the action should be retained for the determination of damages.

**(3)** Any remand under paragraph (2) shall not be effective until 60 days after the district court has issued an order determining liability and has certified its intention to remand the removed action for the determination of damages. An appeal with respect to the liability determination of the district court may be taken during that 60-day period to the court of appeals with appellate jurisdiction over the district court. In the event a party files such an appeal, the remand shall not be effective until the appeal has been finally disposed of. Once the remand has become effective, the liability determination shall not be subject to further review by appeal or otherwise.

**(4)** Any decision under this subsection concerning remand for the determination of damages shall not be reviewable by appeal or otherwise.

**(5)** An action removed under this subsection shall be deemed to be an action under section 1369 and an action in which jurisdiction is based on section 1369 of this title for purposes of this section and sections 1407, 1697, and 1785 of this title.

**(6)** Nothing in this subsection shall restrict the authority of the district court to transfer or dismiss an action on the ground of inconvenient forum.

**(f) Derivative removal jurisdiction.**--The court to which a civil action is removed under this section is not precluded from hearing and determining any claim in such civil action because the State court from which such civil action is removed did not have jurisdiction over that claim.

4a

## CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 937; Pub.L. 94-583, § 6, Oct. 21, 1976, 90 Stat. 2898; Pub.L. 99-336, § 3(a), June 19, 1986, 100 Stat. 637; Pub.L. 100-702, Title X, § 1016(a), Nov. 19, 1988, 102 Stat. 4669; Pub.L. 101-650, Title III, § 312, Dec. 1, 1990, 104 Stat. 5114; Pub.L. 102-198, § 4, Dec. 9, 1991, 105 Stat. 1623; Pub.L. 107-273, Div. C, Title I, § 11020(b)(3), Nov. 2, 2002, 116 Stat. 1827; Pub.L. 112-63, Title I, § 103(a), Dec. 7, 2011, 125 Stat. 759.)

## Footnotes

1       So in original. Section 1407 of this title does not contain a subsec. (j).

28 U.S.C.A. § 1441, 28 USCA § 1441

Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 89. District Courts; Removal of Cases from State Courts (Refs & Annos)

28 U.S.C.A. § 1442

§ 1442. Federal officers or agencies sued or prosecuted

Currentness

**(a)** A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

**(1)** The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

**(2)** A property holder whose title is derived from any such officer, where such action or prosecution affects the validity of any law of the United States.

**(3)** Any officer of the courts of the United States, for or relating to any act under color of office or in the performance of his duties;

**(4)** Any officer of either House of Congress, for or relating to any act in the discharge of his official duty under an order of such House.

**(b)** A personal action commenced in any State court by an alien against any citizen of a State who is, or at the time the alleged action accrued was, a civil officer of the United States and is a nonresident of such State, wherein jurisdiction is obtained by the State court by personal service of process, may be removed by the defendant to the district court of the United States for the district and division in which the defendant was served with process.

**(c)** Solely for purposes of determining the propriety of removal under subsection (a), a law enforcement officer, who is the defendant in a criminal prosecution, shall be deemed to have been acting under the color of his office if the officer--

**(1)** protected an individual in the presence of the officer from a crime of violence;

**(2)** provided immediate assistance to an individual who suffered, or who was threatened with, bodily harm; or

**(3)** prevented the escape of any individual who the officer reasonably believed to have committed, or was about to commit, in the presence of the officer, a crime of violence that resulted in, or was likely to result in, death or serious bodily injury.

**(d)** In this section, the following definitions apply:

**(1)** The terms "civil action" and "criminal prosecution" include any proceeding (whether or not ancillary to another proceeding) to the extent that in such proceeding a judicial order, including a subpoena for testimony or documents, is sought or issued. If removal is sought for a proceeding described in the previous sentence, and there is no other basis for removal, only that proceeding may be removed to the district court.

**(2)** The term "crime of violence" has the meaning given that term in section 16 of title 18.

**(3)** The term "law enforcement officer" means any employee described in subparagraph (A), (B), or (C) of section 8401(17) of title 5 and any special agent in the Diplomatic Security Service of the Department of State.

**(4)** The term "serious bodily injury" has the meaning given that term in section 1365 of title 18.

**(5)** The term "State" includes the District of Columbia, United States territories and insular possessions, and Indian country (as defined in section 1151 of title 18).

**(6)** The term "State court" includes the Superior Court of the District of Columbia, a court of a United States territory or insular possession, and a tribal court.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 938; Pub.L. 104-317, Title II, § 206(a), Oct. 19, 1996, 110 Stat. 3850; Pub.L. 112-51, § 2(a), (b), Nov. 9, 2011, 125 Stat. 545; Pub.L. 112-239, Div. A, Title X, § 1087, Jan. 2, 2013, 126 Stat. 1969.)

28 U.S.C.A. § 1442, 28 USCA § 1442
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. **7a** 2

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 89. District Courts; Removal of Cases from State Courts (Refs & Annos)

28 U.S.C.A. § 1447

§ 1447. Procedure after removal generally

Currentness

**(a)** In any case removed from a State court, the district court may issue all necessary orders and process to bring before it all proper parties whether served by process issued by the State court or otherwise.

**(b)** It may require the removing party to file with its clerk copies of all records and proceedings in such State court or may cause the same to be brought before it by writ of certiorari issued to such State court.

**(c)** A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal. A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case.

**(d)** An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise.

**(e)** If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court.

### CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 939; May 24, 1949, c. 139, § 84, 63 Stat. 102; Pub.L. 88-352, Title IX, § 901, July 2, 1964, 78 Stat. 266; Pub.L. 100-702, Title X, § 1016(c), Nov. 19, 1988, 102 Stat. 4670; Pub.L. 102-198, § 10(b), Dec. 9, 1991, 105 Stat. 1626; Pub.L. 104-219, § 1, Oct. 1, 1996, 110 Stat. 3022; Pub.L. 112-51, § 2(d), Nov. 9, 2011, 125 Stat. 546.)

28 U.S.C.A. § 1447, 28 USCA § 1447
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**8a**