No. 25-1674

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PEOPLE OF THE STATE OF CALIFORNIA, EX REL. ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA,

*Plaintiff-Appellee,*

V.

EXXON MOBIL CORPORATION,

*Defendant-Appellant.*

## On Appeal from the United States District Court for the Northern District of California

No. 3:24-cv-07594-RS
Hon. Richard Seeborg, District Judge

## APPELLEE'S ANSWERING BRIEF

ROB BONTA
 *Attorney General of California*
HELEN H. HONG
 *Acting Solicitor General*
DANIEL A. OLIVAS
DENNIS L. BECK, JR.
 *Senior Assistant Attorneys General*

MICA L. MOORE
 *Deputy Solicitor General*
DEBORAH M. SMITH
VANESSA MORRISON
 *Supervising Deputy Attorneys General*
GABRIEL MARTINEZ
STACY J. LAU
ELIZABETH B. RUMSEY
 *Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA  90013-1230
(213) 269-6138
Mica.Moore@doj.ca.gov
*Attorneys for Plaintiff-Appellee*

August 22, 2025

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................. 1

Jurisdictional statement ............................................................................. 2

Statement of the issues ............................................................................... 3

Statement of the case ................................................................................. 3

    A.    The State's lawsuit ...................................................................... 3

    B.    The district court's remand order ............................................... 6

Summary of argument ................................................................................ 9

Standard of review ................................................................................... 11

Argument .................................................................................................. 11

I.    The district court lacked admiralty jurisdiction ............................... 11

    A.    The complaint does not assert torts occurring at sea ............... 12

    B.    The complaint does not implicate traditional maritime activity ....... 14

II.    The district court lacked federal-enclave jurisdiction ..................... 16

III.    The district court lacked federal-officer jurisdiction ....................... 22

    A.    ExxonMobil's wartime supply contracts are not causally connected to the complaint's claims ............................................................... 23

    B.    ExxonMobil did not "act under" federal authority in fulfilling its wartime supply contracts ............................................................... 28

    C.    ExxonMobil does not have a colorable federal defense to the complaint's claims ............................................................................. 33

Conclusion ............................................................................................... 35

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Alvares v. Erickson*
514 F.2d 156 (9th Cir. 1975) ...............................................................17

*Anne Arundel Cnty. v. BP P.L.C.*
94 F.4th 343 (4th Cir. 2024) ...........................................................2, 26

*Arizona v. Manypenny*
451 U.S. 232 (1981).............................................................................33

*Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy*
25 F.4th 1238 (10th Cir. 2022) ...................................................2, 19, 21

*Boyle v. United Techs. Corp.*
487 U.S. 500 (1988).............................................................................34

*BP P.L.C. v. Mayor and City Council of Balt.*
593 U.S. 230 (2021)...............................................................................2

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*
797 F.3d 720 (9th Cir. 2015) ...................................................29, 30, 33

*Caterpillar Inc. v. Williams*
482 U.S. 386 (1987)........................................................................20, 21

*City & Cnty. of Honolulu v. Sunoco LP*
39 F.4th 1101 (9th Cir. 2022) ........................................................*passim*

*Clinton v. Joshua Hendy Corp.*
285 F.2d 199 (9th Cir. 1960) ...............................................................13

*Cnty. of San Mateo v. Chevron Corp.*
32 F.4th 733 (9th Cir. 2022) .........................................................*passim*

*Connecticut v. Exxon Mobil*
83 F.4th 122 (2d. Cir. 2023) ...........................................................2, 26

ii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*DeFiore v. SOC LLC*
   85 F.4th 546 (9th Cir. 2023) ................................................................27

*Exec. Jet Aviation, Inc. v. City of Cleveland*
   409 U.S. 249 (1972)..................................................................15, 16

*Exxon Mobil Corp. v. United States*
   108 F. Supp. 3d 486 (S.D. Tex. 2015)...................................................31

*Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr.*
   463 U.S. 1 (1983)...............................................................................22

*Getz v. Boeing Co.*
   654 F.3d 852 (9th Cir. 2011) .............................................................34

*Ghotra by Ghotra v. Bandila Shipping, Inc.*
   113 F.3d 1050 (9th Cir. 1997) ...........................................................16

*Goncalves ex rel. Goncalves v. Rady Children's Hosp. S.D.*
   865 F.3d 1237 (9th Cir. 2017) .....................................................24, 27

*Gruver v. Lesman Fisheries, Inc.*
   489 F.3d 978 (9th Cir. 2007) .............................................................11

*Guidry v. Durkin*
   834 F.2d 1465 (9th Cir. 1987) .....................................................13, 14

*In re Haw. Fed. Asbestos Cases*
   960 F.2d 806 (9th Cir. 1992) .............................................................32

*J. Lauritzen A/S v. Dashwood Shipping, Ltd.*
   65 F.3d 139 (9th Cir. 1995) ...............................................................13

*James Stewart & Co. v. Sadrakula*
   309 U.S. 94 (1940)..............................................................................17

*Jefferson Cnty., Ala. v. Acker*
   527 U.S. 423 (1999)............................................................................24

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*
513 U.S. 527 (1995)......................................................................*passim*

*Johnson v. Colonial Pipeline Co.*
830 F. Supp. 309 (E.D. Va. 1993) ...................................................15

*Kohlasch v. N.Y. State Thruway Auth.*
460 F. Supp. 956 (S.D.N.Y. 1978) ..................................................15

*Lake v. Ohana Mil. Cmtys.*
14 F.4th 993 (9th Cir. 2021) .................................................17, 20, 25

*Leite v. Crane Co.*
749 F.3d 1117 (9th Cir. 2014) .....................................................25, 33

*Louisville & Nashville R.R. v. Mottley*
211 U.S. 149 (1908).........................................................................21

*Macomber v. Bose*
401 F.2d 545 (9th Cir. 1968) ...........................................................17

*Maryland v. 3M Co.*
130 F.4th 380 (4th Cir. 2025) ..........................................................21

*Mayor and City Council of Balt. v. BP P.L.C.*
31 F.4th 178 (4th Cir. 2022) ......................................................*passim*

*Mesa v. California*
489 U.S. 121 (1989).........................................................................23

*Minnesota v. Am. Petroleum Inst.*
63 F.4th 703 (8th Cir. 2023) ....................................................2, 26, 27

*Myhran v. Johns-Manville Corp.*
741 F.2d 1119 (9th Cir. 1984) .........................................................14

*Nat'l Sea Clammers Ass'n v. City of N.Y.*
616 F.2d 1222 (3d Cir. 1980) ..........................................................15

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Rhode Island v. Shell Oil Prods. Co., LLC*
  35 F.4th 44 (1st Cir. 2022)...................................................................1, 19

*Ruppel v. CBS Corp.*
  701 F.3d 1176 (7th Cir. 2012) .....................................................................23

*Sisson v. Ruby*
  497 U.S. 358 (1990)......................................................................................12

*Taghadomi v. United States*
  401 F.3d 1080 (9th Cir. 2005) ...............................................................13, 14

*United States v. Redwood City*
  640 F.2d 963 (9th Cir. 1981) .......................................................................15

*Vaden v. Discover Bank*
  556 U.S. 49 (2009)........................................................................................21

*Winters v. Diamond Shamrock Chem. Co.*
  149 F.3d 387 (5th Cir. 1998) .......................................................................32

*Yates v. Island Creek Coal Co.*
  485 F. Supp. 995 (W.D. Va. 1980)...............................................................15

**STATUTES**

28 U.S.C.
  § 1291..............................................................................................................2
  § 1331............................................................................................................17
  § 1333.....................................................................................................6, 9, 16
  § 1442............................................................................................................22
  § 1442(a)(1) ....................................................................................................6
  § 1447(d)..........................................................................................................2

43 U.S.C. § 1349(b)(1)......................................................................................25

v

## TABLE OF AUTHORITIES
### (continued)

**Page**

CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 17.................................................................................17

OTHER AUTHORITIES

Cal. State Lands Comm., Resolution (Oct. 1, 2009),
  https://tinyurl.com/4bv8cpwv .............................................................................20

## INTRODUCTION

The California Attorney General filed a civil enforcement action in California state court against ExxonMobil.  The complaint alleges that ExxonMobil engaged in a decades-long campaign to mislead the public about the feasibility of methods for recycling plastics, causing a variety of harms to the State, its residents, and the environment.  The complaint asserts state tort, consumer protection, and statutory claims against ExxonMobil, and seeks a range of remedies to redress the State's injuries.  ExxonMobil attempted to remove the action to federal district court, but the district court remanded the lawsuit to state court.

ExxonMobil briefly attempts to litigate the merits of the underlying lawsuit, which are not at issue in this appeal.  The only question at this stage is whether the district court correctly determined that it lacked subject matter jurisdiction over this lawsuit.  It did.  The Attorney General's claims do not implicate the admiralty jurisdiction of the federal courts; they do not challenge actions performed at the behest of federal officers; and they do not have their locus on federal enclaves. The federal courts of appeals have uniformly rejected attempts to remove analogous state and local enforcement actions to federal court.[1]  ExxonMobil

---

[1] *See Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1797 (2023); *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023); *Rhode Island v. Shell Oil Prods. Co., LLC*, 35 F.4th 44 (1st Cir. 2022), *cert. denied*, 143 S. Ct.

(continued…)

1

cannot avoid that weight of authority by rewriting the complaint's allegations, or by recharacterizing the requirements for federal jurisdiction. The Court should affirm the district court's remand order.

## JURISDICTIONAL STATEMENT

The district court's jurisdiction is at issue in this appeal. ExxonMobil attempted to remove the Attorney General's state-court enforcement action to federal district court on three separate grounds. The Attorney General opposed on the basis that the district court lacked subject matter jurisdiction. The district court agreed and entered an order remanding the case to state court on February 24, 2025. 1-ER-2–16. ExxonMobil filed a timely appeal on March 11, 2025. 6-ER-1121. This Court has jurisdiction to review the remand order under 28 U.S.C. §§ 1291 and 1447(d). Because ExxonMobil asserted federal-officer jurisdiction as one ground for removal, the district court's entire remand order is appealable. *See BP P.L.C. v. Mayor and City Council of Balt.*, 593 U.S. 230 (2021).

---

1796 (2023); *Minnesota v. Am. Petroleum Inst.*, 63 F.4th 703 (8th Cir. 2023), *cert. denied*, 144 S. Ct. 620 (2024); *Connecticut v. Exxon Mobil*, 83 F.4th 122 (2d. Cir. 2023); *Anne Arundel Cnty. v. BP P.L.C.* 94 F.4th 343 (4th Cir. 2024); *Mayor and City Council of Balt. v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023); *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy*, 25 F.4th 1238 (10th Cir. 2022), *cert. denied.*, 143 S. Ct. 1795 (2023).

## STATEMENT OF THE ISSUES

Whether the district court properly remanded the Attorney General's lawsuit to state court because it lacked admiralty jurisdiction, federal-enclave jurisdiction, and federal-officer jurisdiction.

## STATEMENT OF THE CASE

### A.    The State's Lawsuit

In November 2024, the Attorney General filed a civil enforcement action in state superior court against ExxonMobil.  6-ER-950–1096.  ExxonMobil is the world's largest producer of plastic polymers, which are the "building blocks of single-use plastics," including water bottles, cups, and disposable utensils.  6-ER-973.  The complaint alleges that ExxonMobil has engaged in an extended campaign to promote recycling technologies as a "cure-all for plastic waste," despite knowing "[a]ll the while" that such technologies would "never be able to process more than a tiny fraction of the plastic waste that [ExxonMobil] produces." 6-ER-956.

According to the complaint, ExxonMobil first promoted mechanical recycling to generate new plastic products from plastic waste.  *See* 6-ER-993.  ExxonMobil, however, "knew mechanical recycling was not a feasible method to handle most plastic waste."  6-ER-994.  Internal documents from the Society of Plastics, the leading plastic trade association, reflected the industry's view that mechanical recycling was both commercially and technologically infeasible for redressing

3

plastics pollution. For instance, a 1973 report sponsored by the Society of Plastics concluded that recycling resulted in blended plastics with degraded quality and that there "were no effective market mechanisms for trade in contaminated, mixed plastics." *Id*. A later study reviewed by the Society's members was even more blunt: "[mechanical] recycling is not and will never be commercially viable unless it is significantly subsidized by a government entity." 6-ER-995. The complaint alleges that ExxonMobil nevertheless spent "millions of dollars on advertisements to herald recycling as the solution to plastic waste," while at the same time "concealing studies and other documents" reflecting "the truth about the ability of mechanical recycling . . . to address the massive volume of plastic waste and pollution." 6-ER-997; 6-ER-1089.

More recently, ExxonMobil has promoted "advanced recycling," a term that it uses for "heat or solvent-based technologies that can theoretically convert certain types of plastic waste" into various products, "which after further refinement, can be used to make new plastic." 6-ER-1024. The complaint alleges that ExxonMobil has tried to obscure the practical limitations of advanced recycling technologies in different ways. For example, it alleges that ExxonMobil has made "statements [that] misleadingly suggest . . . that most or all of the plastic inputted in the [advanced recycling] process becomes new plastic or environmentally beneficial products," despite knowing that it is "technically impossible" to obtain

such a yield. 6-ER-1028 (emphasis added). ExxonMobil has also represented that advanced recycling is suitable for "everyday residential plastic waste," such as "potato chip bags and candy wrappers," even though it knows "such plastic waste is too contaminated, has too many additives that can harm refinery equipment, and is too compositionally and chemically variable" for advanced recycling. 6-ER-1032. Further, ExxonMobil has marketed plastic polymers produced from advanced recycling technologies as "certified circular polymers," thus "implying that they were made from plastic waste," even though over 99.9 percent of the polymers consist of newly-produced plastics. 6-ER-1034; *see* 6-ER-1040–1046.

The complaint alleges that ExxonMobil's conduct has exacerbated plastic pollution, causing a range of harms to the State. *See* 6-ER-1063–1085. In 2022 alone, an estimated 120,000 to 180,000 metric tons of plastic waste were released into the State—the "equivalent of dumping 20 to 30 garbage trucks per day" in the State. 6-ER-974. When dispersed into the environment, plastic does not biodegrade, but fragments into progressively smaller pieces. 6-ER-976. The resulting microplastics can be transported by air, wind, and water, and easily inhaled or ingested by wildlife and humans. 6-ER-976–978. Microplastics are virtually impossible to eradicate, and can cause a range of harms to the State's natural resources, wildlife, and residents. *See id.*; 6-ER-1068–1070.

5

To redress some of those harms, the Attorney General asserts state-law claims against ExxonMobil for public nuisance, impairment of natural resources, water pollution, false or misleading advertising, misleading environmental marketing, and unfair competition. 6-ER-1085–1094. The complaint requests an abatement order, seeks an order compelling ExxonMobil "to cease and desist any and all deceptive public statements related to its plastic operations," including statements involving "advanced recycling" or "certified circular polymers," and requests civil penalties, among other remedies. 6-ER-1094–1096.

## B. The District Court's Remand Order

On the same day the Attorney General filed this enforcement action in state court, several environmental nonprofit organizations filed a separate lawsuit raising similar claims. 6-ER-2. ExxonMobil removed both cases to federal district court, where they were related before the same judge. 1-ER-3. As to the Attorney General's action, ExxonMobil invoked admiralty jurisdiction under 28 U.S.C. § 1333, federal-enclave jurisdiction, and federal-officer jurisdiction under 28 U.S.C. § 1442(a)(1) as grounds for removal. *See* 5-ER-926–946.

6

The district court granted the Attorney General's motion to remand the case to state court, rejecting each of ExxonMobil's three asserted grounds for removal. 1-ER-2–16.[2]

First, the court concluded that the federal-enclave doctrine did not apply. ExxonMobil argued that "the state's complaint asserts damages to California's 'waterways' and their 'shorelines," "a vast expanse which necessarily must include a few federal enclaves." 1-ER-9. The court noted that "[f]or federal enclave jurisdiction to apply, such an enclave must be the 'locus' of the claim[s]." 1-ER-6. But because the Attorney General asserted "only state claims in a state court" and "expressly disavow[ed] injuries on federal lands," "neither claims nor relief could lie in federal enclaves, let alone have such enclaves as their loci." 1-ER-9; *see* 6-ER-956. The court further reasoned that even if the disclaimer were set aside, ExxonMobil had "fail[ed] to establish that the loci of the at-issue claims are in federal enclaves." 1-ER-9. "Simply because plastic pollution touches on federal enclaves does not mean California's claims have their loci there; to the contrary, the claims concern the cultural messaging and corporate decision-making that

---

[2] The district court denied a motion to remand filed by the environmental nonprofit organizations, concluding that it had diversity jurisdiction over the plaintiffs' claims. *See* 1-ER-16. That basis for subject matter jurisdiction is not available against the State. The nonprofit organizations' case is pending in federal court. *Sierra Club v. Exxon Mobil Corp.*, No. 3:24-cv-7288 (N.D. Cal.).

ExxonMobil allegedly engaged in when promoting the use of recycling as a cure-all to plastic waste." 1-ER-10.

Second, the district court rejected ExxonMobil's assertion of federal-officer jurisdiction as "completely baseless." 1-ER-11. In support of removal, ExxonMobil relied on contracts that the federal government executed with its predecessors "to produce rubber for World War II-era military use." 1-ER-10. Based on those contracts, ExxonMobil claimed "a causal nexus between its actions, taken pursuant to a federal officer's directions, and [the] plaintiff's claims." *Id*. The court found that theory to "verge[] on the fanciful," because "the claims in this case are not about pollution in the abstract," but ExxonMobil's "allegedly self-interested and deceptive promotion of plastics recycling programs that it knew would fail." 1-ER-10–11. And "there could not be a wider mismatch between the purported federal directions regarding synthetic rubber production and the deceptive conduct California raises in its complaint." 1-ER-11. The court held that ExxonMobil had failed to establish a colorable federal defense to the Attorney General's claims for similar reasons: ExxonMobil's proposed federal-contractor defense, based on the premise that "the federal government specified the details of its wartime synthetic rubber production," "fail[ed] to track the complaint's actual claims," which center on deception. *Id.*

8

Finally, the district court held that it lacked admiralty jurisdiction over the complaint. 1-ER-12–13. It first held that the "saving to suitors" clause of 28 U.S.C. § 1333 precluded jurisdiction. Under that provision, "maritime claims brought in state court are not removable to federal court absent an independent jurisdictional basis," and ExxonMobil had not established that either federal-officer jurisdiction or federal-enclave jurisdiction were present. 1-ER-12 (quoting *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 763 (9th Cir. 2022)).

The court held that it lacked admiralty jurisdiction even if the saving to suitors clause were set aside, as "California's claims are not maritime in nature." 1-ER-12. ExxonMobil had not established that "the relevant torts occurred on navigable water" or that "a vessel on navigable water caused injury suffered on land." *Id.* To the contrary, the court concluded, "the alleged tort is 'deception'" and "[t]hat deception did not occur in navigable water" or "bear a substantial relationship to traditional maritime activity." 1-ER-13.

## SUMMARY OF ARGUMENT

The district court correctly rejected each of ExxonMobil's proposed bases for federal jurisdiction over the Attorney General's state enforcement action. ExxonMobil fails to satisfy the requirements for removal, and relies on contentions that this Court rejected in *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 763

(9th Cir. 2022) and *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1111 (9th Cir. 2022).

The federal courts lack admiralty jurisdiction over the Attorney General's enforcement action. The complaint concerns deceptive statements and conduct related to plastic recycling. Those allegations do not implicate any of the maritime issues that are the particular concern of admiralty, and ExxonMobil has not identified any case where a court has exercised admiralty jurisdiction in factual circumstances similar to those at issue here.

The federal-enclave doctrine also does not support jurisdiction. The Attorney General's complaint asserts state-law claims that seek relief only as to the State, and expressly disclaims relief as to any injuries arising on federal lands. ExxonMobil's view that a federal court should nevertheless exercise jurisdiction over this case would functionally eliminate the Attorney General's right to pursue similar enforcement actions based on widespread harms in state court.

Finally, ExxonMobil cannot come close to establishing federal-officer jurisdiction. It relies on World War II-era synthetic rubber supply contracts that have no meaningful relationship to the complaint's deception allegations, let alone the causal connection necessary for federal-officer jurisdiction. Even if the supply contracts were somehow connected to the Attorney General's claims, they are the

10

exact type of commercial agreements that this Court has held are insufficient to support federal-officer jurisdiction.

## STANDARD OF REVIEW

This Court reviews questions of subject matter jurisdiction de novo. *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 746 (9th Cir. 2022).

## ARGUMENT

## I. THE DISTRICT COURT LACKED ADMIRALTY JURISDICTION

ExxonMobil first contends that removal was proper because the district court had admiralty jurisdiction over the Attorney General's claims. Opening Br. 16-35.[3] The district court correctly concluded that it lacked admiralty jurisdiction. The Attorney General's claims do not concern torts that took place at sea (or on other navigable waters), and do not implicate traditional types of maritime activities that would be properly addressed by courts sitting in admiralty.

A tort claim falls within admiralty jurisdiction of the federal courts when two conditions are met. Under the "location test," a court must first "determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). Next, under the "connection

---

[3] This Court "use[s] the terms 'admiralty' and 'maritime' interchangeably, as the relevant caselaw often uses both words without apparent distinction." *Gruver v. Lesman Fisheries, Inc.*, 489 F.3d 978, 982 n.5 (9th Cir. 2007).

test," a court must "assess the general features of the type of incident involved" and "determine whether the incident has 'a potentially disruptive impact on maritime commerce.'" *Grubart*, 513 U.S. at 534 (quoting *Sisson v. Ruby*, 497 U.S. 358, 363-364 & n.2 (1990). In addition, the court must determine whether "the general character of the activity" has a "substantial relationship to traditional maritime activity." *Id.* at 539. The tortfeasor's actions must be "so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." *Id.* at 539-540. The connection test thus serves to exclude disputes that lack a meaningful connection to admiralty from the federal courts, even though a "purely mechanical" application of the location test might otherwise support jurisdiction. *Id.* at 533.

### A. The Complaint Does Not Assert Torts Occurring at Sea

ExxonMobil has not satisfied the location test. The complaint alleges that ExxonMobil engaged in deceptive conduct related to plastic recycling. ExxonMobil does not contend that any conduct relevant to those claims occurred on navigable waters, rather than at its corporate headquarters and offices, or other locations on land. The claims also do not concern any vessels. *Grubart*, 513 U.S. at 534.

ExxonMobil argues that under *Taghadomi v. United States*, the "situs of a tort for the purpose of determining admiralty jurisdiction is the place where the injury

12

occurs," and that the location test is therefore satisfied here because at least some of the State's injuries were felt in navigable waters. 401 F.3d 1080, 1084 (9th Cir. 2005); Opening Br. 16-17. But ExxonMobil overstates *Taghadomi*'s holding. *Taghadomi* considered allegations that the Coast Guard conducted a negligent rescue operation on land, endangering two kayakers. 401 F.3d at 1082. One kayaker was "tossed overboard, attacked by a shark, and died," and the other "washed up on an island and was stranded for three days" before rescue. *Id.* at 1082. The court found the location test satisfied, because the relevant injuries occurred at sea. *Id.* at 1086. But it distinguished the negligence tort at issue from cases in which plaintiffs asserted claims for defamation and tortious interference with contractual relations—"torts in which injury is often diffuse" or "presumed." *Id.* at 1086. In those instances, the injury that is relevant for the location test is "deemed to occur" where the critical elements of the tort are completed. *Id.* at 1085-1086; *see Guidry v. Durkin*, 834 F.2d 1465, 1469 (9th Cir. 1987) (defamation is cognizable in admiralty only when publication of defamatory material occurs at sea); *J. Lauritzen A/S v. Dashwood Shipping, Ltd.*, 65 F.3d 139, 143 (9th Cir. 1995) (tortious interference with contract was not cognizable in admiralty when all elements occurred on land); *see also Clinton v. Joshua Hendy Corp.*, 285 F.2d 199, 201-202 (9th Cir. 1960) (same).

13

In short, the "situs of a tortious injury depends . . . on the type of tort alleged." *Guidry*, 834 F.2d at 1469. The only tort claim included in the Attorney General's complaint is a claim for public nuisance. *See* 6-ER-1085–1088. That claim involves diffuse injury by its nature—and is therefore closer to the defamation and tortious interference with contract torts considered in *Guidry* and *J. Lauritzen A/S*, than the negligence tort at issue in *Taghadomi*, where plaintiffs "d[id] not claim that the injuries occurred anywhere but at sea." *Taghadomi*, 401 F.3d at 1086. The elements of the Attorney General's tort claim were satisfied, if at all, by ExxonMobil's activities on land, and ExxonMobil does not claim otherwise. There is therefore no basis for admiralty jurisdiction.

## B. The Complaint Does Not Implicate Traditional Maritime Activity

ExxonMobil cannot satisfy the connection test, either. Even assuming that the conduct at issue involves "potentially disruptive impacts on maritime commerce," (*see* Opening Br. 19-20), the claims do not bear any meaningful connection to traditional maritime issues—let alone a "substantial relationship." *Grubart*, 513 U.S. at 539. The "general character of the activity giving rise to the incident" is deceptive conduct, here, related to the recyclability of plastic. *Id*. A court does not need the "special expertise of a court in admiralty as to navigation or water-based commerce" to evaluate that conduct. *Myhran v. Johns-Manville Corp.*, 741 F.2d 1119, 1122 (9th Cir. 1984). The complaint's allegations do not

14

implicate any of the technical concepts that are the core concern of admiralty, such as "maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage." *Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 270 (1972). And the complaint does not assert that any injuries were caused by maritime instrumentalities.[4]

ExxonMobil contends that the district court "eliminat[ed] the maritime aspect" of the Attorney General's claims, which it contends represent "the paradigmatic example of the kind[s] of maritime tort[s] for which 'specialty admiralty rules' exist." Opening Br. 23. But ExxonMobil does not identify any case where a court exercised admiralty jurisdiction over allegations comparable to those here. Opening Br. 21-22; *see, e.g.*, *United States v. Redwood City*, 640 F.2d 963, 965 (9th Cir. 1981) (mooring of "unseaworthy, unfit, and leaking" barge leading to oil spill); *Nat'l Sea Clammers Ass'n v. City of N.Y.*, 616 F.2d 1222, 1231 n.25, 1236 (3d Cir. 1980) ("dredging and dumping operations"); *Kohlasch v. N.Y. State Thruway Auth.*, 460 F. Supp. 956, 959, 962 (S.D.N.Y. 1978) (obstruction of channel by "oil, sand, debris" from negligently maintained drain).

---

[4] *See Johnson v. Colonial Pipeline Co.*, 830 F. Supp. 309, 313 (E.D. Va. 1993) (no admiralty jurisdiction where "root cause" of fuel leak into creek "was a non-maritime event involving a non-maritime instrumentality"); *Yates v. Island Creek Coal Co.*, 485 F. Supp. 995, 997 n.4 (W.D. Va. 1980) (no admiralty jurisdiction over claim for damages caused by the flooding of navigable waters resulting from strip mining).

It also does not identify any particular admiralty rule that it contends should govern the Attorney General's claims. *Grubart*, 513 U.S. at 543. ExxonMobil only stresses that the complaint includes "allegations of maritime pollution." Opening Br. 21. But that is a type of *harm*—not the "character of the activity" giving rise to the claims. *See, e.g.*, 6-ER-1090 (describing conduct giving rise to pollution claim). And there is no admiralty jurisdiction where, as here, a court can "plainly apply familiar concepts of [state] tort law" to the claims, "without any effect on maritime endeavors." *Exec. Jet Aviation*, 409 U.S. at 273.[5]

## II. THE DISTRICT COURT LACKED FEDERAL-ENCLAVE JURISDICTION

Federal-enclave jurisdiction is a type of federal-question jurisdiction. *See San Mateo*, 32 F.4th at 748-749. The Enclave Clause of the Constitution grants Congress authority "[t]o exercise exclusive Legislation . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall

---

[5] ExxonMobil contends that the Attorney General waived the right to invoke the saving to suitors clause, which would also preclude admiralty jurisdiction. Opening Br. 23-35. The clause prevents defendants from removing suits that are filed in state court on admiralty jurisdiction grounds without an independent basis for jurisdiction. *See* 28 U.S.C. § 1333; *Ghotra by Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1054 (9th Cir. 1997). The district court concluded that the Attorney General had not forfeited the argument, and held that the clause independently supported remand. *See* 1-ER-16–35. But there is no need for this Court to consider that alternative holding, because the district court correctly concluded that the Attorney General's claims do not sound in admiralty.

16

be, for the Erection of Forts, Magazines, Arsenals, . . . and other needful Buildings." U.S. Const. art. I, § 8, cl. 17. When Congress acquires exclusive legislative jurisdiction over a particular territory under the Enclave Clause, federal law is generally "deemed to incorporate existing state law," to "ensure[] 'that no area however small will be left without a developed legal system for private rights.'" *Lake v. Ohana Mil. Cmtys.*, 14 F.4th 993, 1002-1003 (9th Cir. 2021) (quoting *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 100 (1940)). The incorporated state laws continue in force as federal laws, and lawsuits invoking them are considered to present federal questions for purposes of jurisdiction under 28 U.S.C. § 1331. *James Stewart & Co.*, 309 U.S. at 96; *see Macomber v. Bose*, 401 F.2d 545, 546 (9th Cir. 1968).

To determine whether the federal-enclave doctrine applies, courts ask whether "the locus in which the claim arose" lies on a federal enclave. *San Mateo*, 32 F.4th at 749 (quoting *Alvares v. Erickson*, 514 F.2d 156, 160 (9th Cir. 1975)). To meet that standard, a plaintiff's complaint "must allege that an injury occurred on a federal enclave or that an injury stemmed from conduct on a federal enclave." *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1111 (9th Cir. 2022). Further, "the connection between injuries and conduct must not be 'too attenuated and remote.'" *Id.* Jurisdiction under the federal-enclave doctrine is "narrow," and

17

defendants may not "use activities on federal enclaves to create instant jurisdiction for a state-law claim." *Id.*

The Attorney General's claims do not have their "locus" on federal enclaves, because they do not challenge conduct occurring on federal enclaves or seek to remedy injuries felt there, either. As to conduct, the complaint concerns ExxonMobil's representations and conduct in promoting plastics recycling technologies to the public, which did not occur on federal enclaves. *See supra*, pp. 3-5; Opening Br. 41. And as to injuries, the complaint seeks relief only for harms to state property and residents. *See, e.g.*, 6-ER-1072 (alleging harms to "California's communities of color and low-income populations"); 6-ER-1075 (alleging harms to "residents and taxpayers" that bear "costs of cleaning up plastic waste"); 6-ER-1094 (seeking relief to prevent "destruction of the natural resources of California"). Were there any doubt, the complaint expressly "disclaims injuries arising on federal land" and "does not seek recovery or relief attributable to these injuries." 6-ER-956.

This Court has rejected assertions of federal-enclave jurisdiction in cases involving similar environmental litigation. The Court's decision in *San Mateo* is instructive. There, the Court affirmed the remand of a suit filed by counties against various companies involved in the production of fossil fuels. 32 F.4th at 744-745. The "substance of [the counties'] claims" was that "tortious conduct by

18

[the] companies in the course of producing, selling, and promoting the use of fossil fuels" had contributed to climate change, "which led to property damage and other injuries to the Counties." *Id.* at 747-748. The Court held that it lacked federal-enclave jurisdiction. It explained that the counties had raised only "state-law claims arising from injuries to real property and infrastructure within their local jurisdictions." *Id.* at 750-751. And while the defendants contended that some among them "engaged in some conduct on federal enclaves that may have contributed to global warming," that conduct was "too attenuated and remote to establish that the Counties' cause of action [was] governed by the federal law applicable to any federal enclave." *Id.* at 751.

In *Honolulu*, the Court rejected federal-enclave jurisdiction over a similar lawsuit. 39 F.4th at 1111-1112. The county "assert[ed] that defendants' deception caused harms from climate change" including "property" and "land encroachment" within its jurisdiction—claims that "d[id] not implicate federal enclave activities." *Id.* at 1106, 1112. The same is true here. *See also Rhode Island v. Shell Oil Prods. Co., LLC*, 35 F.4th 44, 58 (1st Cir. 2022); *Mayor and City Council of Balt. v. BP P.L.C.*, 31 F.4th 178, 217-219 (4th Cir. 2022); *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy*, 25 F.4th 1238, 1271-1272 (10th Cir. 2022).

ExxonMobil's counterarguments are not persuasive. It does not attempt to argue that any of the challenged activities identified in the complaint occurred on

19

federal enclaves. *See* Opening Br. 41. It instead focuses on the injury prong, contending that the "complaint seeks to hold [it] liable for plastic pollution across the entire state," and therefore seeks relief for at least some "injury occurring on numerous federal enclaves." Opening Br. 38-39.[6] But that argument mischaracterizes the Attorney General's complaint. The complaint seeks relief that is particular to the State, and it expressly disclaims relief as to federal enclaves within the State. 6-ER-956. ExxonMobil's repeated references to the complaint's "sweeping" claims (*see* Opening Br. 2, 14, 15, 36, 38) cannot change the actual scope of the claims.

ExxonMobil argues that the Attorney General's disclaimer represents a form of "artful pleading" that courts should not credit. Opening Br. 43; *see id.* at 42-44. But it is hornbook law that "the presence or absence of federal question jurisdiction is governed by the 'well-pleaded complaint rule.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Under that rule, "a suit 'arises under' federal law 'only

---

[6] In its notice of removal, ExxonMobil did not include any specific allegations establishing the enclave status of federal lands. 6-ER-932; *see* Opening Br. 38-39. It included some locations in the notice that are not enclaves at all, because the federal government does not have exclusive legislative jurisdiction there. *See, e.g.*, Opening Br. 38 (referring to the "Golden Gate National Recreation Area"); Cal. State Lands Comm., Resolution (Oct. 1, 2009) at 1-3, https://tinyurl.com/4bv8cpwv (granting the federal government concurrent jurisdiction within the Golden Gate National Recreation Area and only with respect to criminal law); *Lake*, 14 F.4th at 998 (concurrent jurisdiction does not establish federal-enclave status).

when the plaintiff's statement of his own cause of action shows that it is based upon federal law.'" *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009) (quoting *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152 (1908)).  What ExxonMobil characterizes as misconduct is a plaintiff's prerogative—to "avoid federal jurisdiction by exclusive reliance on state law."  *Caterpillar*, 482 U.S. at 392.  Federal courts have therefore rejected assertions of federal-enclave jurisdiction where a plaintiff seeks relief only for local injuries, even if the challenged conduct may have also caused harm on federal enclaves.  *See Boulder*, 25 F.4th at 1271-1272 (federal-enclave doctrine did not apply where complaint disclaimed "damages or abatement relief for injuries to or occurring on federal lands"); *Baltimore*, 31 F.4th at 218 (similar).[7]

ExxonMobil suggests that a different rule should apply in this case, because the Attorney General seeks relief for an injury that is "indivisible."  Opening Br. 44; *see id.* at 43 (contending that injuries on federal enclaves are "inseparable from the basis of [the Attorney General's] claims").  It contends that "statewide plastic

---

[7] ExxonMobil cites *Maryland v. 3M Co.*, 130 F.4th 380, 389-90 (4th Cir. 2025), which declined to enforce a disclaimer limiting plaintiff's claims to non-federal conduct in evaluating whether federal-officer (not federal-enclave) jurisdiction supported removal.  Opening Br. 44.  But the court's rejection of the disclaimer was premised on "the unique lens through which [courts] consider federal officer removal."  130 F.4th at 389; *see id.* at 388-389 (noting that the federal-officer removal "is an exception to the well-pleaded complaint rule").

pollution does not stop neatly at federal enclave borders," and so federal enclaves might incidentally benefit from any remedy secured by the Attorney General. Opening Br. 43. But the reality that the alleged deceptive conduct might have also caused harms within federal enclaves does not mean that the locus of the complaint's claims lies there. ExxonMobil's understanding of federal-enclave doctrine would federalize virtually any case in which a state seeks to redress widespread injuries. ExxonMobil identifies no authority endorsing such a theory, which would drastically shift the allocation of authority between federal and state courts. *See Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 21 n.22 (1983) ("considerations of comity" should make courts "reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it").

## III. THE DISTRICT COURT LACKED FEDERAL-OFFICER JURISDICTION

Section 1442 provides a right of removal for federal officers—and those private persons who act under them—who can assert a federal defense to a state-law claim. 28 U.S.C. § 1442; *see San Mateo*, 32 F.4th at 755. To remove a case under section 1442, a private person "must establish [that] there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and the plaintiff's claims." *Id.* The "causal nexus" prong includes two requirements: that "the [defendant] was 'acting under' a federal officer in performing some 'act under

22

color of federal office,'" and that "such action is causally connected with the plaintiff's claims against it." *Id.* A plaintiff must also establish that it "can assert a colorable federal defense" to invoke federal-officer jurisdiction. *Id.* ExxonMobil fails to satisfy those requirements.

### A. ExxonMobil's Wartime Supply Contracts Are Not Causally Connected to the Complaint's Claims

ExxonMobil must show that the Attorney General's claims "ar[ose] out of the acts" alleged to have been performed under federal authority, to remove on the basis of federal-officer jurisdiction. *Mesa v. California*, 489 U.S. 121, 131 (1989) (quoting *Maryland v. Soper*, 270 U.S. 9, 33 (1926)). As one court of appeals explained, "a bona fide federal officer could not remove a trespass suit that occurred while he was taking out the garbage—there must be a 'causal connection between the charged conduct and the asserted official authority.'" *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012).

ExxonMobil's arguments rest on a series of contracts that it entered into with the federal government during World War II, under which it agreed to produce "millions of tons of synthetic rubber for the federal government." Opening Br. 51. ExxonMobil contends that some synthetic rubber "became tires for military vehicles" and that because "many of those military vehicles were stationed at the dozens of military installations that are located in California," some rubber debris "would have made its way into California's natural environment and waterways,

23

contributing to the state's pollution problems." *Id.* The problem with that theory is that it does not relate to the Attorney General's claims. The complaint challenges ExxonMobil's allegedly deceptive conduct in "promot[ing] recycling as a cure-all for plastic waste," conduct that began decades later. 6-ER-956. The complaint does not seek to impose liability solely for ExxonMobil's production of plastics polymers and related products, or its production of synthetic rubber during the war. And ExxonMobil does not even attempt to argue that any of the marketing, advertising, corporate messaging, or other activities that *are* discussed in the complaint are related to its supply contracts with the federal government.

ExxonMobil emphasizes that "the hurdle erected by [the causal-connection] requirement is quite low." Opening Br. 51 (quoting *Goncalves ex rel. Goncalves v. Rady Children's Hosp. S.D.*, 865 F.3d 1237, 1244 (9th Cir. 2017)). To be sure, a defendant does not need "an airtight case on the merits" to satisfy the requirement. *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 432 (1999). But that does not relieve ExxonMobil of its burden to demonstrate that the "challenged acts 'occurred because of what [it was] asked to do by the government.'" *Goncalves*, 865 F.3d at 1245 (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129 (2d Cir. 2008)). Similarly, while ExxonMobil cites the rule that courts must "credit the defendant's theory of the case" in evaluating whether the causal connection requirement is satisfied, *see* Opening Br. 51 (quoting *Leite v. Crane Co.*, 749 F.3d 1117, 1124

24

(9th Cir. 2014)), ExxonMobil still must advance some theory of *this* case, not a different one unrelated to the allegations in the complaint. *See id.* at 1124 (defendant established nexus where "the very act that established the basis of plaintiffs' claims . . . is an act [defendant] contends it performed under the direction of the Navy").

This Court has rejected federal-officer jurisdiction where defendants offered similarly thin allegations of a causal connection. In *Lake*, military families sued private companies that provided housing on a military base, alleging that those companies had failed to warn them about pesticide contamination. 14 F.4th at 998. This Court rejected federal-officer removal, reasoning that while defendants "assert[ed] that the Navy exercised significant control over [plaintiff's] housing," they "d[id] not argue that the Navy had control over [their] decision whether to disclose the pesticide contamination," the "central issue" in the case. *Id.* at 1004-1005.

In *San Mateo*, this Court declined to exercise jurisdiction under the Outer Continental Shelf Lands Act for analogous reasons. 32 F.4th at 751-754. The Act establishes federal court jurisdiction over suits that "aris[e] out of, or in connection with" petroleum production activities on the outer continental shelf. 43 U.S.C. § 1349(b)(1). The OSCLA standard is similar to the causal nexus standard of federal-officer removal, which derives from the "for or related to" language in

25

Section 1442. The Court held that the defendants had failed to establish jurisdiction under the Act, because plaintiffs' claims—which centered on "[defendants'] fossil fuel products, [their] knowledge and awareness of the harmful effects of those products, and their 'concerted campaign' to prevent the public from recognizing those dangers"—were "too attenuated" from defendants' fossil fuel production activities on the outer continental shelf. 32 F.4th at 754-755.[8] Any connection between ExxonMobil's wartime rubber manufacturing contracts and the Attorney General's claims is even more remote. *See also Connecticut v. Exxon Mobil*, 83 F.4th 122, 145 (2d. Cir. 2023) ("[T]here is no such causal nexus between Exxon Mobil's claimed role as a military supplier and the alleged 'campaign of deception' that forms the basis of Connecticut's CUTPA claims,"); *Minnesota v. Am. Petroleum Inst.*, 63 F.4th 703, 715 (8th Cir. 2023) ("Energy Companies' production of military-grade fuel," "even if done at federal direction, bears little to no relationship with how they conduct their marketing activities").[9]

---

[8] *See also Anne Arundel Cnty. v. BP P.L.C.* 94 F.4th 343, 349-350 (4th Cir. 2024) (similar); *Baltimore*, 31 F.4th at 233-234 (similar).

[9] The Supreme Court recently granted certiorari in *Chevron USA Incorporated v. Plaquemines Parish, Louisiana*, which addresses the nexus requirement for federal-officer removal. Specifically, *Plaquemines* will consider whether removal requires a defendant to establish that the challenged conduct was contractually directed by the government, or whether the Removal Clarification Act of 2011 altered the standard to confer jurisdiction where the government-directed conduct is only "connected or associated with" a plaintiff's claims. *See*

(continued…)

26

ExxonMobil further contends that federal-officer removal is proper because the complaint alleges injuries that are "inextricably intertwined with pollution caused by improperly discarded synthetic-rubber products," which includes "at least some products traceable to [its] WWII-era operations under federal direction." Opening Br. 53. That argument is irrelevant to the causal connection prong. The fact that other activities may have also contributed to plastics pollution does not suggest that those activities relate in any way to one another, or otherwise connect ExxonMobil's wartime activities to the complaint's deception allegations. At most, ExxonMobil's argument raises a causation question that goes to the merits of the Attorney General's claims. But that is the type of ordinary tort inquiry that state courts are well-equipped to decide, and does not entitle ExxonMobil to a federal forum.

---

Pet. for a Writ of Certiorari at 24, 27, *Chevron USA Incorporated v. Plaquemines Parish*, No. 24-813 (Jan. 29, 2025). As the *Plaquemines* petitioners acknowledge (Pet. at 26-27), this Court has "read [its] causal nexus test as incorporating" the "'connected or associated with' standard reflected in Congress's 2011 amendment and the Supreme Court's decisions." *DeFiore v. SOC LLC*, 85 F.4th 546, 557 n.6 (9th Cir. 2023); *see Goncalves*, 865 F.3d at 1244-1245. But ExxonMobil's allegations fall on the wrong side of the line, regardless how the nexus requirement is framed. *See Baltimore*, 31 F.4th at 233-234 (rejecting similar removal theory under "connected or associated with" standard); *Minnesota*, 63 F.4th at 715 (same). *Plaquemines* therefore has no bearing here.

**B.    ExxonMobil Did Not "Act Under" Federal Authority in Fulfilling Its Wartime Supply Contracts**

ExxonMobil also cannot demonstrate its wartime contracts establish the type of close relationship to federal authority that is necessary to support federal jurisdiction.  To determine whether a private person "acts under" a federal officer, this Court considers whether the person (1) "act[s] on behalf of [an] officer in a manner akin to an agency relationship"; (2) is "under 'the subjection, guidance, or control'" of a federal officer, or in an "unusually close" relationship with one, "involving detailed regulation, monitoring, or supervision"; (3) "assist[s] [a] federal officer in fulfilling 'basic governmental tasks' that 'the Government itself would have had to perform' if it had not contracted with a private firm"; or (4) performs an activity that is "so closely related to the government's implementation of its federal duties that [it] faces 'a significant risk of state-court prejudice.'" *San Mateo*, 32 F.4th at 756.  By contrast, an "arms-length business arrangement with the federal government" does not satisfy the "acting under" requirement. *Id.* at 757.

ExxonMobil relies on seven supply contracts and five leases that were executed in 1942 and 1943.  Opening Br. 48-50; 4-ER-563–778; 5-ER-780–841.[10]

---

[10] The contracts were executed by two predecessors of ExxonMobil: the Humble Oil and Refining Company and the Standard Oil Company of Louisiana. For ease of understanding, this brief refers to the predecessors as "ExxonMobil."

Under the agreements, ExxonMobil agreed to design and construct plants for rubber manufacturing and to obtain "all necessary" equipment to operate the plants. 4-ER-565. ExxonMobil was to notify the government when the plants were "in [its] opinion, ready for full commercial use," lease the facilities from the government, and produce the requested quantities of rubber. *Id.* In exchange, the federal government agreed to pay ExxonMobil for the rubber and to compensate it for the costs incurred to produce it. *See, e.g.*, 4-ER-567–577, 4-ER-580; 5-ER-780–782. The federal government gave ExxonMobil purchase options for the plants, and allowed it to use the facilities to manufacture synthetic rubber and other materials for the commercial market when full operation was not required to satisfy its obligations under the contract. *See, e.g.*, 4-ER-665; 4-ER-701; 5-ER-785–786; 5-ER-799.

The degree of "supervision or control" necessary for federal-officer jurisdiction is "missing" where, as here, "the government [is] relying on the expertise of [a contractor] and not vice versa." *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 728 (9th Cir. 2015) (quoting *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1007 (9th Cir. 2008)). The contracts do not suggest that ExxonMobil acted as an agent of the federal government; the government merely agreed to purchase the synthetic rubber ExxonMobil produced, and to finance its production. To that end, the terms of the agreements are primarily directed to

establishing pricing and defining categories of reimbursable costs that ExxonMobil was anticipated to incur in producing the rubber, not to specifying detailed instructions for how that work would be completed.[11]  The contracts also included provisions stating that "[n]othing" in their terms "shall be construed as appointing [ExxonMobil] as agent of or for" the federal government.  *See* 4-ER-565; 4-ER-601; 4-ER-650; 4-ER-684; 4-ER-717; *Cabalce*, 797 F.3d at 729 (company's independent-contractor status supported the conclusion that it was not acting under a federal officer).

Similar contractual arrangements have been held to be inadequate for federal-officer removal.  In *Honolulu*, this Court rejected the argument that defendants acted under federal officers by "produc[ing] oil and gas during the Korean War," where defendants "did not serve as government agents and were not subject to close direction or supervision."  39 F.4th at 1108-1109.  The Court further held that defendants did not "act under" federal officers by leasing and operating a federally-owned reserve; their activities did not involve close supervision or control.  *Id.* at 1108.  Not even an oil field "run jointly by the Navy and Standard

---

[11] *See, e.g.*, 4-ER-608 (reimbursing ExxonMobil for "the costs of conducting all research . . . in connection with the process or processes used or intended to be used by" it); 4-ER-724 (reimbursing for "[t]he cost of training personnel . . . provided that such expenses conform to and do not exceed expenses of the same kind assumed by [ExxonMobil] in the normal conduct of its business").

30

Oil," over which the Navy set "overall production level[s]" and "define[d]" permissible "exploration window[s]" met the mark. *Id.* at 1109. The Court reasoned that such authority still established only "general direction—not 'unusually close'" supervision. *Id.*

ExxonMobil contends that the government exercised "detailed regulation, monitoring, and supervision" over the operation of its plants, including "day-to-day involvement in operational decisions." Opening Br. 49-50 (citing 5-ER-969–942). But none of the evidence it cites establishes such a relationship. For instance, ExxonMobil references the allegations it included in its notice of removal, but the notice only describes a handful of instances where ExxonMobil, as lessee of the federally-owned plants, sought approval to install additional machinery and facilities. *See, e.g.*, 5-ER-939-940 ("[ExxonMobil] submitted a post-WWII request [for] authorization to install a pump and tank truck loading facilities at the butyl rubber plant. The pump and facilities [were] estimated to cost $1,700. The [federal government] ultimately approved the request.").[12]

---

[12] Citing to the record in a different case, ExxonMobil states that "[a] federal official was also permanently stationed at each facility, to oversee operations and ensure compliance with federal specifications." Opening Br. 50 (citing *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486 (S.D. Tex. 2015)). But the cited decision states only that one federal official was stationed at ExxonMobil's Baytown facility, and the record includes no information about that official's role and responsibilities. See *Exxon Mobil Corp.*, 108 F. Supp. 3d at 531; *see* No. 10-

(continued…)

ExxonMobil also relies on the government's requirements for the synthetic rubber, which included instructions as to the "type" and "amount" of the rubber. Opening Br. 50. But those allegations fall well short of supporting federal-officer removal. To support jurisdiction, federal specifications must do more than mandate "a certain level of performance." *In re Haw. Fed. Asbestos Cases*, 960 F.2d 806, 813 (9th Cir. 1992). ExxonMobil does not argue that the synthetic rubber contemplated by the contracts was materially distinct from other compounds that were commercially available at that time, or that it was tailored in some specific way to satisfy particular government objectives. *Cf. Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 399 (5th Cir. 1998) (herbicide manufacturers that produced Agent Orange "acted under" federal officers; federal specifications "included use of [] two active chemicals in unprecedented quantities for the specific purpose of stripping certain areas of Vietnam of their vegetation"), *overruled on other grounds by Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020); *Honolulu*, 39 F.4th at 1108 ("acting under" prong was not met

---

cv-2386, Dkt. No. 118 at 95. Indeed, because the Baytown site included facilities for the production of aviation gasoline, in addition to synthetic rubber, it is not even apparent whether that lone official had any role in ExxonMobil's synthetic rubber manufacturing efforts. See *Exxon Mobil Corp.*, 108 F. Supp. 3d at 499 (describing the "Hydrocodimer Plancor" plant at Baytown, which produced "avgas blending stock").

32

where federal directions involved "fewer detailed specifications" and "less ongoing supervision," "relative to *Winters*").

### C. ExxonMobil Does Not Have a Colorable Federal Defense to the Complaint's Claims

The removing defendant must also establish a colorable federal defense to the complaint's claims. *Leite*, 749 F.3d at 1122. While a defendant does not need to demonstrate that the defense is meritorious to successfully remove to federal court, conclusory arguments do not suffice. *See Cabalce*, 797 F.3d at 731-732 & n.6.

ExxonMobil's proposed defenses fail at the threshold. ExxonMobil first contends that it has a colorable First Amendment defense because the complaint's allegations target protected speech. Opening Br. 57. But the federal defense must "aris[e] out of [the defendant's] official duties" to support jurisdiction, and ExxonMobil's First Amendment defense does not relate to the contracts from which it claims to have acted under federal authority. *Arizona v. Manypenny*, 451 U.S. 232, 234 (1981). ExxonMobil does not argue that the federal government compelled any of the statements or marketing referenced in the complaint, or any other statements relevant to this case, and so it cannot rely on the First Amendment to support federal-officer removal. *See Honolulu*, 39 F.4th at 1110 (rejecting First Amendment defense offered in support of federal-officer removal where defendants "d[id] not contend that the government ordered their allegedly deceptive acts").

ExxonMobil's federal-contractor defense also fails. Opening Br. 58-59. The defense shields contractors from products liability and other tort claims asserting harms arising from design features that were dictated by the government. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 506-512 (1988); *see Getz v. Boeing Co.*, 654 F.3d 852, 861 (9th Cir. 2011). Consistent with that purpose, the defense is available only where tort liability "arises as a result of [a] contractor's compliance" with federal specifications. *Getz*, 654 F.3d at 860. ExxonMobil does not explain how the substance of any of the government's rubber requirements provides it a defense to the theories of liability identified in the complaint. It only repeats the claim that synthetic rubber may have also contributed to pollution, which does not establish a colorable federal-contractor defense.[13]

---

[13] ExxonMobil also asserts that it has "preemption defenses that are more than colorable." Opening Br. 57. But a removing defendant must do more than "simply assert[] a defense and the word 'colorable' in the same sentence," and ExxonMobil does not explain what those defenses entail. *Honolulu*, 39 F.4th at 1110.

## CONCLUSION

The district court's remand order should be affirmed.

Dated:  August 22, 2025

Respectfully submitted,

*/s/ Mica L. Moore*

ROB BONTA
  *Attorney General of California*
HELEN H. HONG
  *Acting Solicitor General*
DANIEL A. OLIVAS
DENNIS L. BECK, JR.
  *Senior Assistant Attorneys General*
MICA L. MOORE
  *Deputy Solicitor General*
DEBORAH M. SMITH
VANESSA MORRISON
  *Supervising Deputy Attorneys General*
GABRIEL MARTINEZ
STACY J. LAU
ELIZABETH B. RUMSEY
  *Deputy Attorneys General*

*Attorneys for Plaintiff-Appellee*

35

## STATEMENT OF RELATED CASES

The Attorney General is not aware of any related cases, as defined by Ninth Circuit Rule 28-2.6, that are currently pending in this Court.

Dated:  August 22, 2025                    /s/ Mica L. Moore
                                            Mica L. Moore

36

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**: <u>25-1674</u>

I am the attorney or self-represented party.

**This brief contains <u>7,901</u> words,** including <u>0</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/ Mica L. Moore*      **Date:** <u>August 22, 2025</u>