**No. 25-1674**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

PEOPLE OF THE STATE OF CALIFORNIA, *EX REL.* ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA,

*Plaintiff-Appellee*,

v.

EXXON MOBIL CORPORATION,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Northern District of California,
No. 3:24-cv-07594-RS

———————————

## REPLY BRIEF FOR APPELLANT EXXON MOBIL CORPORATION
———————————

DAWN SESTITO
MATTHEW COWAN
O'MELVENY & MYERS, LLP
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071
dsestito@omm.com

DAVID J. LENDER
WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, NY 10153
david.lender@weil.com

PAUL D. CLEMENT
C. HARKER RHODES IV
NICCOLO A. BELTRAMO
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellant Exxon Mobil Corporation*

October 14, 2025

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ......................................................................................... 1

ARGUMENT ................................................................................................. 1

I.     The District Court Had Admiralty Jurisdiction Over This Case ................... 1

     A.    California's Claims Allege Injury on Navigable Waters ..................... 2

     B.    California's Claims Involve a Substantial Relationship to Traditional Maritime Activity ............................................................ 6

II.    The District Court Had Federal-Enclave Jurisdiction Over This Case ................................................................................................... 9

III.   The District Court Had Federal-Officer Removal Jurisdiction Over This Case ................................................................................................. 14

     A.    ExxonMobil's Actions Under Federal Direction Have The Requisite Connection With California's Claims .............................. 14

     B.    ExxonMobil Has Colorable Federal Defenses .................................. 27

CONCLUSION ........................................................................................... 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Ali v. Rogers*,
    780 F.3d 1229 (9th Cir. 2015)................................................................ 1, 2, 6, 9

*Arizona v. Manypenny*,
    451 U.S. 232 (1981)........................................................................................27

*Baker v. Atl. Richfield Co.*,
    962 F.3d 937 (7th Cir. 2020)................................................................ 23, 26, 28

*Bd. of Cnty. Comm'rs v. Suncor Energy (U.S.A.) Inc.*,
    25 F.4th 1238 (10th Cir. 2022)......................................................................13

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988)................................................................................ 28, 29

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
    797 F.3d 720 (9th Cir. 2015)..........................................................................17

*California ex rel. Harrison v. Express Scripts, Inc.*,
    2025 WL 2586648 (9th Cir. Sept. 8, 2025) ....................................................13

*Chevron USA Inc. v. Plaquemines Parish*,
    145 S.Ct. 2792 (2025)...................................................................................15

*City & Cnty. of Honolulu v. Sunoco LP*,
    39 F.4th 1101 (9th Cir. 2022)....................................................... *passim*

*Conner v. Aerovox, Inc.*,
    730 F.2d 835 (1st Cir. 1984) ..........................................................................6

*Cnty. of San Mateo v. Chevron Corp.*,
    32 F.4th 733 (9th Cir. 2022)..........................................................11, 14, 15, 25

*Cnty. of Santa Clara v. Atl. Richfield Co.*,
    137 Cal.App.4th 292 (2006) ...........................................................................5

*DeFiore v. SOC LLC*,
    85 F.4th 546 (9th Cir. 2023)....................................................... *passim*

*Durham v. Lockheed Martin Corp.*,
    445 F.3d 1247 (9th Cir. 2006)............................................................10

*Exxon Mobil Corp. v. United States*,
    108 F.Supp.3d 486 (S.D. Tex. 2015)..................................................20

*Exxon Mobil Corp. v. United States*,
    2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) ...................................20

*Florio v. Olson*,
    129 F.3d 678 (1st Cir. 1997) ................................................................3

*Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. San Diego*,
    865 F.3d 1237 (9th Cir. 2017)................................................. 15, 21, 22

*Gruver v. Lesman Fisheries Inc.*,
    489 F.3d 978 (9th Cir. 2007)................................................................6

*Guidry v. Durkin*,
    834 F.2d 1465 (9th Cir. 1987)...........................................................2, 4

*J. Lauritzen A/S v. Dashwood Shipping, Ltd.*,
    65 F.3d 139 (9th Cir. 1995)...............................................................2, 4

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
    513 U.S. 527 (1995).................................................................. 1, 2, 7, 8

*Kelly v. United States*,
    531 F.2d 1144 (2d Cir. 1976) ...............................................................3

*Kohlasch v. N.Y. State Thruway Auth.*,
    460 F.Supp. 956 (S.D.N.Y. 1978) ........................................................7

*Kuehne & Nagel (AG & Co) v. Geosource, Inc.*,
    874 F.2d 283 (5th Cir. 1989)................................................................3

*Lake v. Ohana Mil. Cmtys., LLC*,
    14 F.4th 993 (9th Cir. 2021)...............................................................25

*Leite v. Crane Co.*,
    749 F.3d 1117 (9th Cir. 2014) ...................................................... 19, 20

*Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co.*,
    436 F.3d 349 (3d Cir. 2006) ................................................................................3

*Maryland v. 3M Co.*,
    130 F.4th 380 (4th Cir. 2025) ...........................................................................26

*Mayor & City Council v. BP P.L.C.*,
    31 F.4th 178 (4th Cir. 2022) .............................................................................13

*Mesa v. California*,
    489 U.S. 121 (1989) ...........................................................................................22

*Nat'l Sea Clammers Ass'n v. City of New York*,
    616 F.2d 1222 (3d Cir. 1980) .............................................................................7

*Oppen v. Aetna Ins. Co.*,
    485 F.2d 252 (9th Cir. 1973) ..............................................................................2

*Ortiz v. Downey*,
    561 F.3d 664 (7th Cir. 2009) ............................................................................11

*People ex rel. Gallo v. Acuna*,
    929 P.2d 596 (Cal. 1997) .....................................................................................5

*Plakas v. Middlesex Cnty.*,
    803 F.2d 714, 1986 WL 17843 (4th Cir. 1986) .................................................6

*Sierra Club, Inc. v. Exxon Mobil Corp.*,
    2025 WL 2578218 (N.D. Cal. Sept. 5, 2025) ......................................... 7, 23, 24

*Solano v. Beilby*,
    761 F.2d 1369 (9th Cir. 1985) ............................................................................2

*Sullivan v. First Affiliated Secs., Inc.*,
    813 F.2d 1368 (9th Cir. 1987) ..........................................................................12

*Taghadomi v. United States*,
    401 F.3d 1080 (9th Cir. 2005) ........................................................................2, 4

*The Plymouth*,
    70 U.S. (3 Wall.) 20 (1866) .................................................................................3

iv

*Tobar v. United States*,
  639 F.3d 1191 (9th Cir. 2011) ...............................................................2, 6

*Totah v. Bies*,
  2011 WL 1324471 (N.D. Cal. Apr. 6, 2011) ......................................11

*United States v. Redwood City*,
  640 F.2d 963 (9th Cir. 1981) ...............................................................7

*United States v. Strong*,
  489 F.3d 1055 (9th Cir. 2007) ..............................................................9

*Watson v. Philip Morris Cos.*,
  551 U.S. 142 (2007) ................................................................. 16, 17

*Whitcombe v. Stevedoring Servs. of Am.*,
  2 F.3d 312 (9th Cir. 1993) ...................................................................2

*Willingham v. Morgan*,
  395 U.S. 402 (1969) ..........................................................................26

*Willis v. Craig*,
  555 F.2d 724 (9th Cir. 1977) .............................................................10

**Statutes**

28 U.S.C. §1367 .....................................................................................3

28 U.S.C. §1442(a)(1) ............................................................. 15, 25, 26, 28

Pub. L. No. 112-51, §2(b)(1)(A), 125 Stat. 545............................... 15, 25

**Other Authorities**

Att'y Gen. of Cal., *Attorney General Bonta Sues ExxonMobil for
  Deceiving the Public on Recyclability of Plastic Products* (Sept. 23,
  2024), https://perma.cc/P3MX-R852................................................8

14C C. Wright et al., Fed. Prac. & Proc. Juris. §3726 (4th ed. 2025) ....................23

**INTRODUCTION**

The district court had jurisdiction over this case for three independent reasons. First, the district court had admiralty jurisdiction, because California seeks relief from ExxonMobil for pollution-related injury that occurred in part on navigable waters. Second, the district court had federal-enclave jurisdiction, because the sweeping state-wide injury that California alleges occurred in part on federal enclaves, and California cannot artificially carve those federal enclaves out from its claims. And third, the district court had federal-officer removal jurisdiction, because the alleged pollution-related injury for which California seeks relief stems in part from conduct that ExxonMobil undertook under the direction of federal officials as part of its wartime production of synthetic rubber for the federal government. This Court should reverse.

**ARGUMENT**

**I.     The District Court Had Admiralty Jurisdiction Over This Case.**

California does not dispute the settled test for admiralty jurisdiction: A federal district court has admiralty jurisdiction over a tort suit where the alleged tort has "(1) taken place on navigable water (or a vessel on navigable water having caused an injury on land), (2) 'a potentially disruptive impact on maritime commerce,' and (3) a 'substantial relationship to traditional maritime activity.'" *Ali v. Rogers*, 780 F.3d 1229, 1235 (9th Cir. 2015) (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995)). And California does not dispute that this

case involves a "potentially disruptive impact on maritime commerce," satisfying the second part of that test. *Id.*; *see* Dkt.24 ("Br.") at 19-20; Dkt. 31 ("Opp.") at 14. The first and third parts of that test are readily met here as well.

### A.    California's Claims Allege Injury on Navigable Waters.

First, California's claims allege a tort that has "taken place on navigable water." *Ali*, 780 F.3d at 1235. As countless cases from this Court and others have explained, in applying that location test, "the situs of a tort for the purpose of determining admiralty jurisdiction is the place where the injury occurs." *Taghadomi v. United States*, 401 F.3d 1080, 1084 (9th Cir. 2005); *see, e.g.*, *Ali*, 780 F.3d at 1236 ("the harm" must "take place on navigable waters"); *Tobar v. United States*, 639 F.3d 1191, 1197 (9th Cir. 2011) ("[T]he situs of a tort for the purpose of determining admiralty jurisdiction is the place where the injury occurs."); *J. Lauritzen A/S v. Dashwood Shipping, Ltd.*, 65 F.3d 139, 142 (9th Cir. 1995) (admiralty jurisdiction requires that "the injury occur on navigable waters"); *Whitcombe v. Stevedoring Servs. of Am.*, 2 F.3d 312, 315 (9th Cir. 1993) (admiralty jurisdiction requires that "the injury occur on water"); *Guidry v. Durkin*, 834 F.2d 1465, 1467 (9th Cir. 1987) (for admiralty jurisdiction, "[c]ourts have traditionally defined the locus of the tort as the place where the injury occurs"); *Solano v. Beilby*, 761 F.2d 1369, 1371 (9th Cir. 1985) (same); *Oppen v. Aetna Ins. Co.*, 485 F.2d 252, 256 (9th Cir. 1973) (similar); *see also, e.g.*, *Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co.*, 436

F.3d 349, 355 (3d Cir. 2006) (for admiralty jurisdiction, "the place where a tort occurs is the place where the injury occurs"), *rev'd on other grounds*, 549 U.S. 422 (2007); *Florio v. Olson*, 129 F.3d 678, 680 (1st Cir. 1997) (location test is satisfied when "the injury occurred on navigable water"); *Kuehne & Nagel (AG & Co) v. Geosource, Inc.*, 874 F.2d 283, 289 (5th Cir. 1989) (location test is met by "injury on navigable waters"); *Kelly v. United States*, 531 F.2d 1144, 1146 (2d Cir. 1976) (location test depends on whether "the 'substance and consummation' of the wrong and injury complained of occurred upon navigable waters" (quoting *The Plymouth*, 70 U.S. (3 Wall.) 20, 35 (1866))).

Here, California's complaint makes clear it is alleging injury that occurred at least in part on navigable waters. *See, e.g.*, 6-ER-973 (alleging pollution in "oceans, seas, rivers and lakes"); 6-ER-974-75 (Pacific Ocean); 6-ER-975 ("rivers, waterways and marine environments"); 6-ER-1065 ("rivers, lakes, bays, and ocean waters"). The location element of the test for admiralty jurisdiction is therefore satisfied. *See* Br.16-19.[1]

California does not dispute that its complaint alleges an injury occurring at least in part on navigable waters. Instead, it argues—contrary to decades of

---

[1] California never contests that as long as its claims are premised at least in part on injuries that occurred on navigable waters, the district court had admiralty jurisdiction over the entire case, including supplemental jurisdiction over any claims for injuries that did not occur on navigable waters. *See* 28 U.S.C. §1367; Br.18 n.4.

precedent—that this Court's decisions in *Taghadomi*, *J. Lauritzen*, and *Guidry* show that the location test only *sometimes* depends on where the injury occurs, and that where the injury is "presumed" or "diffuse," the tort is instead "'deemed to occur' where the critical elements of the tort are completed." Opp.13-14. That is flat wrong. On the contrary, each of those three cases explicitly reaffirms the rule that the location of a tort for admiralty jurisdiction is the place where injury occurs. *See Taghadomi*, 401 F.3d at 1084; *J. Lauritzen*, 65 F.3d at 142; *Guidry*, 834 F.2d at 1467.

In fact, *Taghadomi* explicitly clarified that "*Guidry* and *J. Lauritzen* were not propounding a general rule that any tort claim is within admiralty jurisdiction only when all of its *prima facie* elements occur at sea"; instead, "they were concerned with defining the location at which *injury* is deemed to occur, in the context of defamation and tortious interference with contract." 401 F.3d at 1085-86. *Guidry* accordingly held that a defamation claim fell within admiralty jurisdiction when publication occurred at sea, because "injury *per se* was established at the time of publication." 834 F.2d at 1470; *see Taghadomi*, 401 F.3d at 1085. *J. Lauritzen* likewise held that a tortious interference claim fell outside admiralty jurisdiction where "the claimed damages arose solely on land," and indeed "all the *prima facie* elements of the alleged tortious interference … occurred solely on land." 65 F.3d at 143. Neither of those cases remotely suggests that admiralty jurisdiction is lacking

4

where, as here, it is undisputed that the alleged injury occurred at least in part on navigable waters.

In any event, even if this Court were to accept California's invitation to depart from decades of settled precedent and adopt a special new rule that a tort with "diffuse" injury occurs wherever "the critical elements of the tort are completed," Opp.13-14—and setting aside the difficult question of how to decide whether a particular tort involves injury that is "diffuse" enough for California's special new rule to apply—the result here would be the same. One of the critical elements of California's public nuisance claim is harm. *See, e.g.*, *People ex rel. Gallo v. Acuna*, 929 P.2d 596, 605 (Cal. 1997) (public nuisance requires showing "'significant harm,' defined as a 'real and appreciable invasion of the plaintiff's interests'"); *Cnty. of Santa Clara v. Atl. Richfield Co.*, 137 Cal.App.4th 292, 305 (2006) (public nuisance must be "substantial," meaning "it causes significant harm"). The harm that California alleges here is plastic pollution, including on navigable waters. *See* 6-ER-973-75; 6-ER-1065; Br.17-18; *supra* p.3. The "critical elements of the tort" that California alleges were thus "completed" on navigable waters, when plastic pollution reached those waters and caused the alleged harm. Opp.13. In short, under either the traditional location test or California's invented alternative, the location element of the test for admiralty jurisdiction is met in this case.

5

**B.** **California's Claims Involve a Substantial Relationship to Traditional Maritime Activity.**

The final element of the admiralty-jurisdiction test is met in this case as well, as California's claims involve "a substantial relationship to traditional maritime activity." *Ali*, 780 F.3d at 1235. That element is "interpreted broadly," *Tobar*, 639 F.3d at 1198, considering a claim's "general features" rather than its "minute particulars," *Ali*, 780 F.3d at 1235. A court must first "define what constitutes the activity giving rise to the incident," and then determine whether that activity has the necessary "substantial relationship to traditional maritime activity." *Gruver v. Lesman Fisheries Inc.*, 489 F.3d 978, 983 (9th Cir. 2007).

California's claims here demonstrate the necessary substantial relationship. California alleges that ExxonMobil caused or contributed to increased pollution of California's navigable waterways, by permitting "plastic waste" to "pass into the waters of the State" and "creating harmful plastic pollution throughout California." 6-ER-1086, 6-ER-1090. Those allegations of maritime pollution bear a substantial relationship to traditional maritime activity, which is why courts across the country have routinely held that pollution in navigable waters constitutes a maritime tort that falls within admiralty jurisdiction. *See, e.g.*, *Plakas v. Middlesex Cnty.*, 803 F.2d 714, 1986 WL 17843, at *1-3 (4th Cir. 1986) (table) (considering "private nuisance claims in admiralty" for disposal of waste into navigable waters); *Conner v. Aerovox, Inc.*, 730 F.2d 835, 836 (1st Cir. 1984) ("maritime tort claims for damages resulting

6

from water pollution"); *Nat'l Sea Clammers Ass'n v. City of New York*, 616 F.2d 1222, 1235 (3d Cir. 1980) (claims of sewage discharge into navigable waters), *vacated in part on other grounds sub nom. Middlesex Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981); *Kohlasch v. N.Y. State Thruway Auth.*, 460 F.Supp. 956, 962 (S.D.N.Y. 1978) (drain that discharged pollution into navigable water); *see also United States v. Redwood City*, 640 F.2d 963, 969-70 (9th Cir. 1981) ("[o]il pollution in navigable waters" constitutes a "maritime tort").

California's contrary argument simply repeats the district court's error. Like the district court, California asserts that the "activity giving rise to the incident" here is just allegedly "deceptive conduct." Opp.14; *see* 1-ER-13. But even the district court has since taken a broader view of the parallel suit that remains before it. *See Sierra Club, Inc. v. Exxon Mobil Corp.*, 2025 WL 2578218, at *4 (N.D. Cal. Sept. 5, 2025) (stating that the parallel complaint seeks to hold ExxonMobil liable for "affirmatively producing and distributing plastics"); *id.* at *5 (focusing on "allegations of creating and distributing" plastics). More fundamentally, in describing its claims as alleging only "deceptive conduct," Opp.14, California engages in exactly the kind of "hypergeneralization" that the Supreme Court warned against in *Grubart*, 513 U.S. at 542. Describing California's claims in that generic way frames them at a level that is "too general to differentiate cases," relying on "a sufficiently high level of generality to eliminate any hint of maritime connection"

7

and thereby "frustrat[ing]" the purpose of the substantial-relationship element. *Id.* at 538, 541-42. As *Grubart* explains, the substantial-relationship element instead requires considering California's claims "at an intermediate level of possible generality"—here, as alleging deceptive conduct *leading to pollution of navigable waters*. *Id.* at 538. At that level of generality, there should be "no question that the activity is substantially related to traditional maritime activity." *Id.* at 540; *see* Br.22-23.

California also criticizes ExxonMobil for not identifying "any case where a court exercised admiralty jurisdiction over allegations comparable to those here." Opp.15. But that is hardly surprising, given that (as California itself trumpets) this is a "first-of-its-kind lawsuit." Att'y Gen. of Cal., *Attorney General Bonta Sues ExxonMobil for Deceiving the Public on Recyclability of Plastic Products* (Sept. 23, 2024), https://perma.cc/P3MX-R852. Until this suit (and the parallel suit below), no one has ever suggested that a manufacturer who produces a legal product (plastic resin pellets) that is then sold to other companies and used by those companies to manufacture *other* legal products (plastic consumer products or packaging) that are then legally sold or otherwise distributed to third parties (businesses and consumers) can then be held liable for pollution caused by those third parties' failure to properly dispose of their trash. But the cases that ExxonMobil has cited *do* establish the relevant governing principle, which California does not meaningfully dispute: that

8

claims alleging pollution of navigable waters have a "substantial relationship to traditional maritime activity," even if that pollution originates on land. *Ali*, 780 F.3d at 1235; *see* Br.21-22; *supra* pp.6-7. The substantial-relationship element of the admiralty-jurisdiction test is therefore met as well, and the district court had admiralty jurisdiction over this case.[2]

## II.  The District Court Had Federal-Enclave Jurisdiction Over This Case.

The district court also had federal-enclave jurisdiction here, because California's sweeping claims inescapably involve alleged injury on federal enclaves. The district court's remand order can and should be reversed on that independent basis as well.

As this Court's precedent makes clear, federal-enclave jurisdiction is proper if either (1) "an injury occurred on a federal enclave" or (2) "an injury stemmed from conduct on a federal enclave" and "the connection between injuries and conduct" is not "too attenuated and remote." *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1111 (9th Cir. 2022). The first prong controls here, because California's claims

---

[2] California does not attempt to rely on the saving-to-suitors clause on appeal, mentioning it only in a footnote and saying only that "there is no need for this Court to consider" that provision. Opp.16 n.5. That passing mention not only forfeits the issue, *see, e.g.*, *United States v. Strong*, 489 F.3d 1055, 1060 n.4 (9th Cir. 2007) ("summary mention of an issue in a footnote" is "insufficient to raise the issue on appeal"), but confirms that the saving-to-suitors clause did not deprive the district court of jurisdiction for all the reasons ExxonMobil has already explained, *see* Br.23-36.

allege injury that occurred in part "on a federal enclave." *Id.*; *see Willis v. Craig*, 555 F.2d 724, 726 (9th Cir. 1977) (per curiam) (federal-enclave jurisdiction is proper if "the property on which [the plaintiff] was injured" was a federal enclave). California's expansive complaint seeks to hold ExxonMobil liable for plastic pollution across the entire state, including numerous marine and land-based federal enclaves. Br.38-39; *see* 6-ER-956 (alleging pollution of "California's iconic coastlines [and] waterways"); 6-ER-973 ("riverbanks and shorelines"); 6-ER-975 ("beaches, rivers, waterways and marine environments"). Because California's sweeping claims allege injury occurring at least in part on federal enclaves, the district court had federal-enclave jurisdiction over California's complaint. *Honolulu*, 39 F.4th at 1111.[3]

California asserts that this Court "has rejected assertions of federal-enclave jurisdiction in cases involving similar environmental litigation," citing *Honolulu* and *San Mateo*. Opp.18-19. But as ExxonMobil has already explained, the defendants in those cases—both of which were suits by local governments against oil and gas companies for allegedly contributing to the risks of global climate change—asserted

---

[3] California again does not dispute that if its claims are based at least in part on injury that occurred on federal enclaves, the district court had jurisdiction over this entire case. *See* Br.39 n.9; *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (defendant could seek removal when "some of [the plaintiff's] claims arose on federal enclaves"); *supra* p.3 n.1.

10

that federal-enclave jurisdiction was proper because some of the *conduct* that may have contributed to the plaintiffs' alleged injuries occurred on federal enclaves. Br.40-41; *see Honolulu*, 39 F.4th at 1111-12; *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 750 (9th Cir. 2022). The Court's rejection of the defendants' conduct-based theory in *Honolulu* and *San Mateo* has nothing to do with this case, where the *injury* California alleges occurred in part on federal enclaves. Br.41-42. California makes no attempt to respond to that straightforward distinction.

California does not dispute that its "iconic coastlines [and] waterways" include numerous federal enclaves, nor does it dispute that the underlying pollution injury here is occurring on those federal enclaves as well as throughout the rest of the state. 6-ER-956; *see* Br.42-43.[4] California nevertheless argues that its complaint "seeks relief only for harms to state property and residents," and "expressly disclaims injuries arising on federal land." Opp.18. But as already explained,

---

[4] California asserts in a footnote that ExxonMobil "did not include any specific allegations establishing the enclave status" of any of the federal enclaves listed in its notice of removal, Opp.20 n.6, but California cites nothing suggesting such allegations are required—which is not surprising, because whether a particular area is a federal enclave is a legal issue, not a factual one. *Cf. Ortiz v. Downey*, 561 F.3d 664, 670 (7th Cir. 2009) ("Litigants need not plead legal theories[.]"). California also disputes the federal-enclave status of the Golden Gate National Recreation Area, Opp.20 n.6, but does not dispute the federal-enclave status of the Presidio (located within the Golden Gate National Recreation Area), *see Totah v. Bies*, 2011 WL 1324471, at *2 (N.D. Cal. Apr. 6, 2011), or any of the other federal enclaves ExxonMobil listed in its notice of removal.

11

California cannot avoid the jurisdictional consequences of its allegations by artificially disclaiming part of its alleged inseparable injury. Br.43-44. The alleged injury caused by statewide plastic pollution does not respect federal-enclave boundaries, and any effort to clean up all plastic pollution on all non-federal land and water across California would necessarily require cleaning up the federal enclaves in the state as well. Br.43. California cannot allege an indivisible injury that spans both federal and non-federal land and then attempt to artificially disclaim the former part of that alleged indivisible injury to escape federal jurisdiction. Br.43-44; *see Sullivan v. First Affiliated Secs., Inc.*, 813 F.2d 1368, 1372 (9th Cir. 1987) (courts evaluating removal must sometimes "seek to determine whether the real nature of the claim is federal, regardless of plaintiff's characterization").

To its credit, California does not contest that it alleges an indivisible injury, such that pollution on federal enclaves is "inseparable" from pollution across the rest of the state. Opp.21. California nevertheless claims the "prerogative" to "avoid federal jurisdiction" by partially disclaiming its alleged indivisible injury, and posits that federal courts have "rejected assertions of federal-enclave jurisdiction where a plaintiff seeks relief only for local injuries, even if the challenged conduct may have also caused harm on federal enclaves." Opp.21. The only two cases California cites for its position, however, are climate-change cases where cities and counties sought damages from oil and gas companies for the effects of climate change within their

12

own borders. *See Mayor & City Council v. BP P.L.C.*, 31 F.4th 178, 217-19 (4th Cir. 2022); *Bd. of Cnty. Comm'rs v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1271-72 (10th Cir. 2022). That is nothing like this case, where California has alleged an indivisible statewide injury and is seeking statewide relief while also attempting to artificially carve out federal enclaves for no reason other than to avoid federal court.[5]

California also asserts that recognizing federal jurisdiction here would "drastically shift the allocation of authority between federal and state courts." Opp.22. Nothing of the sort. In reality, it is California's attempt to insist on trying its sweeping claims in its own state courts, even though the underlying injury it asserts occurred in part on federal enclaves, that would contravene federal law and upset the federal-state balance. California cannot both insist on bringing expansive claims that necessarily implicate injury on federal enclaves and also insist on trying

---

[5] This Court's recent decision in *California ex rel. Harrison v. Express Scripts, Inc.*, 2025 WL 2586648 (9th Cir. Sept. 8, 2025), also affords California no support. In that case, California sued defendants involved in the opioid industry, who asserted federal-officer removal jurisdiction based on their dealings with the federal government. This Court found the district court lacked federal-officer removal jurisdiction based on California's "comprehensive disclaimer," which "explicitly narrow[ed] its claims to Defendants' conduct related to the non-federal market." *Id.* at *1. That disclaimer was possible because "the actions Defendants took in relation to their federal and non-federal clients" in that case "were not inextricably intertwined." *Id.* at *5; *see id.* at *10-15. By contrast, California does not dispute that the challenged conduct here allegedly gave rise to a single indivisible injury occurring both on federal and non-federal land, making it impossible for California to disclaim only part of that alleged indivisible injury. *See* Br.43-44.

13

those expansive claims in state court. Federal-enclave jurisdiction accordingly provides an independent basis for reversing the district court's remand order.

### III. The District Court Had Federal-Officer Removal Jurisdiction Over This Case.

Finally, the district court also had federal-officer removal jurisdiction over this case, which likewise provides an independent basis for reversing the decision below. Under this Court's precedent, federal-officer removal is available to a private defendant when "(a) it is a person within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and [the] plaintiff's claims; and (c) it can assert a colorable federal defense." *San Mateo*, 32 F.4th at 755. California does not dispute that ExxonMobil is a "person" within the meaning of the statute, *see* Br.46, and the other two elements of the federal-officer removal test are satisfied here as well.

### A. ExxonMobil's Actions Under Federal Direction Have The Requisite Connection With California's Claims.

To show the causal nexus that this Court requires for the second element of the federal-officer removal test, a defendant must show "(1) that [it] was 'acting under' a federal officer in performing some 'act under color of federal office,' and

14

(2) that such action is causally connected with the plaintiff's claims against it." *San Mateo*, 32 F.4th at 755. ExxonMobil meets both subparts of that test here.[6]

1. First, ExxonMobil indisputably acted under federal direction in producing synthetic rubber for the federal government during World War II ("WWII"). A private person acts under federal direction when it engages in "an effort to assist, or to help carry out, the duties or tasks of the federal superior" under federal "subjection, guidance, or control." *Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. San Diego*, 865 F.3d 1237, 1245 (9th Cir. 2017) (emphasis omitted). And the paradigmatic example of a person acting under federal direction is a federal contractor who "is helping the Government to produce an item that it needs" under "detailed regulation, monitoring, or supervision"—particularly "a product that [the government] used to help conduct a war," and that "at least arguably … in the absence of a contract with a private firm, the Government itself would have had to

---

[6] As previously explained, Congress broadened the federal-officer removal statute in the Removal Clarification Act of 2011 to reach all claims "relating to" acts under federal direction. Pub. L. No. 112-51, §2(b)(1)(A), 125 Stat. 545; *see* 28 U.S.C. §1442(a)(1); Br.47-48, 51. In light of that amendment, under this Court's precedent, ExxonMobil need only show that California's claims are "connected or associated" with ExxonMobil's actions under federal direction, not that they are causally related. *DeFiore v. SOC LLC*, 85 F.4th 546, 557 n.6 (9th Cir. 2023). As California notes, the Supreme Court has recently granted certiorari to clarify whether the federal-officer removal statute continues to require any causal nexus in light of the Removal Clarification Act. *Chevron USA Inc. v. Plaquemines Parish*, 145 S.Ct. 2792 (2025) (mem.) (granting certiorari); *see* Opp.26 n.9.

[produce]." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 153-54 (2007); *see, e.g.,* *Honolulu*, 39 F.4th at 1107 ("[A] private party acts under the government when the party is a contractor given detailed specifications and ongoing supervision to help fight a war.").

That is precisely what ExxonMobil did in producing synthetic rubber as a federal contractor for the federal government's war effort during WWII. Facing a tremendous wartime need for synthetic rubber, the government enlisted ExxonMobil to help meet that need through the "joint efforts of Government and private industry," contracting with ExxonMobil to construct butyl and butadiene plants and purchasing the output from those plants for vehicle tires and other military necessities. 6-ER-1101; *see* 5-ER-939-42; 6-ER-1111; Br.49. And the government exercised detailed supervision and control over ExxonMobil's production of synthetic rubber for the government under its federal contracts, with "day-to-day involvement in operational decisions." 5-ER-939; *see* 5-ER-939-42; Br.49-50.

California has no plausible basis for disputing that ExxonMobil acted under federal direction in producing synthetic rubber under federal contracts to meet the federal government's wartime needs during WWII. California concedes that the federal government contracted with ExxonMobil in "seven supply contracts and five leases" to "design and construct plants for rubber manufacturing," "lease the facilities from the government," and "produce the requested quantities of rubber."

16

Opp.28-29. California nevertheless asserts the necessary government "supervision or control" is absent here, because the government was "relying on the expertise of [ExxonMobil] and not vice versa." Opp.29 (quoting *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 728 (9th Cir. 2015)). That misses the mark entirely. The fact that the government may (and often will) seek to take advantage of private industry expertise in recruiting private contractors to carry out its federal goals does not somehow mean those contractors are not acting under federal direction. On the contrary, federal contractors are the classic example of private persons acting under federal officers. *See Watson*, 551 U.S. at 153-54; *Honolulu*, 39 F.4th at 1107. That acting-under relationship does not turn on the extent to which the supervising federal officer relies on private expertise to achieve the federal government's ends—a rule that would be impossible to apply in practice, and would perversely discourage private parties from assisting the government when it needs that assistance the most.[7]

California again relies on *Honolulu*, Opp.30-31, but again that case is readily distinguishable. In *Honolulu*, this Court held that oil and gas companies "did not act under federal officers when they produced oil and gas during the Korean War and in

---

[7] *Cabalce* itself does not adopt any such misguided rule. Instead, *Cabalce* was a case where the record lacked "any evidence of the requisite federal control or supervision" at all, making it obvious that the removing defendant did not act under federal direction. 797 F.3d at 728.

the 1970s" under Defense Production Act ("DPA") directives, because "DPA directives are basically regulations" and did not subject the companies to any "close direction or supervision." 39 F.4th at 1107-08. The Court likewise rejected the defendants' arguments that they acted under federal direction when they "repaid offshore oil leases in kind and contracted with the government to operate the Strategic Petroleum Reserve," "conduct[ed] offshore oil operations," and "operat[ed] the Elk Hills oil reserve," which was "an oil field run jointly by the Navy and Standard Oil." *Id.* at 1108-10. In each case, the Court found, the defendants were not subject to any "close direction or supervision" by the federal government. *Id.* at 1108; *see id.* (finding a "typical commercial relationship" that was "more like an arm's-length business deal"); *id.* at 1109 (finding only "general regulations that applied to everyone"). That is nothing like the "day-to-day involvement in operational decisions" and detailed control that the federal government exercised here in recruiting ExxonMobil to produce the synthetic rubber that ExxonMobil developed to meet the government's criteria and that the government needed to win WWII. 5-ER-939; *see* Br.49-50.

California also challenges the details of the federal government's supervision and control, criticizing ExxonMobil for relying on "the allegations it included in its notice of removal" rather than citing specific "evidence" to show that relationship. Opp.31. But California brings only a facial challenge to the sufficiency of

18

ExxonMobil's allegations, not a factual challenge—as witnessed by the fact that California makes no attempt to cite any contrary evidence of its own. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121-22 (9th Cir. 2014) (distinguishing a "facial" challenge, where courts must accept the removing defendant's allegations and draw all reasonable inferences in its favor, from a "factual" attack, where the plaintiff "contests the truth of the [removing defendant's] factual allegations, usually by introducing evidence outside the pleadings"). California's demand for further "evidence" to support ExxonMobil's allegations is therefore unwarranted.

In any event, the exhibits attached to the notice of removal provide more than adequate evidence of the kind of detailed control that the federal government exercised over ExxonMobil's operations. *See* 5-ER-939-40 (citing request to federal government for authorization "to install a pump and tank truck loading facilities" that were "estimated to cost $1,700"); 5-ER-940 (citing request to federal government for authorization "to construct a concrete drainage ditch … for $1100"); *id.* (citing request to federal government for authorization to construct a "[g]eneral [s]eparator" at the outlet of a 72-inch sewer, which the government denied). And California has no answer to the factual findings in *Exxon Mobil Corp. v. United States* (which ExxonMobil cited in its notice of removal, *see* 5-ER-940-42), where another district court explicitly found that the federal government "exerted significant control over the operations of refinery owners or operators that contracted

19

to manufacture … synthetic rubber." 2020 WL 5573048, at *14 (S.D. Tex. Sept. 16, 2020). As that court explained, the government engaged in detailed "direction of synthetic-rubber plant operations," including by "requir[ing] Exxon's predecessors at both sites to obtain government approval for, among other things, any plant-related expenditure exceeding $1,000; the disposal of waste, scrap, byproducts, and surplus materials and equipment; additions or alterations to the plants; and increasing employee salaries and benefits." *Exxon Mobil Corp. v. United States*, 108 F.Supp.3d 486, 531 (S.D. Tex. 2015); *see also id.* (citing documentary evidence underscoring "the level of control" that the government exerted); Br.49-50.[8]

The federal government also set exacting technical specifications for the synthetic rubber that it enlisted ExxonMobil to produce, requiring ExxonMobil to manufacture precisely the synthetic rubber that the government wanted and not

---

[8] California quibbles in a footnote with ExxonMobil's allegation that federal officials were permanently stationed at each of its synthetic rubber plants, noting that the *Exxon Mobil* court said only that a "government official was also permanently stationed at one of the Baytown plants," 108 F.Supp.3d at 531; *see* Opp.31-32 n.12. Again, California's attempt to demand further evidence at the notice-of-removal stage, while choosing not to provide any contrary evidence of its own, is misguided. *Leite*, 749 F.3d at 1121-22. In any event, the *Exxon Mobil* court explicitly found that the government official at Baytown "played a substantial role in overseeing day-to-day operations," down to the level of scrutinizing whether workers were starting their preparations to clock out too early. 108 F.Supp.3d at 531. And contrary to what California suggests, *Exxon Mobil* makes clear that the government official at Baytown was overseeing "synthetic-rubber plant operations," not aviation gasoline. *Id.*

whatever synthetic rubber ExxonMobil might have chosen to produce in a free market. *See generally* 4-ER-564-778, 5-ER-781-841 (federal contracts); Br.50. California asserts that the synthetic rubber ExxonMobil produced was not "materially distinct from other compounds that were commercially available at that time" or "tailored in some specific way to satisfy particular government objectives." Opp.32. That is incorrect: ExxonMobil developed synthetic rubber products for the government that were not previously commercially available, and that were tailored to the specific requirements that the government set in its federal contracts. *See, e.g.,* 5-ER-938-39 (explaining that at the beginning of the war effort, butyl rubber was "not yet commercially available"). Those detailed requirements—together with the minute control that the federal government exercised over ExxonMobil's day-to-day operations, *see supra* pp.19-20—plainly demonstrate that ExxonMobil was "a contractor given detailed specifications and ongoing supervision" and so "act[ed] under the government." *Honolulu*, 39 F.4th at 1107.

2. ExxonMobil's actions under federal direction also have the necessary connection with California's claims to authorize federal-officer removal. California acknowledges that "the hurdle erected by [that] requirement is quite low," Opp.24 (quoting *Goncalves*, 865 F.3d at 1244), and that it requires only that the plaintiff's claims and the defendant's actions under federal direction be "connected or associated" without requiring a causal link, Opp.26-27 n.9 (quoting *DeFiore*, 85

F.4th at 557 n.6); *see* 28 U.S.C. §1442(a)(1) (authorizing removal of any claim "relating to" any act under federal direction); Br.51.[9]

This case readily clears that "low bar." *Goncalves*, 865 F.3d at 1245. ExxonMobil helped produce millions of tons of synthetic rubber for the federal government during WWII, much of which wound up in California and has contributed to the pollution problem on which California's claims are based. 5-ER-937-45; *see* Br.51-53. ExxonMobil's actions under federal direction in producing that synthetic rubber are therefore "connected or associated" with California's claims, *DeFiore*, 85 F.4th at 557 n.6, making federal-officer removal appropriate.

California has no persuasive response. Notably, California does not dispute that its claims for plastic pollution may include synthetic-rubber pollution as well, effectively abandoning the district court's primary reason for holding that ExxonMobil failed to show the necessary connection. *See* 1-ER-10 (finding no connection because "[r]ubber is not the product at issue in the complaint—plastic is"); Br.52-55 (explaining that the district court erred in assuming that plastic and

---

[9] California invokes pre-2011 precedent to assert that ExxonMobil must show California's claims "ar[ose] out of the acts" that ExxonMobil performed under federal direction, Opp.23 (quoting *Mesa v. California*, 489 U.S. 121, 131 (1989)). Those cases are no longer good law. As noted above (and as this Court's precedent recognizes), Congress broadened the federal-officer removal statute in 2011 to reach all claims "relating to" acts under federal direction, eliminating any direct causation requirement. *DeFiore*, 85 F.4th at 557 n.6; *see supra* p.15 n.6.

synthetic rubber are necessarily different); *cf.* Opp.23-27 (nowhere disputing that plastic pollution may include synthetic rubber pollution). Nor does California dispute that any attempt to remedy its alleged plastic-pollution injury would have to contend with the effects of synthetic-rubber pollution as well. *See* Br.53.

California nevertheless asserts that ExxonMobil's actions in producing synthetic rubber under federal direction "do[] not relate to [California's] claims," because (California says) its complaint "challenges ExxonMobil's allegedly deceptive conduct," and "does not seek to impose liability *solely* for ExxonMobil's production of plastics polymers and related products, or its production of synthetic rubber during the war." Opp.24 (emphasis added). But as that "solely" betrays (and the district court's recent decision in the parallel suit below confirms), California's claims *are* based in part on ExxonMobil's production of some amount of the underlying plastic and synthetic rubber at issue. Opp.24; *see Sierra Club*, 2025 WL 2578218, at *4-5 (stating that the parallel complaint seeks to hold ExxonMobil liable for "affirmatively producing and distributing plastics," and focusing on "allegations of creating and distributing" plastics). And if any part of the plaintiff's claim is subject to federal-officer removal, the whole case is removable. *See, e.g.*, 14C C. Wright et al., Fed. Prac. & Proc. Juris. §3726 (4th ed. 2025); *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 946 (7th Cir. 2020) (federal-officer removal "need only apply to one claim to remove the case"). In short, ExxonMobil's production of the underlying

23

materials at issue—which occurred in part under federal direction—is a key part of California's case, and a key part of the district court's decision not to dismiss the remaining claims in the parallel suit below. *Sierra Club*, 2025 WL 2578218, at *4-5. That is more than sufficient to demonstrate the necessary connection between ExxonMobil's acts under federal direction and California's claims.

And even if California tried to disclaim any reliance at all on ExxonMobil's production and distribution of synthetic rubber as a basis for its claims—which California has carefully refrained from doing—it still could not avoid the connection between its claims and ExxonMobil's acts under federal direction. The aesthetic and economic injury that California faces from pollution on its coastlines and waterways is not caused by plastic pollution alone, but by all the various improperly discarded materials that have contaminated those areas, including synthetic-rubber products; and as California apparently concedes, any remedy that seeks to address its asserted injury would also have to contend with synthetic-rubber pollution as well. California's claims are thus inextricably intertwined with ExxonMobil's production of some portion of that same synthetic rubber under federal direction during WWII. *See* Br.53.

California attempts to rely on this Court's decisions in *Lake* and *San Mateo*, but those cases provide California no support. *Contra* Opp.25-26. *Lake* held that the removing defendants did not meet the "acting under" requirement because the

24

government did not exercise "significant control" over the removing defendants' actions; it did not address the separate issue of whether, if the removing defendants had acted under federal direction, those acts would have been related to the plaintiffs' claims. *Lake v. Ohana Mil. Cmtys., LLC*, 14 F.4th 993, 1004-05 (9th Cir. 2021).[10] As for *San Mateo*, this Court did not decide whether the defendants in that case had shown a connection between the acts that they asserted were taken under federal direction and the plaintiffs' claims for purposes of the federal-officer removal statute. 32 F.4th at 760. California instead relies on *San Mateo*'s analysis of the jurisdictional provision in a different statute, the Outer Continental Shelf Lands Act (OCSLA). *See id.* at 751. But the fact that this Court found the connection between the defendants' "operations on the outer Continental Shelf" and the climate-change injuries asserted by the *San Mateo* plaintiffs to be "too attenuated to give rise to jurisdiction," *id.* at 754, says nothing about the relationship between ExxonMobil's production of synthetic rubber under federal direction and California's allegations of pollution caused in part by that same material, especially when the Supreme Court has made clear that the federal-officer removal provision is governed by a unique

---

[10] To the extent *Lake* suggests that a removing defendant must show a federal officer specifically "directed the defendant to take" the particular action that the plaintiffs' claim challenges, 14 F.4th at 1005, that suggestion cannot be reconciled with the broader "relating to" standard that Congress adopted in the Removal Clarification Act of 2011. 28 U.S.C. §1442(a)(1); *see* Pub. L. No. 112-51, §2(b)(1)(A), 125 Stat. 545; *DeFiore*, 85 F.4th at 557 n.6; Br.47-48; *supra* p.15 n.6.

25

rule of construction that errs on the side of removal. *See, e.g.*, *Willingham v. Morgan*, 395 U.S. 402, 406-07 (1969) (federal-officer removal "should not be frustrated by a narrow, grudging interpretation" of the statute).

California ultimately declares it simply "irrelevant" that its claims are "inextricably intertwined with pollution caused by improperly discarded synthetic-rubber products," because (California says) a California state court can resolve the resulting "causation question" for itself by apportioning the injury that California alleges across its federal and non-federal sources. Opp.27. But the federal-officer removal statute entitles private parties acting under federal officers to have *federal* courts, not state courts, evaluate their federal defenses—including the extent to which those federal defenses preclude liability for the plaintiff's alleged injury when that injury stems from multiple sources. *See, e.g.*, *Baker*, 962 F.3d at 945; *Maryland v. 3M Co.*, 130 F.4th 380, 390-92 (4th Cir. 2025) (finding connection requirement met where factfinder would have to apportion contamination across federal and non-federal sources). Because California's asserted pollution-related injury is inextricably connected to ExxonMobil's production under federal direction of synthetic rubber that has allegedly contributed at least in part to that injury, California's claims are necessarily "relat[ed] to" ExxonMobil's acts under federal direction. 28 U.S.C. §1442(a)(1).

26

**B.     ExxonMobil Has Colorable Federal Defenses.**

Last but not least, ExxonMobil also has colorable (indeed, meritorious) federal defenses to California's claims. ExxonMobil's defenses are nowhere near "wholly insubstantial and frivolous," and so easily clear the "low bar" that the colorable-defense element requires. *DeFiore*, 85 F.4th at 560.

For one, ExxonMobil has a First Amendment defense to California's claims, which seek to penalize ExxonMobil for its protected speech on the politically volatile topic of recycling. *See, e.g.*, 6-ER-956 (challenging allegedly "deceptive public messaging regarding plastic recycling"). California does not deny that its claims implicate protected speech, or that ExxonMobil's First Amendment defense is colorable; instead, it argues only that ExxonMobil's First Amendment defense does not "aris[e] out of [ExxonMobil's] official duties." Opp.33 (quoting *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981)). But the case that California quotes establishes no such requirement, and ExxonMobil respectfully submits that no such requirement should exist, as the need for a federal forum to hear a federal defense is the same whether or not the federal defense is directly related to the defendant's federal duties. In any event, this Court's precedent indicates that the defense need only "stem from" or "flow from" the defendant's official duties, not that a direct causal relationship is required. *Honolulu*, 39 F.4th at 1110. Here, ExxonMobil's statements about recycling are sufficiently related to its production under federal

27

direction of synthetic rubber—one of the many materials whose recycling ExxonMobil has promoted—to permit federal-officer removal based on ExxonMobil's First Amendment defense. *See* 6-ER-1032-33 n.125 (citing ExxonMobil's efforts to recycle "waste tires").[11]

In any event, ExxonMobil also has a colorable federal-contractor defense based on its compliance with federal specifications in producing synthetic rubber for the federal government under federal direction. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 506, 512 (1988); *Baker*, 962 F.3d at 946; Br.57-59. As to that defense, California conspicuously (and correctly) declines to defend the district court's conclusion that it cannot be colorable because California's claims focus on "plastic" rather than "rubber." 1-ER-11; *see* Opp.34. Instead, California argues that ExxonMobil has not shown "how the substance of any of the government's rubber requirements provides it a defense to the theories of liability identified in the complaint." Opp.34. But removing defendants "need not win [their] case before removal," *DeFiore*, 85 F.4th at 558, and the fact that ExxonMobil followed federal specifications in manufacturing material that is allegedly contributing to California's

---

[11] To the extent *Honolulu* suggests that a First Amendment defense only "aris[es] from official duties" if the government specifically "ordered" the defendant to make the challenged statement, 39 F.4th at 1110, it cannot be reconciled with Congress' broadening of the federal-officer removal statute to reach not only claims "for" acts under federal direction, but also claims "relating to" acts under federal direction. 28 U.S.C. §1442(a)(1); *see supra* p.15 n.6.

claims of pollution-related injury is more than enough to show a colorable federal-contractor defense to at least some part of that injury. Put simply, California cannot hold ExxonMobil liable for manufacturing a product in accordance with the specifications that the government required and whose relevant characteristics the government understood just as well as ExxonMobil itself, even if that product later contributed in some degree to pollution in California. *Boyle*, 487 U.S. at 512. Federal-officer removal therefore provides a third independent basis for federal jurisdiction over this case.

## CONCLUSION

This Court should reverse the district court's remand order.

Respectfully submitted,

s/Paul D. Clement

| | |
|---|---|
| DAWN SESTITO | PAUL D. CLEMENT |
| MATTHEW COWAN | C. HARKER RHODES IV |
| O'MELVENY & MYERS, LLP | NICCOLO A. BELTRAMO |
| 400 S. Hope Street, 18th Floor | CLEMENT & MURPHY, PLLC |
| Los Angeles, CA 90071 | 706 Duke Street |
| dsestito@omm.com | Alexandria, VA 22314 |
| | (202) 742-8900 |
| DAVID J. LENDER | paul.clement@clementmurphy.com |
| WEIL, GOTSHAL & MANGES, LLP | |
| 767 Fifth Avenue | |
| New York, NY 10153 | |
| david.lender@weil.com | |

*Counsel for Appellant Exxon Mobil Corporation*

October 14, 2025

29

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Circuit Rule 32-1(b) because this brief contains 6,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

October 14, 2025

<u>s/Paul D. Clement</u>
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that on October 14, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in this case are registered ACMS users and that service will be accomplished by the ACMS system.

<u>s/Paul D. Clement</u>
Paul D. Clement